1  Michael Yesk (SB#130056)
2  Yesk Law
   70 Doray Drive, Suite 16
3  Pleasant Hill, CA 94523
   925-849-5525
4
   Attorney for Plaintiffs
5

6              UNITED STATES DISTRICT COURT
7        FOR THE NORTHERN DISTRICT OF CALIFORNIA

8  SEAN K. BURKE and DEBORAH  L.      )   Case No.: 3-13-CV-04249-WHA
9  BURKE,                             )
                                      )   Judge: Hon. William Alsup
10          Plaintiffs,               )
                                      )   SUPPLEMENTAL DECLARATION OF
11    v.                              )   WILLIAM J. PAATALO IN SUPPORT OF
                                      )   PLAINTIFFS' NOTICE OF MOTION FOR
12 JPMORGAN CHASE BANK, N.A.; WELLS   )   RELIEF FROM JUDGMENT PURSUANT
   FARGO BANK, N.A. AS TRUSTEE FOR    )   TO FRCP 60(b)
13 JPMORGAN MORTGAGE TRUST 2008-R2    )
   MORTGAGE PASS-THROUGH              )   Date: March 30, 2017
14 CERTIFICATES SERIES 2008-R2        )   Time: 8:00am
                                      )   Courtroom: 8-19th Floor
15          Defendants.               )
                                      )
16                                    )
   _____  )
17

18 I, William J. Paatalo, declare and state as follows:

19     I am an individual residing in Montana.  I have personal knowledge of the following facts

20 and could and would testify competently thereto if requested to do so.

21     The Exhibit 1 are true and correct copies of the documents that were used in the case of

22 JPMorgan Chase, National Association v. Emmanuel Geronimos, et al., Superior Court, Judicial

23 District of Stamford/Norwalk, Docket No. FST-CV-13-6017139-S.  I was accepted as witness in

24 that case.  The facts contained therein are true of my own personal knowledge, or my

25 information and belief, if so stated.

26
   SUPPLEMENTAL DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF PLAINTIFFS' NOTICE OF
                MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO FRCP 60(b)

                                          1

1    I declare under penalty of perjury under the laws of the State of California that the

2    foregoing is true and correct, and that this Declaration was executed in Stillwater County,

3    Montana on the date below.

4    DATED: February 27, 2017

5

6    William J. Paatalo

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    DECLARATION OF WILLIAM J. PAATALO IN SUPPORT OF PLAINTIFFS' NOTICE OF MOTION FOR
RELIEF FROM JUDGMENT PURSUANT TO FRCP 60(b)

26                                                    2

| | |
|---|---|
| **DOCKET NO. FST-CV-13-6017139-S** | : **SUPERIOR COURT** |
| **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION** | : **JUDICIAL DISTRICT OF STAMFORD/NORWALK** |
| **V.** | : **AT STAMFORD** |
| **EMMANUEL C. GERONIMOS, ET AL.** | : **NOVEMBER 28, 2016** |

<u>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE (SEEKING PRECLUSION OF TESTIMONY FROM WILLIAM PAATALO)**</u>

The defendants Emmanuel and Lillian Geronimos (the "Defendants") submit the following

Opposition to the Motion in Limine (DE 201.00) filed by the substitute plaintiff U.S. Bank Trust

N.A., as Trustee for LSF9 Master Participation Trust ("Plaintiff") seeking to preclude testimony

from the former police officer, current licensed private investigator, and certified forensic loan

auditor William Paatalo, whom Defendants have disclosed as both an expert and fact witness in

this case.[1]  In support of its Opposition, Defendants state as follows.

I.      FACTUAL BACKGROUND

This foreclosure case arises from a loan made by Washington Mutual Bank to Emmanuel

Geronimos in September 2004.  The loan is secured by a mortgage on the residential property

owned by Mr. Geronimos and his wife.

Plaintiff claims to be the successor in interest to JPMorgan Chase Bank, N.A. ("Chase"),

which Plaintiff asserts acquired Washington Mutual Bank's rights to the underlying mortgage and

note via a September 2008 Purchase and Assumption Agreement from the Federal Deposit

---

[1]    The sum and substance of Mr Paatalo's proposed non-scientific expert and factual testimony in this case, together with his qualifications, is set forth in the Disclosure and Affidavit attached hereto as **EXHIBIT A**, which may be subject to augmentation based upon a supplemental production received from the Plaintiff just last week.  Plaintiff has been aware of virtually all of this material since May of 2016, when an earlier but substantially similar version of Mr Paatalo's affidavit and report was disclosed to the Plaintiff.

Insurance Corporation, as receiver for the failed Washington Mutual Bank. Defendants dispute

Plaintiff's standing to enforce the loan asserting, among other things, that:

(i)     in response to a Defendants' request for a copy of the note Chase was suing under, Chase tendered a copy of a note bearing no endorsement, special or in blank, and having no allonge indicating assignment;

(ii)    the purported 'original' note did not and does not appear to Defendants to be the actual original;

(iii)   testimony from a designated Chase representative corroborates that the "original" document tendered by Plaintiff could not be the original;

(iv)    Chase could not explain the provenance or timing of a rubber-stamped endorsement in blank appearing on (some, but not all) copies of the alleged Note;

(v)     the Purchase and Assumption Agreement between FDIC and Chase purported to transfer only 'certain assets' of Washington Mutual Bank, and expressly excluded assets held by Washington Mutual Bank's non-bank subsidiaries (*e.g.,* the conduits used by Washington Mutual Bank to effect transfers associated with its extensive securitization activities);

(vi)    while maintaining the lucrative loan servicing rights, Washington Mutual Bank routinely used its non-bank subsidiaries (especially Washington Mutual Mortgage Securities Corp. (WMMSC) and WaMu Asset Acceptance Corp. (WAAC)) as warehouse entities that held Washington Mutual Bank loans intended for later securitization. WMMSC and WAAC purchased loans from Washington Mutual Bank promptly after origination, and held the loans until they were sold into the secondary market. This enabled Washington Mutual Bank to remove the loans from its balance sheet, thereby easing regulatory reserve requirements, while also placing the underlying loans into bankruptcy-remote 'Special Purpose Vehicles' required to effect securitization. In consequence, such loans were removed from the assets owned, and therefore transferable, by Washington Mutual Bank;

(vii)   WMMSC and WAAC are still active, and public filings reveal that they continue to hold billions of dollars of loans acquired from Washington Mutual Bank;

(viii)  original plaintiff Chase conceded that it was unaware of the existence of, and could not produce, any schedule or list of Washington Mutual Bank mortgage loans purportedly acquired by Chase from FDIC (notwithstanding express requirements contained in its agreement with FDIC);

(ix)    there was no document purporting specifically to assign the Mortgage or the Note from FDIC to Chase until November 2014, over six years after FDIC's takeover of

Washington Mutual Bank, when Chase purported, as attorney in fact for FDIC, to assign the loan documents to itself;

(x)    Chase's Loan Transfer History documentation for the subject loan, albeit incomplete (and subject to ongoing discovery), appears to reflect that ownership of the Geronimos loan (as opposed to mere servicing rights) was vested in an entity other than Washington Mutual Bank and therefore could not have transferred to Chase pursuant to Purchase and Assumption Agreement with FDIC; and

(xi)   a servicing agreement produced just last week in a supplemental production by Plaintiff, although heavily redacted, appears to confirm that Chase could not have transferred this loan to the substitute plaintiff.


## II.    THE PROPOSED TESTIMONY

The proposed expert witness William Paatalo has been a licensed private investigator since 2009; he is currently licensed by the State of Oregon. Prior to that, he spent six years as a sworn police officer with the St. Paul, Minnesota Police Department, after which he spent eight years as a mortgage loan officer, responsible for overseeing the origination, processing, and underwriting of mortgage loans. Since 2010, he has worked exclusively investigating foreclosure fraud, chain of title, the securitization of residential and commercial mortgage loans, and accounting issues relevant to mortgage defaults, a relatively new field [2] which burgeoned only with the mortgage lending crisis of 2008. He estimates that he has expended more than 10,000 hours conducting investigatory research from public and private sources specifically related to mortgage securitization and chain of title analysis. Through extensive experience, research and study, he asserts expertise received by courts in, among other things, the following areas:

- Knowledge of the "Pooling & Servicing Agreements" and various Securities & Exchange Commission (SEC) filings associated with mortgage-backed securitized trusts.

- Specific language in the PSA's and Prospectus / Prospectus Supplements involving securitization participants, key dates, "Servicer Advances," sources of third-party

---

[2] In consequence, credentialing in the field is an emerging process. That said, Mr. Paatalo obtained certification as a Certified Forensic Mortgage Loan Auditor in 2011 through a multi-day course given in San Diego, California and involving some 30-40 hours of course work and an exam.

payments, and transfer and conveyancing requirements.

- Knowledge and use, as well as the interpretation of "MB S Data" showing "advance payments" made to the certificate holders / investors, as well as other information specific to accounting, chain of title, and other aspects of securitization.

- Chain of Title analyses based upon publicly recorded documents, documents produced in discovery, and documents attached as exhibits to foreclosure complaints. Documents typically include mortgages, deeds of trust, assignments, notes, and allonges; in addition to documents filed under penalty of perjury with the SEC.

In this case, he proposes to offer testimony and analysis, factual and not scientific in nature, based upon review of documents filed under penalty of perjury with the U.S. Securities & Exchange Commission (SEC), publicly recorded documents in the Federal Court's PACER System, documents obtained from the parties in this action, and documents and materials from past investigations, including official government publications, to demonstrate facts and circumstances to support the proposition that the loan that is the subject of this case was not among the assets acquired by JPMorgan Chase N.A. from FDIC upon the failure of Washington Mutual Bank, as more specifically detailed his <u>Exhibit A</u> hereto.

Mr. Paatalo's testimony is based upon investigation, study and experience, addressing not only factual findings[3], but also matters implicating the intricacies, both with respect to

---

[3]  These factual findings include, but are not limited to: (i) Chase's proffered 'Loan Transfer History" document for this loan departs from other similar documents produced by Chase for similar pre-takeover Washington Mutual originated loans in that it does not begin with loan inception; (ii) Chase's proffered 'Loan Transfer History" document for this loan reveals that the loan was held by an investor designated as "A01"; (iii) documents provided by Chase and available in public case records reveal that investor designations beginning with the letters "A" through "V" denote private investors, not Chase, for which other letter designations are used; (iv) Official Government Reports confirm Washington Mutual Bank's extensive off balance sheet activities and securitization practices, including the extensive use of its non-bank subsidiaries to effect securitization; (v) the presence of explicit exclusions of assets in the Purchase and Assumption Agreement with the FDIC; (vi) the terms of the Purchase and Assumption Agreement with the FDIC in general and their bearing on this case; and (vii) the fact that, based on publicly available SEC documents, Washington Mutual Bank's securitization non-bank subsidiary securitization

4

Washington Mutual Bank and in general, of mortgage loan pooling and securitization and the roles of the various participants therein, and the splitting of loan rights (such as servicing and ownership) and income streams, subjects well beyond the ken of the ordinary person. In that way, his testimony will fairly assist the trier of fact in "understanding the evidence or determining an issue of fact."

III.    MR PAATALO MEETS THE APPLICABLE STANDARDS FOR PROVIDING EXPERT TESTIMONY IN THIS CASE AS TO THE SUBJECT MATTER DISCLOSED

There are but two conditions for the admission of expert testimony in Connecticut. They are: (1) the witness must be qualified in the field to form an opinion, and (2) the expert's opinion must assist the trier of fact in understanding the evidence or determining an issue of fact. Tait, *Handbook of Connecticut Evidence,* §7.5.2 at 449 (5th Ed. Wolters Kluwer 2014).[4]

As to the first condition, "unless required by statute, a particular credential or degree is not a prerequisite for qualification as an expert as long as the expert's education and experience otherwise indicate knowledge on the matter is significantly greater than that of persons lacking such knowledge or experience." Tait, *Handbook of Connecticut Evidence,* §7.6.1 at 459 (5th Ed. Wolters Kluwer 2014), citing, inter alia, *E&M Custom Home LLC v. Negron* 140 Conn App. 92,

---

conduits to this day reflect the existence of billions of dollars of loans acquired by them from Washington Mutual Bank.

[4]    The seminal Wigmore treatise maintains that the ultimate test of the admissibility of opinion evidence is whether it will aid the trier in arriving at his decision; 7 Wigmore, Evidence (3d Ed.) § 1918, citing *Taylor v. Town of Monroe*, 43 Conn 36, 44 (1875) (holding that road builders should have been allowed to testify as to whether or not absence of railing, or elevation of embankment, made roadway unsafe: "The true test of the admissibility of such [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue').

110-111 (2013) (unlicensed home improvement contractor qualified to testify as to cost of repairs). Expertise may come from practical experience or study alone. *State v. Hasan*, 205 Conn. 485, 488 (1987)(testimony based on reading and experience regarding footgear wear patterns permitted to link defendant to shoe implicated at crime scene); *Davis v. Margolis*, 215 Conn. 408, 416-417 (1990)(trial court reversed for precluding expert from testifying on standard of care in legal ethics case in criminal law context where proposed expert's practical experience with attorney client confidences and relations in criminal cases should have been fully presented and considered); *State v. Pjura*, 68 Conn App. 119 128-130 (2002) (arresting office permitted to testify as to defendant's perceived intoxication based on observations and field tests; opinion **resulted from the officer's training, skill and knowledge and was the result of a continuing interpretative process that officer engaged in from the time he first observed the defendant's vehicle traveling in the breakdown lane until he arrested the defendant.)**

Once the threshold question of usefulness to the jury has been satisfied, any other questions regarding the expert's qualifications properly go to the weight, and not to the admissibility, of his testimony. *Sanderson v. Bob's Coaster Corporation,* 133 Conn. 677, 682, 54 A.2d 270 (1947).

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) is cited by Plaintiff for the proposition that where there is no evidence in the record to support the validity of the expert's methods other than the expert's belief in them, that is not enough. But that case involved a supposed link between the plaintiff's exposure to defendant's PCB's and plaintiff's cancer; the proffered *scientific* evidence[5] concededly relied on animal studies without any supporting

---

[5] Ergo, the case was governed by *Dauber v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993), requiring that a trial judge, acting as "gatekeeper," must "'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"

epidemiological studies, involving circumstances highly dissimilar to the plaintiff's situation there. That has no application to a case like this, where the witness has brought to bear his professional investigative skills, his knowledge and experience with mortgage chain of title analysis, and his study of securitization to develop non-scientific facts and inferences germane to the matter in dispute. See *e.g., State v. Oral H.* 125 Conn App. 276, 2985 (2010), *cert denied* 300 Conn 902 (2011) (declining to extend *Porter* to non-scientific expert testimony).

Equally inapposite is *Klein v. Norwalk Hospital*, 299 Conn. 241, 261-263 (2010), which relates to medical testimony of a scientific nature, relying on *State v. Porter* 241 Conn 57 (1997). "Under Porter, **the proponent of** *scientific* **evidence and any testimony that depends on that evidence bears the burden of demonstrating that the methodology underlying the evidence is reliable and that any testimony purportedly reliant upon that evidence is in fact based on that methodology,**" 299 Conn at 261 (*emphasis supplied*), **and "***scientific* **evidence should be subjected to a flexible test, with differing factors that are applied on a case-by-case basis, to determine the reliability of the scientific evidence.**" *Id.* (*emphasis supplied*).

As set forth above on pages 3-5, Mr Paatalo is by reason of his experience, investigation, study and experience well qualified to fairly assist the trier of fact in "understanding the evidence or determining an issue of fact."

And, finally, a witness who does not qualify as an expert may nonetheless testify as a fact witness. See, *e.g., Mack v. LaValley,* 55 Conn App. 150, 155-156 (1999) (engineer not qualified as expert could still testify that, based on photographic evidence, steps were slippery and steps sloped away from door). Thus the factual data gathered by Mr Paatalo in his investigation (see, *e.g.*, fn. 3, *supra.)* may properly be received even if he were not to qualify as an expert.

## IV. MR PAATALO'S TESTIMONY IS NOT CONFINED TO THE ULTIMATE ISSUE IN THIS CASE, AND MAY NOT PROPERLY BE EXCLUDED ON THAT BASIS

The ultimate issue in this case is whether this Plaintiff has standing to enforce the note. Mr Paatalo's testimony addresses facts and inferences bearing on whether or not the Geronimos loan was among the assets of Washington Mutual Bank that transferred to Chase in the FDIC transaction and that Chase came to own and transfer to the Plaintiff. While that testimony informs the ultimate issue, it is not the ultimate issue.

Apart from that, Mr Paatalo's evidence will in any event assist the trier to make intelligent findings about the standing issue. As such, it is admissible. See, State *v. Vilalastra*, 207 Conn. 35, 41 (1988).

## V. PLAINTIFF'S EFFORTS TO BRAND MR PAATALO'S TESTIMONY AS IRRELEVANT TO ANY ISSUE IN THIS CASE ARE PATENTLY UNAVAILING

At pages 8-12 of its motion in limine, the Plaintiff posits that Mr. Paatalo's testimony, *to wit*, as to facts developed through investigation, experience, and study leading him to the conclusion that the 2004 Geronimos loan was not among the assets actually acquired by Chase under the 2008 Purchase and Assumption Agreement with FDIC, is immaterial to this case because (i) the Plaintiff claims to hold the original note, and (ii) Defendants are, in Plaintiff's view, not legally permitted to challenge the assignment by which Plaintiff claims to have obtained rights to the underlying loan. Plaintiff is, however, plainly mistaken on both counts.

Plaintiff's initial claim, that it holds the original note, is easy to dispose of in this context, because it is a claim that Defendants hotly contest. As a result, the validity, or not, of that claim is a matter properly to be determined at trial. Plaintiff- who it must fairly be noted has failed on

two attempted summary judgment motions in this case -- does not get to short-circuit the trial process by its unilateral fiat.

The second assertion, that Defendants are precluded in any way from questioning transfer of this loan, is simply an inaccurate statement of the law as applied to the facts of this case. Indeed, Plaintiff either misapprehended or misrepresented the authorities upon which it purports to rely.

Plaintiff cites *Stehrenberger v. JP Morgan Chase Bank*, 2012 U.S. Dist. LEXIS 157457 (S.D. Ohio 2012) for the broad proposition that no borrower may challenge any aspect of the assignment contemplated by Purchase and Assumption Agreement ("PAA") between FDIC and JPMorgan Chase. However, Plaintiff grossly overstates – indeed, misstates—the meaning of *Stehrenberger* and its application, if any, to this case. In *Stehrenberger*, the *pro se* plaintiff [6] sought to enjoin Chase from enforcing any former Washington Mutual loans, to declare that the PAA was invalid, and to refund all monies that it received from Washington Mutual loans solely because Chase "was only able to acquire assets that were individually identified within the [PAA] itself." 2012 U.S. Dist. LEXIS 157457 at *3-*4; her challenge was based on the premise that Chase did not own any WaMu loans because the PAA failed to explicitly list each loan. *Id.* at *13. The *Stehrenberger* court found that Stehrenberger lacked standing to raise the alleged failure of the

---

[6] The presiding Magistrate Judge pointed out that the *Stehrenberger* plaintiff had previously conceded "…that the FDIC sold all of WaMu loans and loan commitments to Chase pursuant to the PAA. 2012 U.S. Dist. LEXIS 157457 at *5. That concession turns out to have been demonstrably improvident. Under the terms of the PAA itself, the acquired assets expressly <u>did not include</u> assets owned by subsidiaries of the Failed Bank: "Assets owned by Subsidiaries of the Failed Bank are not "Assets" within the meaning of this definition" (*i.e.* referring to the assets being purchased, as defined in Section 3.1 of the PAA.) PAA, at p. 2.

Chase itself confirmed the exclusion in a press release announcing the Washington Mutual acquisition: "Excluded from the transaction are the senior unsecured debt, subordinated debt, and preferred stock of Washington Mutual' s banks. JPMorgan Chase will not be acquiring any assets or liabilities of the banks' parent holding company (WM) or the holding company's non-bank subsidiaries. " See JPMorgan Press Release dated September 25, 2008.

PAA to identify specific assets as the basis for the relief requested *i.e.*, invalidating the PAA. However, and crucially for our purposes here, *Stehrenberger* went on to observe that:

> Plaintiff *would* have standing to defend against Chase's enforcement of her WaMu loan under the theory that WaMu had sold her loan *prior* to Chase entering into the PAA. This is because if Chase lacks title because WaMu was not the holder of her loan when Chase entered the PAA, Plaintiff could be at risk for having to pay the same debt twice. Significantly, Plaintiff has not alleged that WaMu did not own her loan or that it had transferred its interest in her loan prior to Chase's acquisition of WaMu's assets.

2012 U.S. Dist. LEXIS 157457 at *12.[7]

That is precisely the case here: the Defendants in this case assert that Washington Mutual Bank, in keeping with its then-customary practices, [8] promptly transferred the underlying loan (while, as per usual, maintaining the servicing rights) to one of its non-bank subsidiaries or to a private investor *prior* to the FDIC takeover.[9] This practice, as someone with Mr Paatalo's investigative

---

[7] *Stehrenberger* (at *9-*10) relied upon, among other things, the Sixth Circuit's opinion in *Livonia Props. Holdings, LLC v. 12840-12976 Farmington Rd. Holdings, LLC,* 399 Fed. Appx. 97, 102 (6th Cir. 2010), wherein the federal Court of Appeals explained:

> An obligor/debtor "may assert as a defense any matter which renders the assignment absolutely invalid or ineffective, or void." 6A C.J.S. Assignments § 132 (2010). These defenses include nonassignability of the instrument, assignee's lack of title, and a prior revocation of the assignment, …. Obligors have standing to raise these claims because they cannot otherwise protect themselves from having to pay the same debt twice. *Id.*

399 Fed. Appx. at 102.

[8] See, *e.g.,* United States Senate Permanent Subcommittee on Investigations Official Report: Wall Street and the Financial Crisis: Anatomy of a Financial Collapse, at p. 118, note 434: "Washington Mutual Mortgage Securities Corp. (WMMSC) and WaMu Asset Acceptance Corp. (WAAC) served as warehouse entities that held WaMu loans intended for later securitization. … WMMSC and WAAC purchased loans from WaMu, and from other mortgage originators, and held the loans until they were sold into the secondary market."

[9] Chase's Loan Transfer History documents for this loan are (somewhat curiously) temporally incomplete and are the subject of ongoing discovery (a Chase representative was subpoenaed for deposition scheduled for November 22, the only date which Chase said the witness could be

training and practical experience and study in researching securitization practices and Washington Mutual Bank's decline and fall can aid the Court in understanding, accomplished at least two important purposes from Washington Mutual Bank's perspective: first, it removed the underlying loan from Washington Mutual Bank's balance sheet, thereby diminishing the amount of reserves the bank was required to maintain for regulatory purposes, and, second, it placed the underlying loan into a 'special purpose vehicle' ("SPV"), a bankruptcy-remote entity that virtually all securitization structures require so as to minimize the risk of bankruptcy-related clawbacks in the event the owner of the loan is forced into bankruptcy.

Plaintiff also seeks to make something out of the fact that courts have taken judicial notice of the Purchase and Assumption Agreement between FDIC, FDIC as Receiver of Washington Mutual Bank and JPMorgan Chase, N.A. effecting the sale of certain Washington Mutual Bank assets to Chase. As for taking judicial notice of the PAA, Defendants here have no objection; in fact, they welcome it as its meaning and import is highly germane to this case. Thus, for example, in *Roberts v. JPMorgan Chase Bank N. A.*, 2011 U.S. Dist. LEXIS 24753 (N.D. Cal. 3/11/2011), cited by Plaintiff here, the court reviewed the terms of the PAA to determine that, among other things, Chase had not under the PAA assumed liability for origination-related claims. 2011 U.S. Dist. LEXIS 24753 at *8. That does not differ in principle from what the Court is being asked to do here: examine the facts and all reasonable inferences therefrom to determine whether or not the

---

available but at the last minute had to be rescheduled to December 5, 2016 because Chase reported that because of a court conflict the witness could not be available on November 22, and was only available on December 5), but they seem to indicate by reference to certain 'investor codes' that the loan appears to have been held by a private investor assigned the code "A01."

And to add to the shroud of mystery being cast by both Chase and the substitute plaintiff on the provenance of this loan, a (heavily redacted) securitization servicing agreement produced by plaintiff for the first time just last week appears to confirm that Chase could not have transferred this loan to the substitute plaintiff.

loan in question was or was not among the assets acquired by Chase from FDIC, taking into account the PAA, the express exclusions therefrom, the conduct of the parties in complying with the PAA's express terms, and Washington Mutual Bank's observable pre-takeover lending and securitization practices. Mr. Paatalo's investigations and analysis can materially aid the Court in that effort.

## VI. PLAINTIFF'S EFFORT TO UNDERMINE MR. PAATALO's QUALIFICATIONS BY REFERENCE TO CERTAIN PRIOR CASES IN WHICH MR. PAATALO HAS PARTICIPATED ARE UNAVAILING, IF NOT UTTERLY DISINGENUOUS.

In an apparent effort to cast aspersions upon judicial acceptance of Mr Paatalo's qualifications and the substance of Mr Paatalo's opinions (see Plaintiff's motion in limine at pp. 12-18), Plaintiff refers to a number of cases in which Mr Paatalo has previously participated. However, in every instance Plaintiff's criticism is manifestly unfounded, if not outright disingenuous.

For example, *Javaheri v. JPMorgan Chase Bank,* Case No 2:10-CV-8185[10] is mentioned as a case where the court "struck Paatalo['s] Declaration." But what plaintiff neglects to inform this court is the reason that the declaration was struck had nothing to do with its substance, or with Mr Paatalo's qualifications. Rather, the declaration was stricken solely because the plaintiff there disclosed it on the eve of trial and outside the prescribed time for making expert disclosures:

"Defendants insist that the declaration be stricken because Javaheri failed to disclose Paatalo in his expert disclosures according to the procedures set forth in Federal Rules of Civil Procedure 26(a)(2)(A) and 26(a)(2)(D). The Court agrees.

Under the Federal Rules of Civil Procedure, each party is required to disclose the "identity of any [expert] witness it may use at trial." Fed. R. Civ. P. 26(a)(2)(A). A party's expert disclosures must be made "at least 90 days before the date set for trial or for the case to be ready for trial." Fed. R. Civ. P. 26(a)(2)(D).

---

[10] Unsurprisingly, Plaintiff fails to cite or attach the opinion upon which it purports to rely.

Javaheri's expert disclosures, served on June 19, 2012, did not disclose any expert witnesses. (Masutani Decl. Ex. A.) Because trial is set for January 15, 2013, Javaheri's expert witness disclosures were due on October 17, 2012. Javaheri first served Paatalo's declaration on Defendants on November 5, 2012, over two weeks late. Further, there is no stipulation or Court order in this matter affecting the disclosure cutoff date. The Court therefore strikes the Paatalo Declaration because Javaheri failed to disclose his purported expert in a timely manner.

*Javaheri v. JPMorgan Chase Bank, N.A.*, U.S. District Court for the Central District of California, Case No. 2:10-cv-08185 ODW at pp. 6-7 (Wright, J. 12/11/2012).

Similarly, Plaintiff cites to *Sepehry-Fard v. Countrywide Home Loans*, No. 13-cv-05769 BLF, 2016 U.S. Dist. LEXIS 37284 (N.D. Cal. 3/21/2016) wherein the court, in connection with the *pro se* plaintiff's motion for relief from judgment in an action previously dismissed for lack of federal subject matter jurisdiction, declined to take judicial notice of an affidavit by Mr. Paatalo in a different case, finding the affidavit not relevant to the new Truth in Lending Act rescission claim plaintiff was then attempting to raise. Again, this had nothing to do with Mr. Paatalo's status qualifications, *vel non*, as an expert.

Plaintiff also observes that Mr Paatalo's testimony was precluded as irrelevant in *Martin v. Litton Loan Servicing, LP*, 2016 U.S. Dist. LEXIS 125836 (E.D. Cal. 9/15/2015). In *Martin*, however, the plaintiff, who's only remaining claims in the case (unlike this case) arose under RESPA and the Fair Debt Collection Practices Act and did not implicate any issues about which Mr Paatalo would seek to opine, sought relief from an expired scheduling order to designate Mr Paatalo as an expert. In that context, the court unsurprisingly found a lack of good cause to permit the late designation.

*Mickelson v. Chase Home Finance, LLC*, U.S. District Court for the Western District of Washington Case No. C11-1445 MJP, was a factually distinct "table-funding" case in which Mr. Paatalo submitted an affidavit. It is significant for our purposes not because the plaintiff did not

prevail on the merits of that case, but rather that Mr. Paatalo's declaration was received by the court.

In *DelPiano v. MERS*, U.S. District Court for the District of Hawaii, Case No. 10-00140, another case with different facts than this case, the Court entered judgement of foreclosure on April 3, 2012 (Doc. ID. 103. 104). The *pro se* Plaintiff then moved to dismiss for failure to state a claim (Doc. ID 115), which was denied on May 10. 2012 (Doc.ID 133). Plaintiff then submitted yet another motion to dismiss (Doc. ID 136), this time including affidavits from a number of persons, including Mr Paatalo. That motion was promptly dismissed as untimely (Doc. ID 137). It does not fairly stand as a rejection either of Mr Paatalo's qualifications, or opinions as to this matter.

Plaintiff also cites *Rivera v. Deutsche Bank Nat'l. Tr. Co. (In re Rivera)*, 2016 Bankr. LEXIS 3019 (9th Cir. B.A.P., 8/11/2016) as a case in which Mr. Paatalo, they claim, was not allowed to testify as an expert. That is not what the case says, however: "Finally, Deutsche Bank sought to exclude any testimony from Paatalo, the Riveras' purported expert witness. The bankruptcy court denied these motions." 2016 Bankr. LEXIS 3019 at *16. Thus to the contrary, Mr. Paatalo was in fact permitted to testify generally as to the key terms and workings of a pooling and servicing agreement arising in a securitization context, as well as to factual information regarding the underlying loan and advances made by the servicer to a trust entity and the lack of reporting of losses by the trust entity. Id. at *18-*19. What the Court ultimately determined in *Rivera* was, in effect, that the servicer's advances could not be used to reduce the borrower's claim for bankruptcy claim allowance purposes; that is not this case.

And Plaintiff's reference to *In re Fanning*, U.S. Bankruptcy Court for the District of Montana, Case No. 10-61660 is outright perplexing. There as the lender in that case sought, just

as Plaintiff does here, to exclude Mr Paatalo's testimony as to chain of title in the securitization context (albeit involving a different lender and different underlying facts) on the grounds that it was not relevant since the lender purported to hold the original note instrument. (See, Docket ID Nos. 77, 78). The Fanning lender's motion to exclude was denied. (See, Docket ID No. 84).

In sum, the cases cited by Plaintiff do not in any way undermine Mr Paatalo's qualifications to provide testimony in this case.

## CONCLUSION

For all the foregoing reasons, Defendants pray that their opposition to the Plaintiff's motion in limine be sustained.

THE DEFENDANTS

By _____ */s/ James C. Graham* _____

James C. Graham, Esq.
Their Attorney
195 Church St, 13th FL
New Haven, CT 06510
203-821-2000
Juris No. 407996

## <u>CERTIFICATION</u>

This is to certify that a copy of the foregoing has been emailed to all of the following counsel and *pro se* parties of record this 28th day of November, 2016:

Hunt Leibert Jacobson, PC
50 Weston Street
Hartford CT 06120
**gmilne@huntleibert.com**

                                 */s/ James C. Graham*

# EXHIBIT A

Exh. A

DOCKET NO.: FST-CV13-6017139-S      :     SUPERIOR COURT

                                   :

JPMORGAN CHASE BANK, N.A.       :     J.D. OF STAMFORD/NORWALK

                                     :

V.                                         :     AT STAMFORD

                                     :

EMMANUEL GERONIMOS, *et al.*      :     NOVEMBER 7, 2016

## <u>AMENDED DISCLOSURE OF EXPERT</u>

The defendants Emmanuel Geronimos and Lillian Geronimos (together, the "Defendants"), further to Practice Book Section 13-4, hereby disclose that they may call the following fact/expert witness:

> William Paatalo
> BP Investigative Agency LLC
> PO Box 838
> Absarokee, MT 59001

Mr. Paatalo is expected to testify as to the failure of Chase Bank in this case to produce pertinent records bearing on the issue of Chase's acquisition and ownership of the loan at issue in this case. He is also expected to testify as to the securitization practices of Washington Mutual Bank. He is also expected to testify as to acquisition and ownership of the loan at issue in this case, and specifically that it did not in fact pass to Chase Bank pursuant to a purchase and assumption agreement with FDIC dated September 2008.

Mr. Paatalo's testimony will be based on his investigation, knowledge, training, experience, examination of public records, and analysis as reflected in Mr. Paatalo's affidavit

and report filed in this case on May 19, 2016 (DE 174.00), a copy of which includes his

*curriculum vitae* and has been served upon adverse counsel, as updated and augmented by Mr.

Paatalo's additional affidavit and report dated October 25, 2016, a copy of which was provided

to adverse counsel on October 28,2016. Copies of Mr. Paatalo's affidavits/reports are attached to

this amended disclosure.


THE DEFENDANTS

By: ___/s/James C. Graham___
James C. Graham
NEUBERT, PEPE & MONTEITH, P.C.
195 Church Street, 13th Floor
New Haven, CT 06510
(203) 821-2000
Juris Number 407996


## **CERTIFICATION**

I hereby certify that a copy of the above was served via US first class mail on November 6, 2016 to all counsel and pro se parties of record as follows.

Geoffrey Milne, Esq.
Hunt, Leibert, Jacobson, P.C.
50 Weston Street
Hartford, CT 06120
*Representing plaintiff*


___/s/ James C. Graham___
James C. Graham
NEUBERT, PEPE & MONTEITH, P.C.

| DOCKET NO.: FST-CV13-6017139-S | : | SUPERIOR COURT |
|---|---|---|
| U.S. BANK TRUST, NA, Trustee, successor to | : | |
| JPMORGAN CHASE BANK, N.A. | : | J.D. OF STAMFORD/NORWALK |
| | : | |
| V. | : | AT STAMFORD |
| | : | |
| EMMANUEL GERONIMOS, et al. | : | MAY 19, 2016 |

## AFFIDAVIT

I, William Paatalo, being first duly sworn, hereby declare as follows:

1. I am an Oregon licensed private investigator under ORS 703.430, and have met the necessary requirements under ORS 703.415. My Oregon PSID number is 49411.

2. I am over the age of eighteen years, am of sound mind, having never been convicted of a felony or a crime or moral turpitude. I am competent in all respects to make this declaration, and if called to testify, I could and would competently testify thereto.

3. I have 17 years combined experience in law enforcement and the mortgage industry. My Resume ("CV") is attached as "**Exhibit 1**."

4. I have worked exclusively over the last 6 - years investigating foreclosure fraud, chain of title, and issues related to the securitization of residential and commercial mortgage loans, and have spent nearly 10,000 hours

1. Affidavit of William J. Paatalo

Defendant's Expert Materials
1110

conducting investigatory research specifically related to mortgage securitization and chain of title analysis.

5.    I have performed such analyses for residential real estate located in many states, including but not limited to, Washington, Oregon, California, Arizona, Nevada, Florida, Ohio, Texas, Montana, New Jersey, and several other states.

6.    As of this date, I have conducted close to 900 investigations in this area.

7.    As a result of my education and experience I am familiar with and have sufficient training and expertise to qualify as an expert, and I have testified as an expert in state and federal judicial proceedings in various jurisdictions throughout the United States.

8.    Most recently, I was admitted to testify at trial as an expert witness on February 25, 2015 in the following California Federal Bankruptcy case:

*Rivera v. Deutsche Bank National Trust Company, U.S. BK Court, Northern CA – Oakland – Case No. 14-54193-MEH-13.*

9.    Some specific areas of my expertise that have been deemed qualified by the courts are as follows:

**Defendant's Expert Materials 1111**

- Knowledge of the "Pooling & Servicing Agreements" and various Securities & Exchange Commission (SEC) filings associated with mortgage-backed securitized trusts.
- Specific language in the PSA's and Prospectus / Prospectus Supplements involving securitization participants, key dates, "Servicer Advances," sources of third-party payments, and transfer and conveyancing requirements to name a few.
- Knowledge and use, as well as the interpretation of "MBS Data" showing "advance payments" made to the certificateholders / investors, as well as other information specific to accounting, chain of title, and other aspects of securitization.
- Chain of Title analyses based upon publicly recorded documents, documents produced in discovery, and documents attached as exhibits to foreclosure complaints. Documents typically include mortgages, deeds of trust, assignments, notes, and allonges; in addition to documents filed under penalty of perjury with the SEC.

10. My analysis in this case is factual, and not considered scientific in nature.

11. In developing the opinions in this affidavit, I relied upon documents filed under penalty of perjury with the U.S. Securities & Exchange Commission (SEC), publicly recorded documents in the Federal Court's PACER System, documents submitted by the Plaintiff(s) in this action, and documents from past investigations.

3. Affidavit of William J. Paatalo

12.     I was retained by attorney James Graham to review the chain of title and securitization of the Geronimos Mortgage and Note. I was asked to point out any discrepancies or issues of fact regarding the chain of title and the securitization of the loan.

13.     The following documents were inspected and/ or marked as exhibits:

- Plaintiff's Motion for Summary Judgment & Exhibits filed July 10, 2014.
- Plaintiff's Affidavit of Alyssa Salyers in Support for Summary Judgment & Exhibits executed July 14, 2015.

**Exhibit 2** – JPMorgan Chase "Press Release" September 25, 2008.
**Exhibit 3** –  Deposition Transcript – Crystal Davis
**Exhibit 4** – Crystal Davis Deposition Exhibit – Private Investor Codes
**Exhibit 5** - "3270 Explorer: Loan Transfer History" screenshot – Geronimos
**Exhibit 6** – "3270 Explorer: Loan Transfer History" screenshot – Kelley

14. Having reviewed the above documents, my professional opinions are as follows:

a.  Washington Mutual Bank (WMB) sold the Geronimos Mortgage and Note to one of its non-bank subsidiaries who then securitized the loan and sold the securities to private investors. These sales transactions prior to the FDIC's

4. Affidavit of William J. Paatalo

takeover of WaMu are being concealed from the Court, along with the identity of the investor(s) for the subject loan. And,

b. As such, the original Plaintiff (JPMorgan Chase Bank, N.A.) (hereinafter "JPMC") acquired no more than the servicing rights to the Geronimos loan from the FDIC, and had no ownership interest to assign to the current Plaintiff.

## EVIDENCE IN SUPPORT OF OPINIONS

## WaMu's "Off-Balance Sheet Activities"

15. On April 13, 2011, the U.S. Senate's "Permanent Subcommittee On Investigations" published an investigative report that includes a detailed analysis of WaMu's securitization activities leading up to the financial collapse in 2008. The report can found be found at the following government website address:

https://www.hsgac.senate.gov/subcommittees/investigations/media/senate-investigations-subcommittee-releases-levin-coburn-report-on-the-financial-crisis

16. The findings of fact in this report, combined with evidence in this Case and affidavit, lead me to the opinions I've outlined above.

17. Key excerpts from the report are as follows:

Pg.116 –

## E. Polluting the Financial System

Washington Mutual, as the nation's largest thrift, was a leading issuer of home loans. When many of those loans began to go bad, they caused significant damage to the financial system.

According to a 2007 WaMu presentation, <u>by 2006, Washington Mutual was the second largest non agency issuer of mortgage backed securities in the United States, behind Countrywide.</u>

<u>By securitizing billions of dollars in poor quality loans, WaMu and Long Beach were able to decrease their risk exposure while passing along risk to others in the financial system.</u> They polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss. At times, WaMu securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors to whom it sold the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered and known to the bank.

Pg. 117 -

According to a 2007 WaMu presentation at a securities investor meeting in New York, in 2004, WaMu issued $37.2 billion in RMBS securitizations and was the sixth largest RMBS issuer in the United States. In 2005, it doubled its production, issuing $73.8 billion in securitizations, and became the third largest issuer. <u>In 2006, it issued $72.8 billion and was the second largest issuer, behind Countrywide.</u>

Pg. 119 -

"WaMu Capital Corp. acted as an underwriter of securitization transactions generally involving Washington Mutual Mortgage Securities Corp. or WaMu Asset Acceptance Corp. Generally, one of the two entities would sell loans into a securitization trust in exchange for securities backed by the loans in question, and WaMu Capital Corp. would then underwrite the securities consistent with industry standards. As an underwriter, WaMu Capital Corp. sold mortgage-backed securities to a wide variety of institutional investors. WCC sold WaMu and Long

6. Affidavit of William J. Paatalo

Defendant's Expert Materials
1115

Beach loans and RMBS securities to insurance companies, pension funds, hedge funds, other banks, and investment banks. It also sold WaMu loans to Fannie Mae and Freddie Mac. <u>WCC personnel marketed WaMu and Long Beach loans both in the United States and abroad.</u>

Before WCC was able to act as a sole underwriter, WaMu and Long Beach worked with a variety of investment banks to arrange, underwrite, and sell its RMBS securitizations, including Bank of America, Credit Suisse, Deutsche Bank, Goldman Sachs, Lehman Brothers, Merrill Lynch, Royal Bank of Scotland, and UBS. To securitize its loans, WaMu typically assembled and sold a pool of loans to a qualifying special-purpose entity (QSPE) that it established for that purpose, typically a trust.

The QSPE then issued RMBS securities secured by future cash flows from the loan pool. Next, the QSPE – working with WCC and usually an investment bank – sold the RMBS securities to investors, and used the sale proceeds to repay WaMu for the cost of the loan pool. Washington Mutual Inc. generally retained the right to service the loans.

18.  This analysis is also supported by Washington Mutual, Inc.'s 10-Q filing with the U.S. Securities and Exchange Commission (SEC) on June 30, 2008 which states on (p.60),

## Off-Balance Sheet Activities

The Company transforms loans into securities through a process known as securitization. When the Company securitizes loans, the loans are usually sold to a qualifying special-purpose entity ("QSPE"), typically a trust. The QSPE, in turn, issues securities, commonly referred to as asset-backed securities, which are secured by future cash flows on the sold loans. The QSPE sells the securities to investors, which entitle the investors to receive specified cash flows during the term of the security. The QSPE uses the proceeds from the sale of these securities to pay the Company for the loans sold to the QSPE. These QSPEs are not consolidated within the financial statements since they satisfy the criteria

7. Affidavit of William J. Paatalo

established by Statement No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities.* In general, these criteria require the QSPE to be legally isolated from the transferor (the Company), be limited to permitted activities, and have defined limits on the types of assets it can hold and the permitted sales, exchanges or distributions of its assets.

19.    Having investigated the WaMu/FDIC/Chase fact pattern for more than six-years, and having investigated hundreds of foreclosure cases where JPMC claims sole ownership of specific WMB loans by virtue of the "Purchase & Assumption Agreement" (PAA) with the FDIC, one fact is now well established – no schedule or inventory of assets listing any specific WMB mortgage loan acquired by JPMC exists, or has ever been produced or disclosed. The reason for this fact is the vast-majority of residential mortgage loans were securitized through WaMu's "Off-Balance Sheet Activities."

### JPMC did not acquire the Assets of WaMu's Non-Bank subsidiaries.

20.    JPMC stated in its summary judgment motion, *"[p]ursuant to the terms and conditions of a Purchase and Assumption Agreement between the FDIC as receiver of Washington Mutual Bank and Chase dated September 25, 3008, Chase acquired certain assets, including all loans and loan commitments of Washington Mutual Ban[k"].* (Chase MSJ, p.2,¶3). For years now, JPMC has been getting away with a massive presumption that it acquired everything Washington Mutual by virtue of the PAA, yet the mortgage loans they claim to have acquired were never "on the books" of "Washington Mutual Bank."

8. Affidavit of William J. Paatalo

21. Attached as **Exhibit 2** is JPMorgan Chase's own press release from September 25, 2008 which states the following on **p.1, ¶5,** "*JPMorgan Chase will not be acquiring any assets or liabilities of the bank's parent holding company (WM) or the holding company's non-bank subsidiaries.*"

22. As outlined above, the two non-bank subsidiaries of Washington Mutual responsible for the securitization of mortgage-backed securities were "Washington Mutual Asset Acceptance Corporation" (WMAAC) and "Washington Mutual Mortgage Securities Corporation" (WMMSC).

23. Both WMAAC and WMMSC are still active and continue to file regular "ABS 15G – Asset Backed Security Reports" with the SEC. Here are the SEC links to both of these entities most recent filings:

**WMAAC "ABS 15G" filed May 12, 2016:**

http://www.secinfo.com/dsbR9.w1Du.htm

**WMMSC "ABS 15G" filed May 12, 2016:**

http://www.secinfo.com/dsbR9.w1dt.htm

24. Both WMMSC and WMAAC have regularly disclosed the following in these SEC filings:

WaMu Asset Acceptance Corp., as Securitizer, is filing this Form ABS-15G in respect of all mortgage-backed securities representing interests in pools of residential mortgage loans for which it acted as depositor and which are outstanding during the reporting period. On September 25, 2008, JPMorgan Chase Bank, National Association ("*JPMCB*") acquired the banking operations of

Washington Mutual Bank from the Federal Deposit Insurance Corporation ("*FDIC*"). It is JPMCB's position that certain of the repurchase obligations of Washington Mutual Bank remain with the FDIC receivership. Assets are reported herein in accordance with Rule 15Ga-1 regardless of the validity of the demand or defenses thereto, and nothing in this report shall constitute, or be deemed, a waiver of any rights, defenses, powers or privileges of any party relating to these assets.

25. There have been voluminous "ABS 15G" reports filed by these entities post receivership, and each one contains an attached "Exhibit 99.1" listing "Demand in Dispute" assets, or what is commonly referred to as "put-back demands" against these entities by investors. The disputed amounts are enormous, and appear to total somewhere in the area of $145,000,000,000.00.

26. I searched JPMorgan Chase's 10-K filings with the SEC to find out if there was any mention of these potential liabilities to its investors. I could not find any disclosures of these potential "repurchase" liabilities. Thus it appears that the investors who own these loans want their money back but are being ignored. JPMC, as servicer for these investors, is continuing to harvest the assets belonging to these investors through foreclosures when by its own admission, JPMC did not receive these non-bank subsidiaries' assets. It appears in this case that JPMC sold and assigned the Geronimos loan when it did not own the loan.

**Private investors own the subject loan, and their identity is being concealed.**

27. Attached as **Exhibit 5** is the servicing system screenshot titled, "<u>3270</u>

Explorer: Loan Transfer History (LNTH)" which was provided to me by Mr. Graham through his discovery efforts. This document shows an investor code "AO1" beginning on "09/13/10." This document shows a shortened loan history (post-WaMu) between 12/01/2008 through 08/20/2014. The screenshot is missing the time period of 09/03/2004 through 09/25/2008. I believe this is intentional.

28. From experience, I have seen complete LNTH screenshots for these WaMu loans provided by JPMC, but usually they are produced with great reluctance and through motions to compel. When produced, these LNTH screens tell an entirely different story about the loans; specifically, all the sales and transfers conducted prior to the FDIC's receivership.

29. Attached as **Exhibit 6** is an identical – "3270 Explorer: Loan Loan Transfer History (LNTH)" screenshot provided by JPMC in a very similar case which I have been involved captioned ██████ v. *JPMorgan Chase Bank, N.A.*, U.S. BK CT, ND CA, Adv. Case No. 10-05245.

30. Like Geronimos, the ██████ loan was also originated by Washington Mutual Bank, F.A. **Exhibit 6** shows the entire LNTH from origination through the FDIC receivership. The beginning "Investor Code" at the inception of the loan is "030" on 08/07/07. The loan is then sold and transferred to a "New/Inv" (new investor) on 09/01/07 with the "Investor Code – AO1." This is the same code appearing on the Geronimos screenshot.

11. Affidavit of William J. Paatalo

31.  A deposition of JPMC employee "Crystal Davis" occurred in the Kelley case on August 13, 2014. A copy of the Davis Deposition Transcript was filed in the *PACER* System and a copy is attached to this affidavit as **Exhibit 3**. **Exhibit 4** is a glossary of codes exhibit provided by JPMC in that deposition.

32.  Crystal Davis explains the investor codes on p.42 as follows:

(In reference to **Exhibit 4**)

Q. Now if you look to the right of that, it states that the claim – the investor IDs begin with an A through V; is that correct?

A. In the current MSP platform, yes, indicates private investor loans.

Q. And what would X,Y,Z indicate?

A. Those would indicate bank-owned assets.

33.  It is very likely that the complete LNTH screenshot, if/when produced, will show a similar sales transaction from WMB to "New/Inv – AO1." The identity of investor "AO1" has not been disclosed and is being concealed from the Court and the Defendant.

34.  As further proof that WaMu sold and securitized the loan to a private investor(s), the Note bears an endorsement "in blank" by an officer of WMB. From experience, it was common practice to endorse notes that were being prepared for immediate sale into the secondary market.

I declare that the foregoing statements are true and correct to the best of my present knowledge, information and belief.

Executed at _ABSARoKee_, Montana this 19th day of May, 2016.

_(signature)_
William Paatalo

STATE OF MONTANA )
                  ) ss.         May 19, 2016
COUNTY OF _Stillwater_ )

On this 19th day of May 2016, before me, the undersigned officer, personally appeared William Paatalo, whose identity was satisfactorily proved to me, and who executed the foregoing instrument as his free act and deed and for the purposes therein contained, and acknowledged that the foregoing statements are true and correct.

In witness whereof I hereunto set my hand.

KELLY RICE
NOTARY PUBLIC for the
STATE OF MONTANA
Residing at Fishtail, Montana
My Commission Expires
JANUARY 30, 2020

_(signature)_
Notary Public
My Commission Expires: 1/30/2020

13. Affidavit of William J. Paatalo

Defendant's Expert Materials
1122

# William J. Paatalo

Private Investigator – Oregon PSID# 49411
BP Investigative Agency, LLC
P.O. Box 838
Absarokee, MT 59001
(406) 328-4075
Bill.bpia@gmail.com

## Curriculum Vitae

William Paatalo has been a licensed private investigator since September of 2009. He has 17 years combined experience in both law enforcement and the mortgage industry which he has utilized to become a leading expert in the areas of chain of title analyses and securitization. He was a police officer with the St. Paul, Minnesota Police Department from 1990-1996 where he was assigned "Field Training Officer" duties in only his second year on the job, and also received multiple commendations.

Mr. Paatalo worked in the mortgage industry as a "loan officer" with Conseco Home Finance from 1999 – 2000, followed by two years of being a branch manager for multiple mortgage brokering firms. From 2002 – 2008, he became the President of Midwestern Mortgage, LLC f/k/a Wissota Mortgage, LLC in Wisconsin and Minnesota. As President of Wissota Mortgage, LLC, Mr. Paatalo was responsible for overseeing the origination, processing, and underwriting of mortgage loans, as well as managing a staff of 17 employees.

Mr. Paatalo has worked exclusively since 2010 investigating foreclosure fraud, chain of title, the securitization of residential and commercial mortgage loans, and accounting issues relevant to alleged "defaults." Mr. Paatalo is also a Certified Forensic Mortgage Loan Auditor through ("CFLA"), and has spent more than 10,000 hours conducting investigatory research specifically related to mortgage securitization and chain of title analysis. He has performed such analyses for residential real estate located in many states, including but not limited to, Washington, Oregon, California, Nevada, Florida, Montana, Texas, Arizona, Ohio, New Jersey, and several other states. To date, Mr. Paatalo has conducted nearly 900 investigations and has provided written

1. CV – William J. Paatalo

Defendant's Expert Materials
1123

expert testimony in the form of affidavits and declarations in approximately 90 -100 cases nationwide. Mr. Paatalo has been qualified in both state and federal courts as an expert, and personally appeared and testified at trial in the four cases outlined below. This experience has lead to Mr. Paatalo becoming one of the leading experts in this relatively new field.

Mr. Paatalo's specific areas of expertise allowed by the courts in the cases referenced below are as follows:

- Knowledge of the "Pooling & Servicing Agreements" and various Securities & Exchange Commission (SEC) filings associated with mortgage-backed securitized trusts.
- Specific language in the PSA's and Prospectus / Prospectus Supplements involving securitization participants, key dates, "Servicer Advances," sources of third-party payments, and transfer and conveyancing requirements to name a few.
- Knowledge and use of ABSNet, and the interpretation of its internal accounting data showing "advance payments" made to the certificateholders / investors, as well as other information specific to accounting, chain of title, and other aspects of securitization.
- Chain of Title analyses based upon publicly recorded documents, documents produced in discovery, and documents attached as exhibits to foreclosure complaints. Documents typically include mortgages, deeds of trust, assignments, notes, and allonges; in addition to documents filed under penalty of perjury with the SEC.

## Relevant Experience:

- Police Officer / "Field Training Officer" – St. Paul, MN 1990-1996.
- Oregon licensed private investigator under ORS 703.430, and has met the necessary requirements under ORS 703.415. To obtain his PI license, Mr. Paatalo met the requirement of 5,000 hours of investigation experience in the law enforcement field, and passed a thorough background investigation and criminal history check.
- Member of the "Oregon Association of Licensed Investigators" (OALI.)
- President of Midwestern Mortgage, LLC f/k/a Wissota Mortgage, LLC in Wisconsin and Minnesota from 2002 – 2008.

2. CV – William J. Paatalo

**Education:**

A.A.S. – Law Enforcement – Normandale C.C., Bloomington, MN – 1986
Marketing Management Certificate – Concordia University, St. Paul, MN 2001
Forensic Loan Auditor Certification Training Course (CFLA) – 32 hrs. – San Diego, CA 2011

## Expert Testimony (Trial):

### FEDERAL CASES

*Robert T. Fanning, Debtor – U.S.Bankruptcy Court, District of Montana – BK Case No. 10-61660*

*Rivera v. Deutsche Bank National Trust Company, U.S. BK Court, Northern CA – Oakland – Case No. 14-54193-MEH-13.*

### STATE CASES

#### OHIO

*Washington Mutual Bank fka Washington Mutual Bank, F.A. v. Jon A. Smetana, et al.,In The Court of Common Pleas, Cuyahoga County, Ohio Case No.CV-08-652392.*

#### OREGON

*U.S. Bank, N.A.as Trustee v. Natache D. Rinegard-Guirma, et al. - Circuit Court For The State Of Oregon, County Of Multnomah - Case No. 1112-16030*

3. CV – William J. Paatalo

*JPMorgan Chase & Co.*

September 25, 2008

## JPMorgan Chase Acquires the Deposits, Assets and Certain Liabilities of Washington Mutual's Banking Operations

**Highly attractive, strategic transaction significantly strengthens consumer franchise.**

**Deal expected to be accretive to earnings immediately. Adds large, stable deposit base and recurring earnings stream to company.**

**Company intends to raise additional capital in conjunction with this transaction to maintain strong capital position.**

- *Acquisition creates largest U.S. depository institution, with over $900 billion of customer deposits*

- *Expansion into attractive California, Florida and Washington State markets creates nation's second-largest branch network; also strengthens existing presence in New York, Texas, Illinois, Arizona, New Jersey, Colorado, Connecticut and Utah*

- *Larger branch footprint will allow company to further extend and grow commercial banking, business banking, credit card, consumer lending and wealth management efforts*

New York, Sept. 25, 2008 - JPMorgan Chase & Co. (NYSE: JPM) tonight announced it has acquired all deposits, assets and certain liabilities of Washington Mutual's banking operations from the Federal Deposit Insurance Corporation (FDIC), effective immediately. Excluded from the transaction are the senior unsecured debt, subordinated debt, and preferred stock of Washington Mutual's banks. JPMorgan Chase will not be acquiring any assets or liabilities of the banks' parent holding company (WM) or the holding company's non-bank subsidiaries. As part of this transaction, JPMorgan Chase will make a payment of approximately $1.9 billion to the FDIC.

The acquisition expands Chase's consumer branch network into the attractive states of California, Florida and Washington State and creates the nation's second-largest branch network - with locations reaching 42% of the U.S. population. The combined 5,400 branches in 23 states will also serve as an excellent base to extend the reach of the business banking, commercial banking, credit card, consumer lending and wealth management businesses. The acquisition also extends Chase's retail branch network to additional states, including Georgia, Idaho, Nevada and Oregon.

The acquisition of Washington Mutual's banking operations is expected to be immediately accretive to earnings and to add more than 50

Defendant's Expert Materials
1126

cents per share in 2009. JPMorgan Chase expects to incur pretax merger costs of approximately $1.5 billion while achieving annual pretax cost savings of approximately $1.5 billion by 2010, net of significant investments in the business. The bank plans to complete most systems integrations and rebranding by year-end 2010, closing less than 10% of branches in the combined network in overlapping markets.

In conjunction with this acquisition, JPMorgan Chase will be marking down the acquired loan portfolio by approximately $31 billion, which primarily represents our estimate of remaining credit losses related to the impaired loans. JPMorgan Chase intends to raise additional capital in connection with this transaction to maintain the company's strong capital position.

"This deal makes excellent strategic sense for our company and our shareholders. Our people have worked hard to build a strong franchise and balance sheet - making this compelling transaction possible," said Jamie Dimon, Chairman and CEO. "As we have said in the past, increasing our regional banking presence not only strengthens our Retail business, but also benefits other business lines across our firm, including our commercial banking, business banking, credit card, and asset management groups."

"JPMorgan Chase is strongly committed to both a strong banking system and our responsibility as a good corporate citizen. We are active in the states and local communities where we do business," Dimon said. In July, the bank earned an outstanding rating from the Office of the Comptroller of the Currency for the company's work helping families buy homes, financing small businesses and making its communities better.

"We look forward to welcoming Washington Mutual's employees to JPMorgan Chase and working with them as we build a great company together," Dimon added.

"This acquisition makes us more convenient and valuable to our customers and meets our strategic goal of broadening our footprint to serve our current and future customers better," said Charlie Scharf, head of Chase's Retail business. He added, "Following a transition, Washington Mutual customers will be able to take advantage of Chase's broader network and a wider product range - all backed by the strength and security of JPMorgan Chase." Over time, Chase will provide more personal bankers, business bankers, loan officers and investment advisers to serve the needs of Washington Mutual customers and to expand their relationship with Chase.

Customers of both companies may continue banking as usual, and feel confident that their deposits are secure, now backed by the strength and security of JPMorgan Chase. Employees and vendors should continue to operate business as usual.

Chase expects to convert Washington Mutual's consumer banking, home lending and credit card businesses to the Chase brand and technology platforms over the next two years. Chase and Washington Mutual customers should be able to access the combined network of 14,000 ATMs without fees in the coming months.

**About JPMorgan Chase**

JPMorgan Chase & Co. (NYSE: JPM) is a leading global financial services firm with assets of $2.0 trillion and operations in more than 60 countries. The firm is a leader in investment banking, financial services for consumers, small business and commercial banking, financial transaction processing, asset management, and private equity. A component of the Dow Jones Industrial Average, JPMorgan Chase serves millions of consumers in the United States and many of the world's most prominent corporate, institutional and government clients under its JPMorgan and Chase brands. Information about the firm is available at www.jpmorganchase.com.

JPMorgan Chase will host a conference call at 9:15 p.m. (Eastern Time) tonight, September 25, 2008. You may access the conference call

**Defendant's Expert Materials**
1127

by dialing 1-877-238-4671 (U.S. and Canada) / 1-719-785-5594 (International) - access code: 814030 or via live audio webcast at the jpmorganchase.com website under Investor Relations/Investor Presentations. Materials and further communication will be available on this website at the time of the call.

A replay of the conference call will be available beginning at approximately 1:00 a.m. on September 26 through midnight, Thursday, October 9 by telephone at (888) 348-4629 (U.S. and Canada); access code: 942856 or (719) 884-8882 (International). The replay will also be available via webcast on www.jpmorganchase.com under Investor Relations, Investor Presentations.

This press release includes forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements are based upon the current beliefs and expectations of JPMorgan Chase's management and are subject to significant risks and uncertainties. Actual results may differ from those set forth in the forward-looking statements. Factors that could cause JPMorgan Chase's actual results to differ materially from those described in the forward-looking statements can be found in JPMorgan Chase's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2008 and June 30, 2008, Annual Report on Form 10-K for the year ended December 31, 2007 and Current Reports on Form 8-K, filed with the Securities and Exchange Commission and available on JPMorgan Chase's website (www.jpmorganchase.com) and on the Securities and Exchange Commission's website (www.sec.gov). JPMorgan Chase does not undertake to update the forward-looking statements to reflect the impact of circumstances or events that may arise after the date of the forward-looking statements.

| As of 6/30/08 | | | |
|---|---|---|---|
| ($ billions) | JPMorgan Chase | Washington Mutual | Combined |
| **Select Business Metrics** | | | |
| Footprint (states) | 17 | 15 | 23 states |
| Total Assets | $1776 | $310 | $2,036 |
| Total Managed Loans | $617 | $231 | $848 |
| Branches[1] | 3,203 | 2,207 | 5,410 |
| Total Deposits | $722.9 | $181.9 | $904.8 |
| Checking Accounts | 11.3mm | 12.7mm | 24.0mm |
| ATMs | 9,310 | 4,962 | 14,272 |
| Managed Credit Card Loans | $154.7 | $26.4 | $181.1 |
| Credit Cards Issued | 157.6mm | 12.7mm | 170.3mm |
| Employees | 195,594 | 43,198 | 238,792 |
| **Network Comparisons** | | | |
| U.S. Households | 25.0% | 30.3% | 42.3% |
| Average Income | $71,595 | $74,747 | $72,332 |

**Defendant's Expert Materials**
**1128**

| Businesses | 26.5% | 33.0% | 45.6% |
|---|---|---|---|
| US Population in Footprint | 75.0mm | 94.1mm | 129.9mm |
| 5yr US Population Growth Rate ('07-'12) | 3.3% | 5.6% | 4.9% |
| % of Population Growth in Footprint | 18.0% | 37.9% | 46.2% |

[1] Branch data is as of September 18, 2008

## What Washington Mutual Customers Should Know and Do

- Feel confident that their deposits are secure

- Continue banking as you have - assured that your bank is now backed by the strength and security of JPMorgan Chase

- Continue to use the same checks. All checks will be processed as usual

- Continue to use the same account numbers

- Continue to use the same ATM card and credit card

- Continue to use the same ATMs

- Continue to use the same branches

- Continue paying your mortgage and credit card as you have. Checks should be made payable the same as they have been in the past, and payment addresses remain unchanged

- Continue using the same contact phone numbers, online service and websites

- Know that you will learn well in advance of improvements, additional conveniences and other changes

Close window | Back to top

Copyright 2015 JPMorgan Chase & Co.

Defendant's Expert Materials
1129

**In Re:**

*JAMES MADISON KELLEY v.*

*JPMORGAN CHASE BANK*

---

*DEPOSITION OF CRYSTAL DAVIS*

*August 13, 2014*

---



TORREANO
*Reporting and Video*

| | |
|---|---|
| **Toll Free** | 866.760.DEPO |
| **Main** | 408.371.0464 |
| **Fax** | 408.371.0402 |
| | www.torreano-depos.com |
| | torreano-depos@sbcglobal.net |

1999 South Bascom Avenue, Suite 700
Campbell, CA 95008

*Min-U-Script® with Word Index*

BP Investigative Agency
Exhibit 3

Defendant's Expert Materials
1130

### Page 1

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
 2     NORTHERN DISTRICT OF CALIFORNIA - DIVISION 5
 3   In Re:
     JAMES MADISON KELLEY,      )  Chapter 11
 4                              )  Adv. Case No.
          Debtor.              )  10-05245
 5                              )
 6
 7   JAMES MADISON KELLEY,      )  Hon. Weissbrodt
 8        Plaintiff,           )
 9        vs.                  )
10   JPMORGAN CHASE BANK, NA,   )
     WASHINGTON MUTUAL BANK,    )
11   DOES (1-20),              )
12        Defendants.          )
13
14
15               DEPOSITION
16             of CRYSTAL DAVIS
17
18             Taken at Regus
19          470 Olde Worthington Road
                Westerville, Ohio
20
21      on August 13, 2014, at 9:05 a.m.
22
22        Reported by: Rhonda Lawrence
23                 --=0=--
24
```

### Page 2

```
 1   APPEARANCES:
 2
 3        James M. Kelley
          14390 Douglass Lane
 4        Saratoga, CA  95070
          408.402.1915
 5        jmadisonkelley@gmail.com
 6             Pro Se.
 7        S. Christopher Yoo
          ALVARADO SMITH
 8        1 MacArthur Place, Suite 200
          Santa Ana, California  92707
 9        714.852.6800
          cyoo@alvaradosmith.com
10
11             on behalf of the Defendants.
12                 --=0=--
13
14
15
16
17
18
19
20
21
22
23
24
```

### Page 3

```
 1               STIPULATIONS
 2        It is stipulated by and between
 3   counsel for the respective parties that the
 4   deposition of CRYSTAL DAVIS, the Witness herein,
 5   called by the Plaintiff under the applicable
 6   Rules of Federal Civil Court Procedure, may be
 7   taken at this time by the notary pursuant to
 8   notice; that said deposition may be reduced to
 9   writing in stenotypy by the notary, whose notes
10   thereafter may be transcribed out of the
11   presence of the witness; and that the proof of
12   the official character and qualification of the
13   notary is waived.
14                 --=0=--
15
16
17
18
19
20
21
22
23
24
```

### Page 4

```
 1          INDEX OF EXAMINATION
 2                                      PAGE
 3   BY MR. KELLEY:                       5
 4          INDEX OF EXHIBITS
 5   EXHIBIT       DESCRIPTION          PAGE
```

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Excerpts from Purchase and Assumption Agreement | 17 |
| 2 | Chase annual report | 26 |
| 3 | Accounting for Certain Loans or Debt Securities | 27 |
| 4 | 10-Q | 30 |
| 5 | Office of Thrift Supervision Fact Sheet | 33 |
| 6 | Notes to Consolidated Financial Statements | 33 |
| 7 | 10K | 35 |
| 8 | FFIEC guidelines | 38 |
| 9 | Bates number JPM002040 | 41 |
| 10 | Loan history | 45 |
| 11 | Loan Transfer Screen | 49 |
| 12 | Account Activity | 55 |
| 13 | Summary of 745 transactions | 58 |
| 14 | Spreadsheet | 67 |

Defendant's Expert Materials
1131

**Page 5**

1      CRYSTAL DAVIS
2 being first duly sworn, as hereinafter
3 certified, deposes and says as follows:
4      EXAMINATION
5 BY MR. KELLEY:
6      Q. This is the deposition of Crystal Davis
7 in the Kelley versus JPMorgan Chase Bank in a
8 case. Got it?
9      My name is James Kelley, and I'm the
10 plaintiff in the case. I guess we have
11 Christopher Yoo from Alvarado Smith, outside
12 attorney for Chase, and Crystal Davis -- right?
13      A. Yeah.
14      Q. -- present. So I'm just going to start
15 out by just asking you a little bit about your
16 background. You don't have to go back to grade
17 school.
18      A. Okay.
19      Q. So your -- first of all, what's your
20 educational background?
21      A. I graduated high school.
22      Q. Okay.
23      A. And I had some college. I studied
24 English at OSU Newark. Did not graduate, did

**Page 6**

1 not get a degree.
2      Q. Okay. Did you take any courses in
3 accounting?
4      A. I did not.
5      Q. You did not. Okay.
6      What is your current job function?
7      A. Associate controller.
8      Q. Okay.
9      A. Well, that's the title.
10      Q. And what are -- what does that entail?
11      A. I supervise a department of accountants
12 who manage the corporate advance reconciliation.
13      Q. How many people do that?
14      A. I have -- under me, I have eight
15 employees.
16      Q. Eight.
17      A. Accountants.
18      Q. And this is at the Polaris facility?
19      A. No; Easton.
20      Q. Easton facility. Okay.
21      And how did you come to that position
22 with an English background?
23      A. So I worked at Harry & David Corporation
24 for seven years where I learned accounting and

**Page 7**

1 did payroll.
2      Q. Okay. So you have a practical
3 background?
4      A. Yes.
5      Q. Okay. And when did you join Chase?
6      A. 2005.
7      Q. 2005. Okay.
8      So you've been there for a while?
9      A. Nine years.
10      Q. Nine years. Okay.
11      And what position did you start in at
12 Chase?
13      A. I started at an entry-level treasury
14 accounting position.
15      Q. Okay.
16      A. So I managed just cash flow to the fed.
17      Q. And how did you progress from there?
18      A. I was in that position about two years,
19 and then I got an offer for a different position
20 within the REO accounting group, and I went to
21 that accounting group, and then got another
22 position in the corporate advance accounting
23 several years after that.
24      Q. Okay. So how long have you been in

**Page 8**

1 corporate advance accounting?
2      A. I have been there for two years.
3      Q. Two years.
4      A. Uh-huh.
5      Q. Okay. So how long were you -- so prior
6 to corporate advance accounting, what were
7 you -- what were you doing? I'm not quite
8 clear.
9      A. REO accounting, so real estate owned.
10 We managed all the accounting for that, all the
11 REO sales.
12      Q. And what kind of software do you use for
13 your accounting?
14      A. Mainly MSP.
15      Q. So you are using MSP?
16      A. Uh-huh.
17      Q. Any other?
18      A. We use SAP.
19      Q. SAP. Okay. That's a pretty well known
20 software brand.
21      A. Yes.
22      Q. Anything else?
23      A. That's it for accounting.
24      Q. Pretty much it?

Defendant's Expert Materials
1132

Page 9

1    A.  Uh-huh.
2    Q.  Okay.  So you don't have general ledger
3    experience?
4        MR. YOO:  Objection.  Vague and
5    ambiguous.
6    A.  General ledger meaning?
7    Q.  Well, you know, starting from the
8    general ledger down to the sub-ledgers.
9    A.  So all of our sub-ledgers are part of
10   the general ledger.
11   Q.  Sure.
12   A.  So I do have experience within specific
13   accounts of the general ledger.
14   Q.  Probably characterized as REO -- the 745
15   advances are -- you consider those REO?
16   A.  They can be.  So 745 is any kind of
17   accounting adjustment.
18   Q.  So we'll be getting a little bit more
19   into that in a moment.
20        So are you the only group doing this?
21   MR. YOO:  Objection.  Vague and
22   ambiguous as to "doing this."
23   Q.  Are you the only operational group doing
24   corporate advances in this area --

Page 10

1    A.  No.
2    Q.  -- or are there other groups like
3    yours?
4    A.  There are other groups like mine.
5    Q.  That you know of, right?
6    A.  Yes.
7    Q.  How many other groups?
8    A.  I don't specifically know.  Sorry.
9    Q.  Is it two?
10       MR. YOO:  Objection.  Asked and
11   answered.
12   Q.  I'm just asking you approximately how
13   many.
14       MR. YOO:  She said she doesn't know.
15   A.  I don't know, to be honest.
16   Q.  But there are other groups?
17   A.  There are other groups, yes.
18   Q.  And how do you know there are other
19   groups?
20   A.  They're within accounting, and because
21   my group only owns a number of the payees, so
22   other groups would have to own the other payees.
23   Q.  Okay.  So it's divided by -- partitioned
24   by payees?

Page 11

1    A.  Yes.
2    Q.  I'm going to -- one reason for this
3    deposition is that Mr. Smith, who was a 30(B)(6)
4    witness in this case, indicated that he spoke
5    with you probably several months ago.  Do you
6    recall talking to Mr. Smith?
7    A.  I do.
8    Q.  Okay.  Could you tell me approximately
9    how much time you spent talking with him?
10   A.  It was very brief.  Our phone
11   conversation was brief.  So probably five, ten
12   minutes.
13   Q.  Okay.  And what did he want to know?
14   A.  He was asking me specifically about the
15   reason codes on the DDCH screen and what they
16   represented.
17   Q.  And that would be codes like LTCO and
18   stuff like that?
19   A.  Correct.
20   Q.  And we'll get back to those.
21       Did you talk with anyone in preparation
22   for this deposition today?
23   A.  Anyone within Chase?
24   Q.  Well, anyone, about this deposition.

Page 12

1    A.  Yes.
2    Q.  Okay.  Like who?
3    A.  I spoke to Thomas from the --
4    Q.  Thomas Van?
5    A.  Yes.
6    Q.  Okay.
7    A.  And I spoke to Anne Fitz -- I forget
8    what her last name is.  Fitzpatrick.
9    Q.  Is that an Alvarado Smith employee?
10       MR. YOO:  She's in-house counsel with
11   Chase.
12   Q.  Oh, in-house counsel.  So you spoke with
13   in-house counsel?
14   A.  Yes.
15   Q.  How much time did you spend speaking
16   with her?
17   A.  Probably two hours.
18   Q.  So you spent more time with them than
19   you did with Mr. --
20   A.  Yes.
21   Q.  -- Smith?  So Mr. Smith didn't ask you
22   about the corporate advances?
23   A.  He did.
24   Q.  Did he?  Okay.  Did he ask you about

Defendant's Expert Materials
1133

## Page 13

1  what they were for?

2  A. Only certain transactions he asked

3  about.

4  Q. Okay. Well, yeah, there are several

5  different types of transactions. We'll get to

6  the details later.

7  So how much time did you spend speaking

8  with Mr. Yoo in preparation for the deposition?

9  A. I got here at 8:15.

10  Q. This is the first time?

11  A. Yes.

12  Q. Okay. Sometimes they do it over the

13  phone.

14  The other thing is, did you review any

15  documents in preparation for this deposition?

16  A. I did.

17  Q. Okay. Could you tell me which ones they

18  were?

19  A. There were a lot. I don't know

20  specifically. I did review the transcript.

21  MR. YOO: She's talking the deposition

22  transcript.

23  Q. You mean Smith?

24  A. Mr. Smith, yeah.

## Page 14

1  Q. I've got one here. I got the brief

2  form.

3  A. And then the print screens, DDCH

4  history, and I think that's all I reviewed.

5  Q. Okay. Did you look at the payee codes?

6  A. Uh-huh. I did.

7  Q. Are you familiar with the payee codes?

8  A. I am.

9  Q. Okay. Good.

10  Because there's been some ambiguity in

11  the previous depositions, a little confusion --

12  it's not just here. It's everywhere -- I'm

13  going to ask that when we refer to a -- that we

14  not use the term WAMU, because WAMU is a logo,

15  it's not a corporation. So I'll refer to

16  Washington Mutual Bank when I mean Washington

17  Mutual Bank. I'll refer to Washington Mutual

18  Bank FA when I mean Washington Mutual Bank FA.

19  And similarly, Washington Mutual Bank FSB, which

20  was not a subject of a receivership.

21  MR. YOO: Objection. Assumes facts not

22  in evidence.

23  MR. KELLEY: I believe it is in evidence

24  in the Smith deposition already.

## Page 15

1  MR. YOO: I don't recall that, so my

2  objection stands. I'm not instructing her not

3  to answer. I'm just simply inserting objections

4  as to the general legal conclusions you're

5  making as to what all those entities are or are

6  not and whether those entities were under

7  receivership or not.

8  MR. KELLEY: Those are legal

9  conclusions. I think they're statements of

10  fact. It's well known.

11  MR. YOO: All right. According to you.

12  MR. KELLEY: Okay.

13  BY MR. KELLEY:

14  Q. So anyway --

15  MR. YOO: I think it would be -- I think

16  it would speed up the deposition -- I'll let you

17  ask any questions that you have for my witness,

18  and just let me insert my objections without

19  going back and forth. Because they're

20  ultimately for the Court to decide at the time

21  of trial. Whenever you intend to introduce

22  Ms. Davis' testimony, the Court will have to

23  determine whether my objection is valid or not.

24  So why don't we simply --

## Page 16

1  MR. KELLEY: I understand.

2  MR. YOO: I'm not going to interrupt,

3  you and it will probably help me if you don't

4  retort my objection. Because it's really

5  irrelevant to the deposition of Ms. Davis. That

6  way it will go faster. Ask your questions.

7  I'll object. If I have think that she shouldn't

8  answer something, I'll instruct her not to

9  answer. We'll let the Court decide. I have no

10  intention of instructing her not to answer any

11  questions at this time unless the question is

12  improper. But if you simply ask your questions,

13  let me insert my objections for the record. If

14  I don't say anything more than objection, I'm

15  not instructing her not to answer. So it will

16  go much quicker. Rather than retorting whether

17  my objection is proper or improper. We're

18  wasting more time, you and me, cluttering the

19  record rather than you simply retorting to my

20  objections.

21  MR. KELLEY: Okay. Let's move on.

22  BY MR. KELLEY:

23  Q. I'm going to introduce into evidence

24  some documents here. This is part of the -- to

Defendant's Expert Materials
1134

Page 17

1 make things clearer, these are excerpts from the
2 purchase and assumption agreement between the
3 FDIC receiver and JPMorgan Chase Bank.
4 =0=
5 (Deposition Exhibit 1 marked.)
6 =0=
7 Q. On page 1 of the exhibit the term "book
8 value" is defined. And could you read that over
9 and see if --
10 MR. YOO: Let the record reflect that
11 page 1 of Exhibit 1 appears -- is identified by
12 page 3.
13 MR. KELLEY: Of the purchase and
14 assumption agreement, yes.
15 MR. YOO: What Mr. Kelley represents is
16 that a portion of the purchase and assumption
17 agreement, and the book value is the first
18 paragraph of page 1 of Exhibit 1 -- or page 3,
19 which is the first page of Exhibit 1.
20 MR. KELLEY: You're right.
21 A. Okay.
22 Q. So the main interest here, I guess, is
23 they're saying book value means with respect to
24 any asset or any liability assumed.

Page 18

1 MR. YOO: Objection. The document
2 speaks for itself.
3 Q. So I want to make the distinction
4 between assets with book value and liabilities
5 with book value, just for precision.
6 Okay. Page 2.
7 MR. YOO: Of Exhibit 1.
8 Q. Yes. Exhibit 1, which is page 5 of the
9 purchase and assumption agreement. I
10 highlighted loans, and here they're defining
11 what loans the agreement applies to. And could
12 you read that over and just make sure you got
13 it.
14 A. Uh-huh.
15 Q. Under I, which is a subparagraph to
16 loans, it says, "Loans (including loans which
17 have been charged off the Accounting Records of
18 the Failed Bank in whole or in part prior to
19 Bank Closing)..."
20 And then it goes on and it says,
21 "participation agreements, interest in
22 participations, overdrafts of customers,"
23 et cetera. I'm not so much interested in
24 overdrafts here.

Page 19

1 "-- revolving commercial lines of
2 credit, home equity lines of credit,
3 Commitments," and so on.
4 So do you understand what a
5 participation agreement is?
6 MR. YOO: Objection. Calls for a legal
7 conclusion. Calls for testimony beyond this
8 person's knowledge.
9 If you understand what that means.
10 A. I don't know specifically what they're
11 speaking of there.
12 MR. YOO: Also, Ms. Davis is not the
13 person with the most knowledge regarding the
14 purchase and assumption agreement.
15 Q. So you don't know what a participation
16 agreement is?
17 MR. YOO: Asked and answered.
18 She works as an associate controller for
19 escrow advances. She may not have that much
20 knowledge about the purchase and assumption
21 agreement. So the document speaks for itself.
22 I'm going to give you some leeway to ask
23 her questions about it, but she clearly is here
24 based upon a short conversation that she had

Page 20

1 with Mr. Smith. She's not here as the person
2 most knowledgeable of Chase regarding the
3 purchase and assumption agreement.
4 MR. KELLEY: You've already said that.
5 MR. YOO: So again, I would caution you
6 to ask the types of questions that you're going
7 to ask her, because they're really -- at some
8 point it may become harassing.
9 MR. KELLEY: I'm not harassing her.
10 MR. YOO: I said at some point it might
11 become harassing as you keep on asking her
12 questions.
13 MR. KELLEY: I would ask you --
14 MR. YOO: Let me --
15 MR. KELLEY: -- to stop interrupting my
16 deposition. This is my deposition. I'm paying
17 for it. And you're running off at three or four
18 minutes a shot on your objections. That's
19 ridiculous.
20 MR. YOO: I'm entitled to it. I feel
21 comfortable.
22 MR. KELLEY: All you have to do is say
23 objection.
24 MR. YOO: Mr. Kelley, let me finish.

Defendant's Expert Materials
1135

Page 21

1 All right? Otherwise this deposition will be
2 over pretty soon. Let me finish, then you can
3 ask your next question.
4     At some point, if you keep asking her
5 questions relating to the purchase and
6 assumption agreement, it will become harassing.
7 I'm going to give you leeway to ask questions.
8 But understand that she's here --
9     MR. KELLEY: It is -- it is necessary to
10 ask those questions, and under Rule 26, I am
11 allowed to ask any question I want, as long as
12 it leads to or has the possibility of leading to
13 admissible evidence.
14     MR. YOO: Exactly.
15     MR. KELLEY: You can't restrict my
16 deposition arbitrarily like you're trying to do.
17     MR. YOO: I told you that at some point
18 it's going to become harassing. Once it becomes
19 harassing, I'm going to instruct her not to
20 answer.
21 BY MR. KELLEY:
22     Q. Down the page it defines obligor. Could
23 you read that over and let me know if you
24 understand what that means?

Page 22

1     MR. YOO: Objection. Document speaks
2 for itself. And calls for a legal conclusion.
3     Q. I'm just asking you if you understand
4 what it is?
5     A. Yes.
6     Q. You do? Okay. So it indicates that
7 there are different types of obligors, right?
8     A. Yes.
9     Q. Direct, indirect, primary, secondary,
10 joint --
11     MR. YOO: Objection. The document
12 speaks for itself.
13     MR. KELLEY: I am defining the terms
14 that are going to be used later on.
15     MR. YOO: Again, I'm just asserting my
16 objections.
17     MR. KELLEY: Yes, you are.
18     MR. YOO: Can you just stop from
19 retorting to my objections.
20     MR. KELLEY: Why are you retorting to
21 me?
22     MR. YOO: I'm not retorting anything.
23 I'm inserting objections. Perhaps you should
24 have counsel representing you so this will go

Page 23

1 smoothly.
2 BY MR. KELLEY:
3     Q. The next page, please. Borrower's
4 claims. That would be page 9 of the purchase
5 and assumption agreement. A little bit further
6 down the page I've highlighted assets purchased
7 by the assuming bank. And they're saying that
8 they're subject to all the liabilities
9 associated with them.
10     A. Yes.
11     Q. And then finally, we get down to asset
12 purchase price, and could you read that over.
13     A. Yes.
14     Q. So it states that the asset purchase
15 price will be the book value if there's no
16 Schedule 3.2. And I'll represent that there is
17 no Schedule 3.2.
18     MR. YOO: Objection. The document
19 speaks for itself.
20     MR. KELLEY: And there is no Schedule
21 3.2 there in the document.
22     MR. YOO: Can you please just -- you
23 don't have to respond to my objections.
24     MR. KELLEY: I don't have to.

Page 24

1 BY MR. KELLEY:
2     Q. Then the next page, which is page 20 of
3 the purchase and assumption agreement, I have,
4 "The Assuming Bank has submitted to the Receiver
5 $1.888 billion for the Assets purchased and
6 Liabilities Assumed hereunder," right?
7     MR. YOO: Objection. Document speaks
8 for itself.
9     Q. I'm going to skip one page of the
10 exhibit and go to page 29 of the purchase and
11 assumption agreement. These are indemnification
12 clauses within the contract, as you see from the
13 heading. Do you understand indemnification?
14     MR. YOO: Objection. Calls for legal
15 conclusion.
16     MR. KELLEY: I asked for her
17 understanding.
18     MR. YOO: Let me just assert my
19 objections. You don't have to respond to my
20 objections. It's really annoying. Objection.
21 Calls for legal conclusion.
22     Q. Do you understand what it is? You can
23 answer the question.
24     A. Yes.

Defendant's Expert Materials
1136

**Page 25**

1    Q. Okay. So you understand it. It talks
2  about obligation supplemental?
3    MR. YOO: Objection. Document speaks
4  for itself.
5    Q. That's just another form of
6  indemnification?
7    MR. YOO: Document speaks for itself.
8  Asking for legal conclusion.
9    Q. Do you understand that?
10   A. Yes.
11   Q. And limited guaranty of a corporation?
12   A. I'm sorry, where is that?
13   Q. Bottom. It says the corporation
14  guarantees the receivers. By corporation, I
15  mean FDIC.
16   A. Yes.
17   Q. That is the corporation, not Chase.
18    Okay. Next page. Subrogation clause.
19  Do you understand what they mean by receiver
20  corporation acting as a guarantor?
21   A. Yes.
22    MR. YOO: Objection. Document speaks
23  for itself. Calls for legal conclusion.
24   Q. And then the next page -- oh, there is a

**Page 26**

1  Schedule 3.2. It says -- lists -- highlighted
2  portion is loans, right? It says book value?
3    A. Yes.
4    MR. YOO: Document speaks for itself.
5    Q. And then on page 36 of the purchase and
6  assumption agreement, which is the last page of
7  the exhibit, it states that the mortgage
8  servicing rights would be at book value.
9    So we're done with that exhibit. Those
10  form the starting point here.
11    MR. KELLEY: This will be Exhibit 2.
12    --o--
13    (Deposition Exhibit 2 marked.)
14    --o--
15   Q. On Exhibit 2, this is a page -- page 109
16  from the JPMorgan Chase annual report in 2009.
17  And the term of interest is purchased
18  credit-impaired loans. And they're setting the
19  purchased credit-impaired loans at 81.2 billion.
20    MR. YOO: Objection. Document -- lacks
21  foundation as to the document.
22   Q. The document is the JPMorgan Chase &
23  Company 2009 annual report.
24    MR. YOO: Same objection.

**Page 27**

1    Q. Do you understand the term "purchased
2  credit-impaired"?
3    A. Yes --
4    Q. Okay. Because it shows up everywhere.
5  Okay. So keep moving.
6    --o--
7    (Deposition Exhibit 3 marked.)
8    --o--
9    Q. Accounting for Certain Loans or Debts
10  Securities acquired in a transfer.
11    MR. YOO: Do you have a copy for me?
12    MR. KELLEY: Yes.
13    MR. YOO: If you could, just for ease of
14  this deposition, as you're introducing exhibits,
15  if you can provide me a copy, as well.
16    MR. KELLEY: I have been providing you
17  with copies.
18    MR. YOO: Thank you.
19  BY MR. KELLEY:
20   Q. So are you familiar with this statement?
21   A. I have not seen this statement.
22   Q. Okay. This governs the acquisition of
23  loans?
24   A. Okay.

**Page 28**

1    MR. YOO: Objection. Assumes facts not
2  in evidence.
3    Q. Okay. I left the first page on there
4  just to identify the document. Could you turn
5  to page 2. And it's showing the accounting for
6  a loan that has been purchased. Have you done
7  anything with this, or are you familiar with it?
8    MR. YOO: Objection. Vague and
9  ambiguous.
10   A. I don't understand.
11   Q. Let's back up. Are you familiar with
12  the purchase method of accounting?
13   A. It's really outside of my accounting
14  scope, so I'm not familiar.
15   Q. Okay. All right. So I'm going to give
16  a little background here. The purchase method
17  of accounting is dictated by FASB 141, which is
18  the Federal Accounting Standards Board 141. A
19  loan that's acquired, whether it's impaired or
20  not, has to be accounted for individually. In
21  other words, each one has to be examined. So if
22  you have a pool of loans, if you acquired a pool
23  of loans, you'd have to examine each one
24  individually. And then once that's done, then

Defendant's Expert Materials
1137

**Page 29**

1  the loan could be aggregated into a pool of
2  loans, but it can't be done -- it can't be
3  aggregated into a pool of loans until the
4  accounting is done. And then once that's done,
5  then the SOP governs the rest of it, the actual
6  accounting for the stuff.
7      In this case they're using a single
8  loan, but that could be a pool of loans. And
9  what they're saying here, if you look at this
10  page, is the purchase amount has to be
11  determined, and they start it as the beginning
12  carrying amount. So this loan was purchased at
13  under price. So $4 million was paid for. And
14  then they calculate what they think the future
15  cash flows are going to be and create a basis
16  for that.
17      MR. YOO: Objection. Assumes facts not
18  in evidence.
19      Q. All right. So anyway -- so this page 2
20  gives the actual accounting -- SOP accounting
21  for a single loan, but it would also apply to a
22  pool of loans.
23      MR. YOO: Objection. The document
24  speaks for itself.

**Page 30**

1      Q. Okay. So let's go to page 3. And on
2  page 3, if you go to B33, it reiterates what I
3  just kind of paraphrased earlier, and that was
4  loans subject to this SOP are acquired
5  individually and in pools, and arm's length
6  transactions should be recorded at their
7  acquisition price presumed to be fair value.
8      MR. YOO: The document speaks for
9  itself.
10      Q. And then at the bottom I highlighted, it
11  says, "The face amount of the loans may be
12  substantially different from the
13  acquisition-date fair value of the loans due to
14  changes in market interest rates, credit risk,
15  and expected prepayments."
16      I'm going to skip over these other two.
17  If you go back to the last -- oh, this is
18  actually a new thing here. Make that exhibit 4.
19          –=0=–
20      (Deposition Exhibit 4 marked.)
21          –=0=–
22      MR. YOO: Do you have a copy for me?
23      THE WITNESS: It's the same.
24      MR. YOO: No, it's different.

**Page 31**

1      Do you have an Exhibit 4 for me?
2      THE WITNESS: This is all part of
3  Exhibit 3. This is a portion.
4      MR. KELLEY: Oh, is that part of 3?
5      MR. YOO: I assume they're not part of
6  3, right?
7      MR. KELLEY: So you got one.
8      MR. YOO: This was attached as part of
9  Exhibit 3. Did you mean to include that?
10      MR. KELLEY: Well, just wait a minute,
11  will you? I've got to look at this stuff.
12      MR. YOO: Well, I wish you had come
13  better prepared.
14      MR. KELLEY: Could you keep your
15  personal remarks to yourself, Mr. Yoo.
16      MR. YOO: If you keep your personal
17  remarks to yourself, maybe I'll do the same.
18      MR. KELLEY: I don't make personal
19  remarks, Mr. Yoo; you do.
20      MR. YOO: Just let us know because I
21  think what Ms. Davis has is the actual Exhibit
22  3. So if you believe it needs to be part of
23  Exhibit 3, then give it back to us.
24      MR. KELLEY: I understand all that. You

**Page 32**

1  don't have to explain. Okay. Let's forget
2  about all that. It's not necessary. So this is
3  not part of Exhibit 3.
4      MR. YOO: So that's going to be Exhibit
5  4?
6      MR. KELLEY: Yeah, could you --
7      MR. YOO: That is already Exhibit 4.
8      MR. KELLEY: Oh, you want to make that
9  Exhibit 4?
10      MR. YOO: She's already done that. Do
11  you have a copy for me of this particular
12  document?
13      MR. KELLEY: Apparently not, or if it is
14  there, it will be hard to find. So we'll make a
15  copy for you. Could you look on hers?
16      MR. YOO: Sure.
17  BY MR. KELLEY:
18      Q. All this is is a footnote that indicates
19  the amount of purchased credit impaired loans
20  obtained from Washington Mutual. And it says
21  that there are 78.1 billion. And they didn't
22  include these in their accounting. This is
23  JPMorgan Chase 10-Q, footnote to the 10-Q. And
24  it says they were recorded at fair value on the

Defendant's Expert Materials
1138

Page 33

1 transaction date including adjustment for credit
2 impairment. So the credit impairment adjustment
3 they're referring to is SOP-3.
4 MR. YOO: Objection. Lacks foundation.
5 Objection document speaks for itself.
6 Objection, also, assumes facts not in evidence.
7 —=0=—
8 (Deposition Exhibit 5 marked.)
9 —=0=—
10 Q. Exhibit 5 is obtained from the Senate
11 Permanent Subcommittee and Investigations.
12 That's the Senate Subcommittee and
13 Investigations. And it is an OTS fact sheet on
14 Washington Mutual Bank issued on September 25th
15 of 2008, which was a bank close date.
16 MR. YOO: Objection. Document speaks
17 for itself. Lacks foundation.
18 Q. Okay. We may refer back to this. So I
19 don't have any questions for you.
20 —=0=—
21 (Deposition Exhibit 6 marked.)
22 —=0=—
23 MR. KELLEY: Did I give you two pages or
24 one?

Page 34

1 MR. YOO: Two pages.
2 MR. KELLEY: Yeah, this is a separate
3 one.
4 MR. YOO: Exhibit 6 appears to be a
5 document that indicates Washington Mutual, Inc.
6 and Subsidiaries, Notes to Consolidated
7 Financial Statements (Unaudited).
8 MR. KELLEY: Oh, excuse me. They do go
9 together. Sorry. They actually do go together.
10 So that's the end of it.
11 MR. YOO: Do you have a second page for
12 me? I already have the first page.
13 BY MR. KELLEY:
14 Q. So if you take a look at that,
15 guarantees. I'll tie these two corporate
16 advances later. Have you had any exposure to
17 guarantee payments?
18 A. No, I have not.
19 Q. So this exhibit is being used to
20 identify the guarantees made by Washington
21 Mutual, Inc. on the loans that it created.
22 MR. YOO: Objection. Lacks foundation.
23 Assumes facts not in evidence.
24 —=0=—

Page 35

1 (Deposition Exhibit 7 marked.)
2 —=0=—
3 MR. KELLEY: I've highlighted the areas
4 of interest. This has to do with mortgage
5 repurchase liability. And if you take a look at
6 the highlighted footnotes, it shows the type of
7 payments and other issues surrounding the
8 repurchase of loans. So the purpose of this
9 exhibit is to highlight that the acquisition of
10 the loans by Chase was not necessarily through
11 the purchase -- through the receiver, but
12 through the liabilities acquired by Chase when
13 it purchased certain assets and certain
14 liabilities. So the loans could be acquired
15 through the liabilities and not be transferred
16 as assets. So that's the purpose of this
17 exhibit.
18 MR. YOO: For the record, Exhibit 7
19 appears to be a portion of some type of a
20 filing. It's identified by the date number on
21 top May 26, 2014, Corp 10K, 2013, and this
22 appears to be page 79 of that document. If it
23 is what it is, again, as to Mr. Kelley's
24 statement, assumes facts not in evidence, lacks

Page 36

1 foundation.
2 MR. KELLEY: Let me highlight that a
3 little bit more. At the bottom of the page it
4 indicates where this is from, it's JPMorgan
5 Chase & Company 2013 annual report.
6 Why don't we take a five-minute break.
7 MR. YOO: Okay.
8 (Recess.)
9 BY MR. KELLEY:
10 Q. Do you understand the difference between
11 book value and fair value?
12 MR. YOO: Objection. Vague and
13 ambiguous.
14 A. Yes.
15 Q. So could you give me an explanation?
16 A. So I believe fair value to be what the
17 market value is of the property, what somebody
18 would pay for the property. Whereas, book value
19 is what the bank carries that asset on its
20 books.
21 Q. So based on what we've seen earlier, the
22 loans were to be acquired at book value, but
23 then they had to be accounted for at fair value,
24 right, by these standards, so there's actually

Defendant's Expert Materials
1139

**Page 37**

1 two things, one is whatever was on the books on
2 September 25, 2008 -- yeah, '8, and then
3 sometime thereafter they do a fair value
4 calculation. Do you know how they do the fair
5 value calculation?
6 A. I do not.
7 Q. So they could, I guess, appraise the
8 property or they could -- if it's a security or
9 something, they could see what it trades for.
10 MR. YOO: She said she doesn't know.
11 Q. So you're not familiar with the actual
12 fair value calculation?
13 A. No.
14 MR. YOO: Asked and answered.
15 Q. But I do agree with your definition.
16 Are you familiar with pool accounting?
17 A. I'm not.
18 Q. You're not? Okay. So your activities
19 are pretty much loan level activities?
20 A. Yes.
21 Q. And then somebody else would aggregate?
22 A. Yes.
23 Q. Are you familiar with the FFIEC, the
24 Federal Financial Institutions Examinations

**Page 38**

1 Council, guidelines?
2 A. I'm not. I've heard that term, but I'm
3 not familiar.
4 Q. So you haven't -- maybe we should just
5 define it. It shows up in the comments field.
6 A. Okay.
7 --=0=--
8 (Deposition Exhibit 8 marked.)
9 --=0=--
10 Q. That's another page from the JPMorgan
11 Chase --
12 MR. YOO: Do you have a copy for me?
13 MR. KELLEY: Actually, no. We're going
14 to have to copy that. So this defines the FFIEC
15 cross-border disclosure requirements.
16 MR. YOO: Objection. Document speaks
17 for itself. Assumes facts not in evidence.
18 Lacks foundation.
19 Q. Okay. The document is relevant to the
20 comments field in some of the 745 transactions.
21 Anyway, I'll just put that in there.
22 Does that make sense? Read it over. Is
23 it clear-cut?
24 A. Yes.

**Page 39**

1 Q. Okay. Before we move on going through
2 some of these things, I wanted to ask you a few
3 questions. There was a -- I think Mr. Smith in
4 his deposition referred to a MSP conversion.
5 Are you familiar with that?
6 A. Yes.
7 Q. Could you explain to me exactly what was
8 going on with the so-called conversion?
9 MR. YOO: Objection. Vague and
10 ambiguous.
11 If you understand his question, go ahead
12 and respond.
13 A. So I think you're speaking about the
14 conversion of the MSP servicing system. So when
15 we acquired -- when Chase acquired the WAMU Bank
16 loans, they were on an MSP servicing system and
17 Chase was also on an MSP servicing system, so it
18 was really just meshing those two systems into
19 one, into our servicing system.
20 Q. Did you participate in that?
21 A. Just related to corporate advances.
22 Q. So they asked you to check things over,
23 make sure they were coming out --
24 A. Yes.

**Page 40**

1 Q. -- the same?
2 A. We had to make sure they balanced. Once
3 everything was brought over, that it balanced to
4 the beginning and ending balances.
5 Q. And was that all done within the same
6 program, or was it --
7 A. Yes.
8 Q. -- two different programs?
9 A. Just the one program.
10 Q. Okay. Anything remarkable about that?
11 MR. YOO: Objection. Vague and
12 ambiguous.
13 Q. Different chart of accounts?
14 A. I mean, I guess I don't understand
15 specifically the question. But there were
16 different accounts that we housed, yes.
17 Q. So you put them in the right box?
18 A. Yes.
19 Q. Make sure they add up at the end of the
20 day?
21 A. That's right.
22 Q. When was that completed?
23 A. Around December 2009.
24 Q. Did you then begin to use the system?

Defendant's Expert Materials
1140

1 You had the converted system?
2 A. Yes.
3 Q. But only when it was finished, right?
4 A. Yes.
5 -=0=-
6 (Deposition Exhibit 9 marked.)
7 -=0=-
8 MR. YOO: For the record, Exhibit 9 is
9 document identified by Bates stamp number
10 JPM002040..
11 MR. KELLEY: That's right.
12 Q. So I've highlighted 91T00. What's
13 91T00?
14 A. It is a corporate advance pay.
15 Q. And what corporate advance payee?
16 A. It's a third party, so the T of the
17 91T00 indicates that it's a third-party payee.
18 Q. Okay.
19 A. And it's used to house private investor
20 claim funds. So when Chase makes a claim to the
21 investor and they pay the claim, funds would be
22 applied to this payee.
23 Q. Okay. So they sent them a bill?
24 A. Yeah.

1 Q. They pay. Okay. Now, if you look to
2 the right of that, it states that the claim --
3 the investor IDs begin with an A through V; is
4 that correct?
5 A. In the current MSP platform, yes,
6 indicates private investor loans.
7 Q. And what would X, Y, Z indicate?
8 A. Those would indicate bank-owned assets.
9 Q. Okay. So W, X, Y, Z. Have you ever
10 seen a W?
11 A. I have.
12 Q. You have?
13 A. Uh-huh.
14 Q. Okay. What if there's no letter there?
15 Suppose it's just a number. What would that
16 indicate?
17 A. That would indicate another type of
18 investor. So it could be Fannie Mae, Freddie
19 Mac, Ginnie Mae.
20 Q. Oh, really?
21 A. Which are not considered private
22 investors.
23 Q. They're kind of quasi private?
24 A. Hybrid.

1 Q. Yeah, they're hybrid. Okay. Thanks.
2 You're the first person who's known what that
3 is. I was in -- just as an aside, I was in
4 court and a judge said -- he was looking at a
5 screen shot, not from Chase, but from Bank of
6 New York, and he said, I never had anyone that
7 could explain a screen shot before in court. So
8 congratulations.
9 Do you happen to recall what the numbers
10 would be for Fannie Mae, Ginnie Mae?
11 MR. YOO: Objection. Completely
12 irrelevant to the subject matter of this
13 lawsuit. Not likely to lead to discoverable
14 evidence.
15 Q. Do you know?
16 A. Generally, Freddie Mac are in a 5
17 series, a 500 series, could be 5 whatever.
18 Q. 5 something?
19 A. Yeah, and then Fannie is in a 4 series.
20 and Ginnie Maes are in, I believe, 7 and 6
21 series.
22 Q. Have you ever seen a 1 or 2?
23 A. Not that I can recall.
24 Q. Okay. How about a 3?

1 A. No, I don't recall.
2 Q. How high do the numbers go?
3 A. Investor IDs can be any number, and so
4 they can go all the way up to like the 900
5 series.
6 Q. So basically three digits?
7 A. Yes. Three characters.
8 Q. Okay. One other thing, this has come up
9 a number of times and people don't seem to know
10 it. If I take an investor ID like 801/0006,
11 what's the /0006? Is that part of the investor
12 ID, or is that some other category?
13 A. It's what we call a category code. And
14 it doesn't always carry a lot of significance
15 other than to -- those categories drive that --
16 where the loan resides into a different account
17 or call center. So it may be the same type of
18 loan, but in order to get those loans to be
19 driven to a different balance sheet we'd have to
20 change that category and have that category map
21 to the GL that it drives to.
22 Q. Excellent explanation. So it just
23 breaks the books up into a series of books?
24 A. Correct.

Defendant's Expert Materials
1141

Page 45

1    Q. Okay. Are you familiar with the LPS
2  desktop system? You may not be.
3    A. If it's interchangeable with MSP, I
4  don't know if they use those interchangeably,
5  but specifically I've never logged into an LPS
6  desktop.
7    Q. It's usually external, I think, to
8  Chase, but it's done between — out in the LPS
9  third-party providers for the banks.
10    MR. YOO: Objection. Assumes facts not
11  in evidence. Lacks foundation.
12    MR. KELLEY: Why don't we take a little
13  break, because I need to get a couple copies
14  made.
15        —o—
16    (Deposition Exhibit 10 marked.)
17        —o—
18    MR. KELLEY: Can you share that?
19    MR. YOO: I have no choice.
20    MR. KELLEY: It turns out you do have a
21  choice. I do have a copy of it.
22    MR. YOO: For the record, Exhibit 10 is
23  a three-page document identified as JPM001546
24  and 47.

Page 46

1  BY MR. KELLEY:
2    Q. You might want to look that over a
3  little bit. I've kind of highlighted some of
4  the areas of interest, but there may be more.
5        Have you seen this type of report
6  before?
7    A. I have not.
8    Q. Okay. It appears that it's a — some
9  sort of MSP summary report, right?
10    MR. YOO: Objection. Lacks foundation.
11  Assumes facts not in evidence.
12        Go ahead and respond, if you can. If
13  you know what it is.
14    A. I've not seen this. It may be a screen
15  that I'm just not familiar with.
16    Q. Okay. But if you look at the top you
17  see the history year to date and INV 801 cat 13,
18  and then investor number. That's the loan
19  number. I'll represent that that is the loan
20  number. And then it has a date there. Do you
21  know what any of those things are, T13, for
22  example, cat 13, 013?
23    A. I don't know what T13 is. Cat 13,
24  again, drives where the — where the loan will

Page 47

1  reside on the balance sheet, and typically a cat
2  13 indicates an arm loan.
3    Q. Okay. So the balance sheets are
4  segregated by loan type?
5    A. Correct.
6    Q. Okay. And if you look down there a
7  little bit further it says PLGD-LN.
8    A. Okay.
9    Q. Have you run across the pledged loans in
10  your dealings?
11    A. No, I have not.
12    Q. You might not. It's more of an investor
13  thing.
14        Let's go to the next page. There's some
15  payee numbers there at the bottom. Are you
16  familiar with that? 95R21.
17    A. Somewhat, yes.
18    Q. Okay. Could you explain? I guess T was
19  third party. I don't know what R is.
20    A. So R would indicate that it's a
21  recoverable balance, meaning recoverable to the
22  borrower.
23    Q. Okay.
24    A. I do know that 95R21 was a payee used

Page 48

1  pre-Chase. Chase no longer uses this payee. It
2  would have been converted over.
3    Q. So this was like a Washington Mutual
4  payee code?
5    A. That's correct. Yes.
6    Q. What code would they use now?
7    A. I don't know for this specific payee.
8    Q. Okay. Do you have any idea what in IV
9  means?
10    A. I do. That's a user ID, but it's used
11  by the invoice team, so it's new invoice.
12    Q. Does this refer to a specific person, or
13  just a group that does this function?
14    A. This specific user is referencing a
15  group, but users can be specific to a person.
16    Q. They could be — they could be specific,
17  or it could be a small group of people using
18  this code to identify their group?
19    A. Yes.
20    Q. Got it. Okay. That helps.
21        And then what's the AR over here at the
22  far right on these entries?
23    A. I honestly don't know.
24    Q. So some of it is the same, some of it

Defendant's Expert Materials
1142

Page 49

1  isn't. Down on the third page they have a list
2  of things that look like kind of definitions.
3      A.  Okay.
4      Q.  And have you ever seen stuff like this?
5  These are kind of like codes. Do you use these
6  now, or did you ever use them?
7      A.  None of these codes look familiar.
8  They're probably specific to this screen, and
9  that's not one that I use.
10     Q.  Okay. All right.
11             --=0=--
12     (Deposition Exhibit 11 marked.)
13             --=0=--
14         MR. YOO:  Exhibit 11 is identified by
15  JPM Bates stamp number 002035.
16     Q.  It says loan transfer screen, and then
17  we have at the top -- if you go down there's
18  headers and go down further it says client 156.
19  Who is client 156?
20     A.  Client 156 is just the platform where
21  Heritage WAMU loans are housed on MSP. So MSP
22  has two platforms, one being 465, which is for
23  Heritage Chase, and the other platform or client
24  is 156, which is Heritage WAMU.

Page 50

1      Q.  And what does that mean?
2      A.  It just means that those loans on client
3  156 were originated by WAMU.
4      Q.  So it doesn't indicate how they were
5  acquired?
6      A.  No.
7      Q.  So they could have been acquired as a
8  liability repurchase or -- they're just
9  Washington Mutual Bank loans or Washington
10  Mutual Bank, FA loans?
11     A.  Yes.
12     Q.  Are there any Washington Mutual, FSP
13  loans in the Heritage thing? I don't think so.
14     A.  I don't know the difference.
15     Q.  It's a technical difference.
16  Apparently, Washington Mutual Bank, FSB wasn't
17  in receivership; it was just transferred as an
18  operating subsidiary.
19         MR. YOO: Objection. Assumes facts not
20  in evidence, lacks foundation. She said she
21  doesn't know.
22     Q.  So what about client 908, who is that
23  client 908?
24     A.  So 908 is just in reference to when --

Page 51

1  before conversion, WAMU had its own MSP, they
2  had platforms. So like Chase today has client
3  465 and 156, they had their own separate
4  platforms or clients on MSP. That's just
5  referring to one of those.
6      Q.  So is 908 a Washington Mutual Bank
7  number, or is it a Chase number?
8         MR. YOO: Asked and answered.
9      Q.  I didn't understand.
10     A.  It's WAMU.
11     Q.  And then it says pre-9-1-09. Does that
12  sound like a conversion date?
13     A.  Preconversion.
14     Q.  And then after that they use something
15  else which they don't indicate here on this
16  screen, I guess. Let's go down to the bottom
17  because they're in reverse order date-wise.
18  What we're seeing here is a date 8-7-07. Could
19  you explain this? The captions are at the top
20  old/INV and EFF date and then we have tran date
21  and then date paid. Could you explain to me the
22  80707 entry transaction date?
23     A.  It appears that's a transaction that
24  happened prior to conversion, so that happened

Page 52

1  in the WAMU servicing system. I can explain it
2  as far as how Chase would currently -- what
3  these would represent in Chase today, but I
4  don't know what they were doing here.
5  Typically, when you see these transfers and they
6  just say maintenance investor, it could be that
7  they were just moving it into a different GL, so
8  they had to move it into a different investor
9  category to record it in that GL account.
10     Q.  You spoke earlier about this apparently --
11  they're indicating the investor number here is
12  030. Do you know what that is?
13     A.  I do not. Those are all preconversion
14  and WAMU had their own logic for the investor
15  IDs that is different than Chase is. Where we
16  had W, X, Y, Z are bank owned, they had a
17  different logic.
18     Q.  So if you move to the column next to
19  that you see the 801006, which I think you've
20  already explained adequately.
21     A.  Uh-huh.
22     Q.  And what they're saying is that the loan
23  was transferred from 030 to 801; is that
24  correct?

Defendant's Expert Materials
1143

**Page 53**

1     A. Appears to be.
2     Q. And then let's move up to the next line.
3 I'll just make a note that that ▮▮▮▮▮ is a
4 loan number at issue here. On 12-17 of '07 it
5 shows another transfer.
6     A. That appears correct.
7     Q. So the investor went from A01 to A11.
8 Would that be a correct read?
9     A. Yes.
10     Q. And then later on in 12-19 of '08 it
11 shows the -- well, go ahead and tell me what
12 happened there.
13     A. Looks like it moved from investor ID,
14 A11 category 006 into A01 category 013.
15     Q. Okay. And again, we don't place special
16 interest on the 006013?
17     A. Correct.
18     Q. So if you look at the dates below that
19 it says the transaction date is 12-19 of '08,
20 right?
21     A. Right.
22     Q. It says the effective date is 3-1 of
23 '08.
24     A. Correct.

**Page 54**

1     Q. How can you effect a backwards transfer?
2 Have you ever seen this done?
3     A. I have. I don't know what that
4 indicates.
5     Q. And it refers to -- do you know what the
6 N refers to?
7     A. I do not.
8     Q. You're doing better than most people.
9 Congratulations. Most of them are baffled by
10 this.
11     And then on 9-2 of '09 it shows an
12 entirely new investor, X01, right?
13     A. Yes.
14     Q. And what's the 228 here?
15     A. Again, just a category that drives
16 ledger.
17     Q. Okay. This one here is -- what's it
18 doing? It's going from AX01 to A01?
19     A. I believe this is when conversion
20 happened, and what you're seeing there is these
21 loans being loaded onto the Chase servicer. So
22 it's really just loading them into this kind of
23 generic investor ID, and then you see a changing
24 back to the correct one that it came from. So

**Page 55**

1 it's really just a step in the conversion.
2     Q. Okay. So just to be clear, the very top
3 of the page it has JPMorgan Chase Bank NA-156?
4     A. Yes.
5     Q. Is that Chase's number?
6     A. 156 indicates that's on the platform for
7 Heritage WAMU.
8     Q. Okay. Platform Heritage WAMU. All
9 right. Okay. Thank you.
10     —0—
11     (Deposition Exhibit 12 marked.)
12     —0—
13     MR. YOO: Do you have a copy for me?
14     MR. KELLEY: Will you share, please. I
15 have one here, but it's not worth searching for.
16 BY MR. KELLEY:
17     Q. So this is JPM001134 Bates number. I've
18 highlighted the thing at the top. This appears
19 to refer to an investor change and effective
20 date. So apparently that matches with this?
21     A. Yes.
22     Q. So even though this is not a Chase --
23 Chase uses this system, obviously, but it's not,
24 I don't think, an internal accounting system,

**Page 56**

1 it's an LPS?
2     A. No.
3     Q. So anyway, that matches.
4     MR. YOO: Let the record reflect that
5 Mr. Kelley's referring to -- when he says it
6 matches, he's referring to the top line of
7 Exhibit 11.
8     Q. Investor change and effective date
9 9-2-09.
10     Did you look at MSP for this loan prior
11 as part of your preparation for this deposition?
12     A. I did review it, just the corporate
13 advance screens.
14     Q. Okay. You didn't look at anything else?
15     A. No.
16     Q. I might ask you, how do you get your
17 instructions to apply a corporate advance? I
18 mean, how do you know what to do in your job?
19 Do you get orders?
20     MR. YOO: Objection. Vague and
21 ambiguous.
22     If you understand his question, go ahead
23 and respond.
24     A. We don't apply the corporate advance, so

Defendant's Expert Materials
1144

1  those are paid out through an invoice system.
2  So the vendor submits an invoice, the invoice is
3  paid through another system and is booked into
4  MSP. What my team does is we reconcile the
5  activity within the payee to ensure if the payee
6  is for inspections that we're only getting
7  inspection transactions in that payee.
8     Q. So every 745 transaction will have,
9  what, an invoice?
10    A. Not a 745. So a 745 is a non-monetary
11 transaction. It's an adjusting entry. It could
12 just be us moving it from one payee to another.
13 Invoices are booked with a 600 series
14 transaction code.
15    Q. I think we have something on that. So
16 how would you know to move to a different payee
17 code?
18    A. We would see transaction with reason
19 codes that do not apply to that payee. So if a
20 payee is set up as an inspection payee, we
21 should only see inspection reason codes. So if
22 we saw a reason code hit that was not
23 inspection-related, we would know that it didn't
24 belong.

1     Q. So for every 745 is there going to be a
2  600 or 500?
3     A. No. A 745 is going to be offset with
4  another 745. So in order to do a 745
5  transaction there has to be a debit and a
6  credit, but there's no invoice. So it's moving
7  things internally on our books. There's no cash
8  received and we're not paying cash out.
9     Q. As an example, if an appraisal was
10 ordered by Chase by an outside firm, then that
11 firm would send Chase an invoice, it would be
12 recorded as a 600?
13    A. 600 series tran, yes.
14    Q. And would there also possibly be a 745
15 entry?
16    MR. YOO: Objection. Asked and
17 answered. Twice.
18    A. Only if the funds needed to be moved
19 into a different account.
20    MR. KELLEY: I want to take a
21 five-minute break.
22    (Recess.)
23    -=0=-
24    (Deposition Exhibit 13 marked.)

1     -=0=-
2     MR. YOO: Exhibit 13 appears to be --
3     MR. KELLEY: This is a summary.
4     MR. YOO: That's something that you
5  generated, right, Mr. Kelley?
6     MR. KELLEY: Right.
7     MR. YOO: Summary of 745 transactions is
8  the title of the document.
9     MR. KELLEY: Yes. And it's a summary of
10 the Chase discovery referencing the Chase Bates
11 number in the first column. So that would be
12 the go-to page. And it has a user column, a
13 date, it's got the payee codes, and the comments
14 field is extracted from those documents.
15    MR. YOO: Again, this document was
16 generated by Mr. Kelley. This is not a Chase
17 document.
18    MR. KELLEY: No, it's not.
19 BY MR. KELLEY:
20    Q. Take a look at that for a minute.
21    A. Okay.
22    Q. I guess starting at the top, the 10 and
23 14, do you know what that is?
24    A. I do.

1     Q. What is it?
2     A. So the 10 and 14 is a contra payee.
3     Q. Is that a real payee?
4     A. By payee, I mean that it's a number
5  assigned to a GL.
6     Q. General ledger?
7     A. Yes.
8     Q. So it doesn't have any further
9  identification?
10    A. No, other than it would just indicate a
11 general ledger account that this activity would
12 be hitting.
13    Q. Okay. So it's headed that way?
14    A. Yes.
15    Q. All right. And when it gets over there,
16 then somebody else does something with it,
17 right?
18    A. Yes.
19    Q. So it's a partitioning of the accounting
20 functions, I take it?
21    A. Yes.
22    Q. And then 16 and 14?
23    A. That is the -- it's a credit loss, GL.
24    Q. What is a credit loss?

Defendant's Expert Materials
1145

Page 61

1   A. It's just where we record potential
2  losses on our books.
3   Q. So if it's minus, is that a loss?
4   A. None of these will specifically be
5  losses, they're just kind of paper accounting,
6  where we're saying a credit is typically a --
7  I'm sorry, a minus would indicate a credit, and
8  something that was just a positive number would
9  be a debit.
10   Q. So the bottom there's a 435 number as
11  positive?
12   A. Uh-huh.
13   Q. There's a debit?
14   A. On the right, yes.
15   Q. So is that -- so which one is the right
16  one?
17     MR. YOO: Object.
18   A. All of these appear to be.
19   Q. Well, they're plus and minus.
20   A. Some of them are just changing the
21  reason code, so if you look over to the right,
22  that 435 transaction --
23     MR. YOO: Let the record reflect that
24  the witness is pointing to numbers 9 and 10,

Page 62

1  LTCO.
2   A. So that -- they're actually just
3  changing a reason code there from LTCO to CMVC.
4  During conversion WAMU had their own reason code
5  system. Chase has our reason code system. So
6  they're just doing an entry to change the reason
7  code in how it's recorded.
8   Q. So the LT stands for what?
9   A. That was a WAMU reason code showing
10  their conversion balance.
11   Q. Why are there -- if you notice, there
12  are three sets of entries under 9-24-2009.
13  That's only one loan. Why are there three sets
14  of entries?
15   A. Again, that goes back to if they were
16  doing an entry, they're just flipping the reason
17  code. So it's not truly a write-down. It's
18  adjusting that reason code. In order to do that
19  they have to reverse what was done on the other
20  reason code and then do an entry for the new
21  reason code.
22   Q. And the reason code is LTCO?
23   A. Well, that was the old reason code, so
24  they changed it to CMVC.

Page 63

1   Q. What's CMVC mean?
2   A. That's a contra conversion balance.
3   Q. Does this relate to the fair value of
4  the loan?
5   A. It does.
6   Q. You're not familiar with fair value
7  calculations. I think we asked that one.
8     MR. YOO: Asked and answered.
9   Q. Some other group does that; is that
10  correct?
11   A. That's correct.
12     MR. YOO: Asked and answered.
13   Q. Do you know what group does it? Do they
14  have a name?
15   A. I don't know.
16   Q. There's over 150,000 employees.
17   A. Right.
18   Q. So the CAMV on the line 7, what's that
19  refer to?
20   A. CAMV refers to a contra anniversary.
21   Q. So sounds like a drug deal, contras. So
22  what's that all about? Why do they have to do
23  this on anniversary dates?
24   A. Because a loan can depreciate over time.

Page 64

1  So they have to keep their value, their fair
2  value analysis current. So they make these
3  adjusting entries.
4   Q. But a loan might not depreciate over
5  time, it might appreciate, right?
6     MR. YOO: Objection.
7   Q. Is that correct?
8   A. That's correct.
9   Q. So what do you do in that circumstance?
10   A. They could do a write-up on the loan.
11   Q. Okay. All right. So what are these?
12  Are these write-ups or write-downs?
13   A. Which one?
14   Q. I'm talking about the CAMV on 6 and 7.
15   A. Those would be write-downs.
16   Q. So these guys are write-downs.
17   A. Uh-huh.
18   Q. Okay. And then if we go to lines 3 and
19  4, it says CAMV?
20   A. Again, that's anniversary contra.
21   Q. So they're adjusting them annually, is
22  that what that means?
23   A. They could be, yes.
24   Q. Because these are 9-25 and the other

Defendant's Expert Materials
1146

Page 65

1  ones were 9-24-09. Okay. Anyway, are those
2  write-ups or write-downs?
3  A. Lines 3 and 4?
4  Q. Uh-huh.
5  A. Those are -- those appear to be
6  write-downs. They are going -- I'm sorry,
7  write-ups.
8  Q. So the loan is appreciating in value?
9  A. It appears that way.
10  Q. That's quite a bit. And then we have
11  the mysterious line 2. It just shows the one
12  entry. This is the actual document production
13  from Chase. So there is no 10 and 14 in line 2.
14  So I'm not sure what that means.
15  A. If this was a 745 tran, there would have
16  to be an offsetting entry.
17  Q. So why isn't it there, I wonder?
18  A. I'm not sure where this came from. It
19  would have to be there. If we looked probably
20  through the system.
21  Q. You guys may have to fix that.
22  A. In my review of the loan, I believe that
23  there was the offset because my balance on 10
24  and 14 and 16 were, you know, equal offsets.

Page 66

1  Q. That's kind of what I was expecting.
2  Then it's a write -- so is 463 -- excuse me,
3  line 2, the 463,000, is that a write-up or
4  write-down?
5  A. Assuming that there was an offset of the
6  463, that looks like it would be a write-down.
7  Q. Do you know how they obtain this
8  write-up or write-down, or do they just hand it
9  to you?
10  A. I do not.
11  Q. So they give you the number and you see
12  it's put in right?
13  A. These payees are managed by another
14  group in accounting outside of what my group
15  does.
16  Q. Okay. When you were looking at these,
17  did you look at any adjustments made prior to
18  September 25, 2008?
19  A. I don't recall specifically what the
20  transactions were, but I reviewed all of the
21  DDCH screen.
22  Q. There's a little mystery here.
23  Okay. I probably need to make a copy of
24  this. This is the best one. Why don't we make

Page 67

1  this -- I know this by heart anyway.
2  --=0=--
3  (Deposition Exhibit 14 marked.)
4  --=0=--
5  MR. YOO: Obviously, you don't have a
6  copy for me?
7  MR. KELLEY: Share, and then I'll use
8  this thing here, which I don't want to put into
9  evidence because it's missing the origin.
10  MR. YOO: All right. Exhibit 14 appears
11  to be some type of a spreadsheet. It's
12  identified by filing date with the court on
13  September 11, 2012, page 18 out of 30.
14  BY MR. KELLEY:
15  Q. Okay. And this is the lawsuit between
16  LSI -- that the FDIC receiver made against LSI
17  Appraisal Company asserting that the loans were
18  made grossly negligent. And on that page you'll
19  notice that the loan in question ▬▬▬▬▬, is
20  there. It's about 11 above the bottom. It
21  says, Saratoga, gives the address, 14390
22  Douglass Lane.
23  A. Okay.
24  MR. YOO: On the bottom, right?

Page 68

1  Q. From the bottom, yeah. And if you move
2  over to column 3, it --
3  MR. YOO: The loss amount?
4  Q. The loss amount is stated as
5  $436,506.26; is that right?
6  MR. YOO: All right.
7  Q. In this case they're claiming that this
8  is a natural loss --
9  MR. YOO: Okay.
10  Q. -- that apparently Washington Mutual
11  incurred prior to the receivership. Otherwise,
12  the receiver wouldn't be able to bring this
13  suit.
14  MR. YOO: Okay. Assumes facts not in
15  evidence. Lacks foundation.
16  MR. KELLEY: Well, foundation, or I'll
17  take judicial notice of this elsewhere in the
18  case.
19  MR. YOO: This is a spreadsheet that was
20  created by the FDIC, correct?
21  MR. KELLEY: By their attorneys.
22  MR. YOO: Right.
23  MR. KELLEY: Yes.
24  MR. YOO: Again, not by Chase, not by

Defendant's Expert Materials
1147

**Page 69**

1 Washington Mutual.
2     MR. KELLEY: That's correct. It was
3 created by the --
4     MR. YOO: Counsel --
5     MR. KELLEY: -- counsel for the
6 receiver.
7     MR. YOO: FDIC?
8     MR. KELLEY: Right.
9 BY MR. KELLEY:
10   Q. And I was wondering if you saw any
11 reference to this loss amount in there.
12 Incidentally, if there was a loss, how would
13 that be reported? Would that be reported
14 through your group in any way?
15   A. No, my group doesn't directly handle
16 losses.
17   Q. So if a -- if a loss occurred based on
18 they bought the loan for a million and they sold
19 it for half a million, they take a -- record a
20 half-a-million-dollar loss, you wouldn't see any
21 of that in your group?
22   A. Not my team directly, no.
23   Q. You might get some sort of thing --
24 order to move things around or whatever. Okay.

**Page 70**

1 Okay. That's it on that one.
2     We see in the documents -- I'm just
3 going to ask you some questions -- that the
4 investor number or IDX99 appears on the loan
5 transfer screen. Actually, X02 appears on the
6 loan transfer screen. And my question to you
7 is: How many -- and it refers to a pool, I
8 think, investor pool.
9     MR. YOO: Objection. Lacks foundation,
10 assumes facts not in evidence.
11   Q. How many numbers -- Xs are there? Have
12 you seen an X01 and X7 or 13?
13   A. Yes, there are multiple.
14   Q. There's lots of them?
15   A. Uh-huh.
16   Q. And is there -- what are these
17 categories?
18   A. The investor -- it can represent
19 different kinds of things, but all Xs are Chase
20 owned, so they're bank-owned loans.
21   Q. And they're consistent with that code
22 that we discussed earlier?
23   A. Yes.
24   Q. So how many have you seen? Are there 50

**Page 71**

1 of them or 20 of them?
2   A. No, there's --
3   Q. 99?
4   A. It can go the whole spectrum.
5   Q. So it could be X99 -- there could be 99
6 different Xs?
7   A. That's correct.
8   Q. And you work with how many of those?
9   A. It would be all of them.
10   Q. Sooner or later, right?
11   A. Yeah.
12   Q. Thank you. You answered a question that
13 Mr. Smith couldn't answer. He didn't know who
14 client 908 was.
15   A. Good.
16   Q. I'm going to ask you this: I've never
17 seen any document production relating to the
18 HELOC that's in this case. Do you also handle
19 HELOCs?
20   A. If they're outside of the MSP servicing
21 system, I would not.
22   Q. So they could be outside the MSP
23 servicing system?
24   A. There are other systems that service

**Page 72**

1 HELOC loans, yes.
2   Q. Could you explain what other systems
3 might be.
4   A. I believe they're VLS for Fortracs,
5 F-O-R-T-R-A-C-S.
6   Q. Anything else?
7   A. Just VLS. So those are the systems that
8 are outside MSP. Not knowing specifically what
9 this loan -- if it would be on MSP or these
10 other systems.
11   Q. I was just curious as to why they would
12 account -- wouldn't MSP be able to handle a
13 HELOC, or is this just a legacy thing?
14   A. No, there are issues with that servicing
15 system that they can't do everything that's
16 required, so they use another servicing system.
17 I don't know what those things are.
18   Q. So they need to use another servicing
19 system?
20   A. Yes.
21   Q. Okay. You also answered a question
22 Mr. Smith couldn't answer with the A through B.
23     Okay. What does CI refer to? It says
24 like a prime or CI.

**Defendant's Expert Materials**
**1148**

**Page 73**

1  A. That refers to credit impaired.

2  Q. Oh, okay. So that's the stuff we were

3  talking about earlier, credit-impaired loans?

4  A. Yes.

5  Q. They call them PCI loans in the annual

6  statement?

7  A. Yes.

8  Q. So some of the loans that were acquired

9  apparently weren't credit impaired. It's not

10  clear from the annual report whether they were

11  included -- you know, they mixed them altogether

12  or what, but I think they didn't.

13  Did Mr. Smith ask you at all about the

14  corporate advance adjustments, the contra

15  accounts? Do you recall him asking?

16  MR. YOO: Objection. Vague and

17  ambiguous.

18  If you understand his question, you can

19  respond.

20  A. I don't specifically recall him asking

21  anything other than what those reason codes mean

22  as a CAMV, and then I explained the contra.

23  Q. So he didn't ask in more detail.

24  I think I asked you earlier, you don't

**Page 74**

1  deal with Washington Mutual, FSB loans?

2  MR. YOO: Asked and answered.

3  A. I don't believe so.

4  Q. Yeah, probably not.

5  On these 745 transactions, they indicate

6  the direction of the flow of money, whether it's

7  virtual or real, right?

8  A. (Nods.)

9  Q. It could go A to B or B to A, right?

10  A. Yes.

11  Q. Okay. And have you seen a lot of these

12  very large 745 transactions like the ones you

13  see here where they're 400,000 or 546,000?

14  A. Yes.

15  Q. You have?

16  A. Yes.

17  Q. Okay. And are they -- have you ever

18  seen them where the -- these numbered

19  transactions exceed the actual amount of the

20  loan?

21  MR. YOO: Objection. Vague and

22  ambiguous as phrased.

23  A. Not that I recall.

24  Q. I was reviewing someone else's loan file

**Page 75**

1  and I found they had a $570,000 loan and he had

2  $700,000 in his 745 transactions, and they

3  weren't listed as contra, they were just --

4  A. It's possible, because fees could

5  compound over time.

6  Q. Well, that would be a lot of

7  compounding. Okay. So if they had a situation

8  where a hurricane came in and blew down the

9  garage and there was no insurance, would that be

10  handled as a 745 adjustment?

11  MR. YOO: Objection. Improper

12  hypothetical. Irrelevant to the subject matter

13  of the lawsuit and not likely to lead to the

14  discovery of admissible evidence.

15  A. I don't know how that would work and how

16  it would be recorded.

17  Q. I'm just looking at these huge amounts

18  of money flowing back and forth. Okay. Let's

19  see what else we have here.

20  Do you ever work -- you don't work

21  directly with any of the subsidiaries of Chase,

22  do you?

23  A. No.

24  Q. You're just totally internal?

**Page 76**

1  A. Internal.

2  Q. So you've never processed something for

3  Washington Mutual Securities Corporation?

4  A. No.

5  Q. Washington Mutual asset?

6  A. No.

7  Q. Do you ever use LEZA?

8  A. No. I've never heard of it.

9  Q. You don't need it?

10  A. Huh-uh.

11  Q. That's another software program.

12  Are you familiar with GAAP, generally

13  accepted accounting principles?

14  A. Yes.

15  Q. Under GAAP, is it permissible to write

16  up something after it's been written down?

17  MR. YOO: Objection. Calls for

18  testimony -- expert testimony, and calls for

19  testimony that's completely irrelevant to the

20  subject matter of the lawsuit and not likely to

21  lead to any discovery of any admissible

22  evidence.

23  A. That would be outside of what I do, so I

24  wouldn't be familiar with those policies or

Defendant's Expert Materials
1149

**Page 77**

1 procedures under GAAP.
2 Q. So you're not familiar with the GAAP?
3 A. With that portion of the GAAP.
4 Q. Okay. What portions of the GAAP are you
5 familiar with?
6 A. Anything that would be related to
7 corporate advance recording, accounts
8 receivable, those type of policies.
9 Q. I should have let you read that. Okay.
10 So if I understood you correctly, you
11 actually don't work with HELOCs?
12 A. Correct.
13 Q. You don't work with iVolt either?
14 Probably don't need to?
15 A. No.
16 Q. Do you know about it?
17 A. (Nods.)
18 Q. Have you ever looked at it?
19 A. Yes.
20 Q. Okay. Are the loan documents displayed
21 in color?
22 A. I don't recall.
23 Q. Smith got that one. He said they are.
24 So...

**Page 78**

1 I might ask you, is there -- do you have
2 an internal document guidelines and procedures,
3 business practices for what you do, or do you
4 just work off of the accounting standards?
5 MR. YOO: Objection. Vague and
6 ambiguous as phrased.
7 A. I'm not sure what you're asking there.
8 Q. Do you have a book that they give you of
9 procedures, here's what you need to do, you can
10 go refer to that book?
11 A. For some things, but not all.
12 Q. Partially?
13 A. Yeah.
14 Q. Now, one other thing we were talking
15 about, which we didn't go into in a lot of depth
16 was the -- this FFIEC write-up thing. It says
17 C150, FFIEC write-up. Do you know what that is?
18 A. I don't know outside of just the
19 description that it's a 150-day contra. I don't
20 know what the 150-day would indicate, from what
21 point.
22 Q. So C150 is 150 days?
23 A. It does indicate 150 days, but I'm not
24 sure 150 days from what point.

**Page 79**

1 Q. Great. So the FFIEC, of course, appears
2 to be referring to that entity. Apparently,
3 this is rather huge. I mean, an institution
4 nobody's ever heard of. My understanding is it
5 says between the federal reserve, the OCC, the
6 FDIC, and the treasury department. So this
7 write-up refers to a report required by the
8 FFIEC. They do have a reporting mechanism. So
9 would you be writing -- is that a write-up or
10 write-down there?
11 A. Based on the signage, it looks as if
12 it's a write-up.
13 Q. So it's a write-up going to -- reporting
14 a write-up to the FFIEC. I guess the question
15 is, since they require foreign reporting, what
16 that has to do with anything. So another
17 mystery.
18 A. Yeah.
19 Q. Okay. Is there any group at Chase that
20 handles these FFIEC write-ups or write-downs or
21 whatever?
22 A. It would be the same group that does the
23 write-downs, but I don't know who specifically
24 that group is.

**Page 80**

1 Q. So the C150, you said it was 150 days?
2 A. Uh-huh.
3 Q. That's an odd number of days. Do you
4 know any more about that sort of thing?
5 A. I don't.
6 Q. Have you ever seen C300 or --
7 A. I believe there's a C360.
8 Q. That would be like annual or something,
9 right?
10 So you have a C180, C150?
11 A. I think it's just those two
12 specifically.
13 MR. KELLEY: Maybe we can go off the
14 record here for a second.
15 (A discussion is held off the record.)
16 MR. KELLEY: So will you make that
17 representation again, Mr. Yoo.
18 MR. YOO: Sure. Off the record
19 Mr. Kelley had asked that Chase produce to him a
20 FFIEC report that was sent by Chase to some type
21 of governmental agency sometime in 2012. I told
22 him that I would look into it, but I did not
23 promise or guarantee him that we would produce
24 such a report if such a report exists.

Defendant's Expert Materials
1150

**Page 81**

MR. KELLEY: Okay. And now you're
representing that you're going to look into it?

MR. YOO: I'm going to look into it.
But that's all I'm representing to you.

MR. KELLEY: Okay. And that refers to
Chase Bates number document JPM002000.

While we're on the record with this
stuff, I want to make note that no documents
were produced today. Documents were requested
at the deposition. They were not produced.

MR. YOO: Ms. Davis is appearing in her
individual capacity as an employee. She's not a
custodial record of Chase. She has no
obligation to produce any documents, especially
the document that was requested. That's not in
her possession. She has no obligation to look
for them.

BY MR. KELLEY:

Q. I might ask you, have you ever run
across the initials FNFS in the comment fields
of some of these documents?

A. I don't recall that, no.

Q. You might not because it generally shows
up in LPS documents.

**Page 82**

In connection with the payee code 16 and
14, the comment field they have CI. What does
that indicate?

MR. YOO: Asked and answered.

A. Credit impaired.

Q. Oh, okay. Got it.

MR. YOO: Do you need time to gather
your thoughts? It seems like it's not conducive
to wait five minutes for you to ask one
question.

MR. KELLEY: Be patient.

MR. YOO: That's not how a deposition
should be taken.

MR. KELLEY: Well, that's your opinion.

MR. YOO: Let the record reflect that
Mr. Kelley's browsing through the deposition of
Mr. Smith to generate a question, and, in fact,
we've been here waiting five, six minutes for
each question to be asked.

MR. KELLEY: That's not true.

MR. YOO: I've been counting the time.
In fact, one question was posed to me, and in
seven minutes only one question has been asked
to the deponent.

**Page 83**

MR. KELLEY: The purpose of the
deposition is to determine the facts in the
case; it doesn't matter if it takes one minute
or five minutes.

MR. YOO: All right. So admitted by
you.

MR. KELLEY: Okay. I'm done. Thank you
very much, Crystal. I appreciate it.

THE WITNESS: No problem.

MR. KELLEY: Your responses were very
clear.

MR. YOO: She answered every question
she knew.

—o0o—

Thereupon, the testimony of August 13,
2014, was concluded at 11:23 p.m.

—o0o—

**Page 84**

CERTIFICATE

STATE OF OHIO       :
                    :  SS:
COUNTY OF FRANKLIN  :

I, Rhonda Lawrence, a Notary Public in
and for the State of Ohio, duly commissioned and
qualified, do hereby certify that the
within-named CRYSTAL DAVIS was first duly sworn
to testify to the truth, the whole truth, and
nothing but the truth in the cause aforesaid;
that the testimony then given was reduced to
stenotypy in the presence of said witness,
afterwards transcribed; that the foregoing is a
true and correct transcript of the testimony;
that this deposition was taken at the time and
place in the foregoing caption specified.

I do further certify that I am not a
relative, employee or attorney of any of the
parties hereto; that I am not a relative or
employee of any attorney or counsel employed by
the parties hereto; that I am not financially
interested in the action; and further, I am not,
nor is the court reporting firm with which I am
affiliated, under contract as defined in Civil
Rule 28(D).

In witness whereof, I have hereunto
set my hand and affixed my seal of office at
Columbus, Ohio, on this 27th day of August,
2014.


                    Rhonda Lawrence
                    Notary Public, State of Ohio.
My commission expires:  October 8, 2018

Defendant's Expert Materials
1151

## $

**$1.888 (1)**
24:5
**$4 (1)**
29:13
**$436,506.26 (1)**
68:5
**$570,000 (1)**
75:1
**$700,000 (1)**
75:2

## /

**/0006 (1)**
44:11

## =

**=0=- (28)**
17:4,6;26:12,14;
27:6,8;30:19,21;33:7,9,
20,22;34:24;35:2;38:7,
9;41:5,7;45:15,17;
49:11,13;55:10,12;
58:23;59:1;67:2,4
**=0=- (2)**
83:14,17

## A

**A01 (3)**
53:7,14;54:18
**A11 (2)**
53:7,14
**able (2)**
68:12;72:12
**above (1)**
67:20
**accepted (1)**
76:13
**According (1)**
15:11
**account (5)**
44:16;52:9;58:19;
60:11;72:12
**accountants (2)**
6:11,17
**accounted (2)**
28:20;36:23
**accounting (33)**
6:3,24;7:14,20,21,
22;8:1,6,9,10,13,23;
9:17;10:20;18:17;27:9;
28:5,12,13,17,18;29:4,
6,20,20;32:22;37:16;
55:24;60:19;61:5;
66:14;76:13;78:4
**accounts (5)**
9:13;40:13,16;73:15;
77:7

**acquired (12)**
27:10;28:19,22;30:4;
35:12,14;36:22;39:15,
15;50:5,7;73:8
**acquisition (3)**
27:22;30:7;35:9
**acquisition-date (1)**
30:13
**across (2)**
47:9;81:20
**acting (1)**
25:20
**activities (2)**
37:18,19
**activity (2)**
57:5;60:11
**actual (6)**
29:5,20;31:21;37:11;
65:12;74:19
**actually (7)**
30:18;34:9;36:24;
38:13;62:2;70:5;77:11
**add (1)**
40:19
**address (1)**
67:21
**adequately (1)**
52:20
**adjusting (4)**
57:11;62:18;64:3,21
**adjustment (4)**
9:17;33:1,2;75:10
**adjustments (2)**
66:17;73:14
**admissible (3)**
21:13;75:14;76:21
**admitted (1)**
83:5
**advance (6)**
6:12;7:22;8:1,6;
41:14,15;56:13,17,24;
73:14;77:7
**advances (6)**
9:15,24;12:22;19:19;
34:16;39:21
**again (11)**
20:5;22:15;35:23;
46:24;53:15;54:15;
59:15;62:15;64:20;
68:24;80:17
**against (1)**
67:16
**agency (1)**
80:21
**aggregate (1)**
37:21
**aggregated (2)**
29:1,3
**ago (1)**
11:5
**agree (1)**
37:15
**agreement (15)**

17:2,14,17;18:9,11;
19:5,14,16,21;20:3;
21:6;23:5;24:3,11;26:6
**agreements (1)**
18:21
**ahead (4)**
39:11;46:12;53:11;
56:22
**allowed (1)**
21:11
**altogether (1)**
73:11
**Alvarado (2)**
5:11;12:9
**always (1)**
44:14
**ambiguity (1)**
14:10
**ambiguous (10)**
9:5,22;28:9;36:13;
39:10;40:12;56:21;
73:17;74:22;78:6
**amount (8)**
29:10,12;30:11;
32:19;68:3,4;69:11;
74:19
**amounts (1)**
75:17
**analysis (1)**
64:2
**Anne (1)**
12:7
**anniversary (3)**
63:20,23;64:20
**annoying (1)**
24:20
**annual (6)**
26:16,23;36:5;73:5,
10;80:8
**annually (1)**
64:21
**answered (12)**
10:11;19:17;37:14;
51:8;58:17;63:8,12;
71:12;72:21;74:2;82:4;
83:12
**Apparently (7)**
32:13;50:16;52:10;
55:20;68:10;73:9;79:2
**appear (2)**
61:18;65:5
**appearing (1)**
81:11
**appears (15)**
17:11;34:4;35:19,22;
46:8;51:23;53:1,6;
55:18;59:2;65:9;67:10;
70:4,5;79:1
**applied (1)**
41:22
**applies (1)**
18:11
**apply (4)**

29:21;56:17,24;
57:19
**appraisal (2)**
58:9;67:17
**appraise (1)**
37:7
**appreciate (2)**
64:5;83:8
**appreciating (1)**
65:8
**approximately (2)**
10:12;11:8
**AR (1)**
48:21
**arbitrarily (1)**
21:16
**area (1)**
9:24
**areas (2)**
35:3;46:4
**arm (1)**
47:2
**arm's (1)**
30:5
**Around (1)**
40:23;69:24
**aside (1)**
43:3
**assert (1)**
24:18
**asserting (2)**
22:15;67:17
**asset (7)**
17:24;23:11,14;
36:19;76:5
**assets (6)**
18:4;23:6;24:5;
35:13,16;42:8
**assigned (1)**
60:5
**Associate (2)**
6:7;19:18
**associated (1)**
23:9
**assume (1)**
31:5
**assumed (2)**
17:24;24:6
**Assumes (1)**
14:21;28:1;29:17;
33:6;34:23;35:24;
38:17;45:10;46:11;
50:19;68:14;70:10
**assuming (3)**
23:7;24:4;66:5
**assumption (12)**
17:2,14,16;18:9;
19:14,20;20:3;21:6;
23:5;24:3,11;26:6
**attached (1)**
31:8
**attorney (1)**
5:12

29:21;56:17,24;
**attorneys (1)**
68:21
**August (1)**
83:15
**AX01 (1)**
54:18

## B

**B33 (1)**
30:2
**back (10)**
5:16;11:20;15:19;
28:11;30:17;31:23;
33:18;54:24;62:15;
75:18
**background (5)**
5:16,20;6:22;7:3;
28:16
**backwards (1)**
54:1
**baffled (1)**
54:9
**balance (7)**
44:19;47:1,3,21;
62:10;63:2;65:23
**balanced (2)**
40:2,3
**balances (1)**
40:4
**Bank (22)**
5:7;14:16,17,18,18,
19;17:3;18:18,19;23:7;
24:4;33:14,15;36:19;
39:15;43:5;50:9,10,16;
51:6;52:16;55:3
**bank-owned (1)**
42:8;70:20
**banks (1)**
45:9
**based (4)**
19:24;36:21;69:17;
79:11
**basically (1)**
44:6
**basis (1)**
29:15
**Bates (5)**
41:9;49:15;55:17;
59:10;81:6
**become (2)**
20:8,11;21:6,18
**becomes (1)**
21:18
**begin (2)**
40:24;42:3
**beginning (2)**
29:11;40:4
**belong (1)**
57:24
**below (1)**
53:18
**best (1)**

Defendant's Expert Materials
1152

66:24
**better (2)**
31:13;54:8
**beyond (1)**
19:7
**bill (1)**
41:23
**billion (3)**
24:5;26:19;32:21
**bit (7)**
5:15;9:18;23:5;36:3;
46:3;47:7;65:10
**blew (1)**
75:8
**Board (1)**
28:18
**book (13)**
17:7,17,23;18:4,5;
23:15;26:2,8;36:11,18,
22;78:8,10
**booked (2)**
57:3,13
**books (6)**
36:20;37:1;44:23,23;
58:7;61:2
**borrower (1)**
47:22
**Borrower's (1)**
23:3
**Bottom (9)**
25:13;30:10;36:3;
47:15;51:16;61:10;
67:20,24;68:1
**bought (1)**
69:18
**box (1)**
40:17
**brand (1)**
8:20
**break (1)**
36:6;45:13;58:21
**breaks (1)**
44:23
**brief (3)**
11:10,11;14:1
**bring (1)**
68:12
**brought (1)**
40:3
**browsing (1)**
82:16
**business (1)**
78:3

---

**C**

**C150 (4)**
78:17,22;80:1,10
**C180 (1)**
80:10
**C300 (1)**
80:6
**C360 (1)**

80:7
**calculate (1)**
29:14
**calculation (3)**
37:4,5,12
**calculations (1)**
63:7
**call (3)**
44:13,17;73:5
**Calls (8)**
19:6,7;22:2;24:14,
21;25:23;76:17,18
**came (3)**
54:24;65:18;75:8
**CAMV (5)**
63:18,20;64:14,19;
73:22
**can (20)**
9:16;21:2;22:18;
23:22;24:22;27:15;
43:23;44:3,4;45:18;
46:12;48:15;52:1;54:1;
63:24;70:18;71:4;
73:18;78:9;80:13
**capacity (1)**
81:12
**captions (1)**
51:19
**carries (1)**
36:19
**carry (1)**
44:14
**carrying (1)**
29:12
**case (8)**
5:8,10;11:4;29:7;
68:7,18;71:18;83:3
**cash (4)**
7:16;29:15;58:7,8
**cat (4)**
46:17,22,23;47:1
**categories (2)**
44:15;70:17
**category (8)**
44:12,13,20,20;52:9;
53:14,14;54:15
**caution (1)**
20:5
**center (1)**
44:17
**certain (3)**
13:2;27:9;35:13,13
**certified (1)**
5:3
**cetera (1)**
18:23
**change (4)**
44:20;55:19;56:8;
62:6
**changed (1)**
62:24
**changes (1)**
30:14

**changing (3)**
54:23;61:20;62:3
**characterized (1)**
9:14
**characters (1)**
44:7
**charged (1)**
18:17
**chart (1)**
40:13
**Chase (47)**
5:7,12;7:5,12;11:23;
12:11;17:3;20:2;25:17;
26:16,22;32:23;35:10,
12;36:5;38:11;39:15,
17;41:20;43:5;45:8;
48:1;49:23;51:2,7;
52:2,3,15;54:21;55:3,
22,23;58:10,11;59:10,
10,16;62:5;65:13;
68:24;70:19;75:21;
79:19;80:19,20;81:6,
13
**Chase's (1)**
55:5
**check (1)**
39:22
**choice (2)**
45:19,21
**Christopher (1)**
5:11
**CI (3)**
72:23,24;82:2
**circumstance (1)**
64:9
**claim (4)**
41:20,20,21;42:2
**claiming (1)**
68:7
**claims (1)**
23:4
**clause (1)**
25:18
**clauses (1)**
24:12
**clear (4)**
8:8;55:2;73:10;
83:11
**clear-cut (1)**
38:23
**clearer (1)**
17:1
**clearly (1)**
19:23
**client (9)**
49:18,19,20,23;50:2,
22,23;51:2;71:14
**clients (1)**
51:4
**close (1)**
33:15
**Closing (1)**
18:19

**cluttering (1)**
16:18
**CMVC (3)**
62:3,24;63:1
**code (21)**
44:13;48:4,6,18;
57:14,17,22;61:21;
62:3,4,5,7,9,17,18,20,
21,22,23;70:21;82:1
**codes (10)**
11:15,17;14:5,7;
49:5,7;57:19,21;59:13;
73:21
**college (1)**
5:23
**color (1)**
77:21
**column (4)**
52:18;59:11,12;68:2
**comfortable (1)**
20:21
**coming (1)**
39:23
**comment (2)**
81:20;82:2
**comments (3)**
38:5,20;59:13
**commercial (1)**
19:1
**Commitments (1)**
19:3
**Company (3)**
26:23;36:5;67:17
**completed (1)**
40:22
**Completely (2)**
43:11;76:19
**compound (1)**
75:5
**compounding (1)**
75:7
**concluded (1)**
83:16
**conclusion (6)**
19:7;22:2;24:15,21;
25:8,23
**conclusions (2)**
15:4,9
**conducive (1)**
82:8
**confusion (1)**
14:11
**congratulations (2)**
43:8;54:9
**connection (1)**
82:1
**consider (1)**
9:15
**considered (1)**
42:21
**consistent (1)**
70:21
**Consolidated (1)**

34:6
**contra (8)**
60:2;63:2,20;64:20;
73:14,22;75:3;78:19
**contract (1)**
24:12
**contras (1)**
63:21
**controller (2)**
6:7;19:18
**conversation (2)**
11:11;19:24
**conversion (11)**
39:4,8,14;51:1,12,
24;54:19;55:1;62:4,10;
63:2
**converted (2)**
41:1;48:2
**copies (2)**
27:17;45:13
**copy (11)**
27:11,15;30:22;
32:11,15;38:12,14;
45:21;55:13;66:23;
67:6
**Corp (1)**
35:21
**corporate (15)**
6:12;7:22;8:1,6;
9:24;12:22;34:15;
39:21;41:14,15;56:12,
17,24;73:14;77:7
**Corporation (8)**
6:23;14:15;25:11,13,
14,17,20;76:3
**correctly (1)**
77:10
**Council (1)**
38:1
**counsel (6)**
12:10,12,13;22:24;
69:4,5
**counting (1)**
82:21
**couple (1)**
45:13
**course (1)**
79:1
**courses (1)**
6:2
**Court (6)**
15:20,22;16:9;43:4,
7;67:12
**create (1)**
29:15
**created (3)**
34:21;68:20;69:3
**credit (14)**
19:2,2;30:14;32:19;
33:1,2;58:6;60:23,24;
61:6,7;73:1,9;82:5
**credit-impaired (4)**
26:18,19;27:2;73:3

Defendant's Expert Materials
1153

cross-border (1)
 38:15
CRYSTAL (4)
 5:1,6,12;83:8
curious (1)
 72:11
current (3)
 6:6;42:5;64:2
currently (1)
 52:2
custodial (1)
 81:13
customers (1)
 18:22

**D**

date (17)
 33:1,15;35:20;46:17,
 20;51:12,18,20,20,21,
 22;53:19,22;55:20;
 56:8;59:13;67:12
dates (2)
 53:18;63:23
date-wise (1)
 51:17
David (1)
 6:23
DAVIS (7)
 5:1,6,12;16:5;19:12;
 31:21;81:11
Davis' (1)
 15:22
day (1)
 40:20
days (5)
 78:22,23,24;80:1,3
DDCH (3)
 11:15;14:3;66:21
deal (2)
 63:21;74:1
dealings (1)
 47:10
debit (3)
 58:5;61:9,13
Debts (1)
 27:9
December (1)
 40:23
decide (2)
 15:20;16:9
define (1)
 38:5
defined (1)
 17:8
defines (2)
 21:22;38:14
defining (2)
 18:10;22:13
definition (1)
 37:15
definitions (1)
 49:2

degree (1)
 6:1
department (2)
 6:11;79:6
deponent (1)
 82:24
deposes (1)
 5:3
deposition (35)
 5:6;11:3,22,24;13:8,
 15,21;14:24;15:16;
 16:5;17:5;20:16,16;
 21:1,16;26:13;27:7,14;
 30:20;33:8,21;35:1;
 38:8;39:4;41:6;45:16;
 49:12;55:11;56:11;
 58:24;67:3;81:10;
 82:12,16;83:2
depositions (1)
 14:11
depreciate (2)
 63:24;64:4
depth (1)
 78:15
description (1)
 78:19
desktop (2)
 45:2,6
detail (1)
 73:23
details (1)
 13:6
determine (2)
 15:23;83:2
determined (1)
 29:11
dictated (1)
 28:17
difference (1)
 36:10;50:14,15
different (18)
 7:19;13:5;22:7;
 30:12,24;40:8,13,16;
 44:16,19;52:7,8,15,17;
 57:16;58:19;70:19;
 71:6
digits (1)
 44:6
Direct (1)
 22:9
direction (1)
 74:6
directly (1)
 69:15,22;75:21
disclosure (1)
 38:15
discoverable (1)
 43:13
discovery (3)
 59:10;75:14;76:21
discussed (1)
 70:22
discussion (1)

80:15
displayed (1)
 77:20
distinction (1)
 18:3
divided (1)
 10:23
document (34)
 18:1;19:21;22:1,11;
 23:18,21;24:7;25:3,7,
 22;26:4,20,21,22;28:4;
 29:23;30:8;32:12;33:5,
 16;34:5;35:22;38:16,
 19;41:9;45:23;59:8,15,
 17;65:12;71:17;78:2;
 81:6,15
documents (10)
 13:15;16:24;59:14;
 70:2;77:20;81:8,9,14,
 21,24
done (12)
 26:9;28:6,24;29:2,4,
 4;32:10;40:5;45:8;
 54:2;62:19;83:7
Douglass (1)
 67:22
down (11)
 9:8;21:22;23:6,11;
 47:6;49:1,17,18;51:16;
 75:8;76:16
drive (1)
 44:15
driven (1)
 44:19
drives (3)
 44:21;46:24;54:15
drug (1)
 63:21
due (1)
 30:13
duly (1)
 5:2
During (1)
 62:4

**E**

earlier (6)
 30:3;36:21;52:10;
 70:22;73:3,24
ease (1)
 27:13
Easton (2)
 6:19,20
educational (1)
 5:20
EFF (1)
 51:20
effect (1)
 54:1
effective (3)
 53:22;55:19;56:8
eight (2)

6:14,16
either (1)
 77:13
else (7)
 8:22;37:21;51:15;
 56:14;60:16;72:6;
 75:19
else's (1)
 74:24
elsewhere (1)
 68:17
employee (2)
 12:9;81:12
employees (2)
 6:15;63:16
end (2)
 34:10;40:19
ending (1)
 40:4
English (2)
 5:24;6:22
ensure (1)
 57:5
entail (1)
 6:10
entirely (1)
 54:12
entities (2)
 15:5,6
entitled (1)
 20:20
entity (1)
 79:2
entries (4)
 48:22;62:12,14;64:3
entry (8)
 51:22;57:11;58:15;
 62:6,16,20;65:12,16
entry-level (1)
 7:13
equal (1)
 65:24
equity (1)
 19:2
escrow (1)
 19:19
especially (1)
 81:14
estate (1)
 8:9
et (1)
 18:23
even (1)
 55:22
everywhere (2)
 14:12;27:4
evidence (19)
 14:22,23;16:23;
 21:13;28:2;29:18;33:6;
 34:23;35:24;38:17;
 43:14;45:11;46:11;
 50:20;67:9;68:15;
 70:10;75:14;76:22

Exactly (2)
 21:14;39:7
EXAMINATION (1)
 5:4
Examinations (1)
 37:24
examine (1)
 28:23
examined (1)
 28:21
example (2)
 46:22;58:9
exceed (1)
 74:19
Excellent (1)
 44:22
excerpts (1)
 17:1
excuse (1)
 34:8;66:2
Exhibit (47)
 17:5,7,11,18,19;18:7,
 8;24:10;26:7,9,11,13,
 15;27:7;30:18,20;31:1,
 3,9,21,23;32:3,4,7,9;
 33:8,10,21;34:4,19;
 35:1,9,17,18;38:8;41:6,
 8;45:16,22;49:12,14;
 55:11;56:7;58:24;59:2;
 67:3,10
exhibits (1)
 27:14
exists (1)
 80:24
expected (1)
 30:15
expecting (1)
 66:1
experience (2)
 9:3,12
expert (1)
 76:18
explain (8)
 32:1;39:7;43:7;
 47:18;51:19,21;52:1;
 72:2
explained (2)
 52:20;73:22
explanation (2)
 36:15;44:22
exposure (1)
 34:16
external (1)
 45:7
extracted (1)
 59:14

**F**

FA (3)
 14:18,18;50:10
face (1)
 30:11

Defendant's Expert Materials
1154

facility (2)
6:18,20
fact (4)
15:10;33:13;82:17,
22
facts (13)
14:21;28:1;29:17;
33:6;34:23;35:24;
38:17;45:10;46:11;
50:19;68:14;70:10;
83:2
Failed (1)
18:18
fair (12)
30:7,13;32:24;36:11,
16,23;37:3,4,12;63:3,6;
64:1
familiar (19)
14:7;27:20;28:7,11,
14;37:11,16,23;38:3;
39:5;45:1;46:15;47:16;
49:7;63:6;76:12,24;
77:2,5
Fannie (3)
42:18;43:10,19
far (2)
48:22;52:2
FASB (1)
28:17
faster (1)
16:6
FDIC (6)
17:3;25:15;67:16;
68:20;69:7;79:6
fed (1)
7:16
Federal (3)
28:18;37:24;79:5
feel (1)
20:20
fees (1)
75:4
few (1)
39:2
FFIEC (9)
37:23;38:14;78:16,
17;79:1,8,14,20;80:20
field (4)
38:5,20;59:14;82:2
fields (1)
81:20
file (1)
74:24
filing (2)
35:20;67:12
finally (1)
23:11
Financial (2)
34:7;37:24
find (1)
32:14
finish (2)
20:24;21:2

finished (1)
41:3
firm (2)
58:10,11
first (9)
5:2,19;13:10;17:17,
19;28:3;34:12;43:2;
59:11
Fitz (1)
12:7
Fitzpatrick (1)
12:8
five (4)
11:11;82:9,18;83:4
five-minute (2)
36:6;58:21
fix (1)
65:21
flipping (1)
62:16
flow (2)
7:16;74:6
flowing (1)
75:18
flows (1)
29:15
FNFS (1)
81:20
follows (1)
5:3
footnote (1)
32:18,23
footnotes (1)
35:6
foreign (1)
79:15
forget (2)
12:7;32:1
form (3)
14:2;25:5;26:10
forth (2)
15:19;75:18
Fortracs (1)
72:4
F-O-R-T-R-A-C-S (1)
72:5
found (1)
75:1
foundation (12)
26:21;33:4,17;34:22;
36:1;38:18;45:11;
46:10;50:20;68:15,16;
70:9
four (1)
20:17
Freddie (2)
42:18;43:16
FSB (3)
14:19;50:16;74:1
FSP (1)
50:12
function (2)
6:6;48:13

functions (1)
60:20
funds (3)
41:20,21;58:18
further (4)
23:5;47:7;49:18;
60:8
future (1)
29:14

G

GAAP (6)
76:12,15;77:1,2,3,4
garage (1)
75:9
gather (1)
82:7
general (8)
9:2,6,8,10,13;15:4;
60:6,11
Generally (3)
43:16;76:12;81:23
generate (1)
82:17
generated (2)
59:5,16
generic (1)
54:23
gets (1)
60:15
Ginnie (3)
42:19;43:10,20
gives (2)
29:20;67:21
GL (5)
44:21;52:7,9;60:5,23
goes (2)
18:20;62:15
Good (2)
14:9;71:15
go-to (1)
59:12
governmental (1)
80:21
governs (2)
27:22;29:5
grade (1)
5:16
graduate (1)
5:24
graduated (1)
5:21
Great (1)
79:1
grossly (1)
67:18
group (19)
7:20,21;9:20,23;
10:21;48:13,15,17,18;
63:9,13;66:14,14;
69:14,15,21;79:19,22,
24

groups (7)
10:2,4,7,16,17,19,22
guarantee (2)
34:17;80:23
guarantees (3)
25:14;34:15,20
guarantor (1)
25:20
guaranty (1)
25:11
guess (8)
5:10;17:22;37:7;
40:14;47:18;51:16;
59:22;79:14
guidelines (2)
38:1;78:2
guys (2)
64:16;65:21

H

half (1)
69:19
half-a-million-dollar (1)
69:20
hand (1)
66:8
handle (3)
69:15;71:18;72:12
handled (1)
75:10
handles (1)
79:20
happen (1)
43:9
happened (4)
51:24,24;53:12;
54:20
harassing (6)
20:8,9,11;21:6,18,19
hard (1)
32:14
Harry (1)
6:23
headed (1)
60:13
headers (1)
49:18
heading (1)
24:13
heard (3)
38:2;76:8;79:4
heart (1)
67:1
held (1)
80:15
HELOC (3)
71:18;72:1,13
HELOCs (2)
71:19;77:11
help (1)
16:3
helps (1)

48:20
hereinafter (1)
5:2
here's (1)
78:9
hereunder (1)
24:6
Heritage (6)
49:21,23,24;50:13;
55:7,8
high (2)
5:21;44:2
highlight (2)
35:9;36:2
highlighted (9)
18:10;23:6;26:1;
30:10;35:3,6;41:12;
46:3;55:18
history (2)
14:4;46:17
hit (1)
57:22
hitting (1)
60:12
home (1)
19:2
honest (1)
10:15
honestly (1)
48:23
hours (1)
12:17
house (1)
41:19
housed (2)
40:16;49:21
huge (2)
75:17;79:3
Huh-uh (1)
76:10
hurricane (1)
75:8
Hybrid (2)
42:24;43:1
hypothetical (1)
75:12

I

ID (5)
44:10,12;48:10;
53:13;54:23
idea (1)
48:8
identification (1)
60:9
identified (6)
17:11;35:20;41:9;
45:23;49:14;67:12
identify (3)
28:4;34:20;48:18
IDs (3)
42:3;44:3;52:15

Defendant's Expert Materials
1155

**IDX99 (1)**
70:4
**impaired (5)**
28:19;32:19;73:1,9;
82:5
**impairment (2)**
33:2,2
**improper (3)**
16:12,17;75:11
**Inc (2)**
34:5,21
**Incidentally (1)**
69:12
**include (2)**
31:9;32:22
**included (1)**
73:11
**including (2)**
18:16;33:1
**incurred (1)**
68:11
**indemnification (3)**
24:11,13;25:6
**indicate (13)**
42:7,8,16,17;47:20;
50:4;51:15;60:10;61:7;
74:5;78:20,23;82:3
**indicated (1)**
11:4
**indicates (9)**
22:6;32:18;34:5;
36:4;41:17;42:6;47:2;
54:4;55:6
**indicating (1)**
52:11
**indirect (1)**
22:9
**individual (1)**
81:12
**individually (3)**
28:20,24;30:5
**in-house (3)**
12:10,12,13
**initials (1)**
81:20
**insert (2)**
15:18;16:13
**inserting (2)**
15:3;22:23
**inspection (3)**
57:7,20,21
**inspection-related (1)**
57:23
**inspections (1)**
57:6
**institution (1)**
79:3
**Institutions (1)**
37:24
**instruct (2)**
16:8;21:19
**instructing (1)**
15:2;16:10,15

**instructions (1)**
56:17
**insurance (1)**
75:9
**intend (1)**
15:21
**intention (1)**
16:10
**interchangeable (1)**
45:3
**interchangeably (1)**
45:4
**interest (7)**
17:22;18:21;26:17;
30:14;35:4;46:4;53:16
**interested (1)**
18:23
**internal (4)**
55:24;75:24;76:1;
78:2
**internally (1)**
58:7
**interrupt (1)**
16:2
**interrupting (1)**
20:15
**into (20)**
9:19;16:23;29:1,3;
39:18,19;44:16,23;
45:5;52:7,8;53:14;
54:22;57:3;58:19;67:8;
78:15;80:22;81:2,3
**introduce (2)**
15:21;16:23
**introducing (1)**
27:14
**INV (1)**
46:17
**Investigations (2)**
33:11,13
**investor (23)**
41:19,21;42:3,6,18;
44:3,10,11;46:18;
47:12;52:6,8,11,14;
53:7,13;54:12,23;
55:19;56:8;70:4,8,18
**investors (1)**
42:22
**invoice (8)**
48:11,11;57:1,2,2,9;
58:6,11
**Invoices (1)**
57:13
**irrelevant (4)**
16:5;43:12;75:12;
76:19
**issue (1)**
53:4
**issued (1)**
33:14
**issues (2)**
35:7;72:14
**IV (1)**

48:8
**iVolt (1)**
77:13

**J**

**James (1)**
5:9
**job (2)**
6:6;56:18
**join (1)**
7:5
**joint (1)**
22:10
**JPM (1)**
49:15
**JPM001134 (1)**
55:17
**JPM001546 (1)**
45:23
**JPM002000 (1)**
81:6
**JPM002040 (1)**
41:10
**JPMorgan (8)**
5:7;17:3;26:16,22;
32:23;36:4;38:10;55:3
**judge (1)**
43:4
**judicial (1)**
68:17

**K**

**keep (6)**
20:11;21:4;27:5;
31:14,16;64:1
**KELLEY (88)**
5:5,7,9;14:23;15:8,
12,13;16:1,21,22;
17:13,15,20;20:4,9,13,
15,22,24;21:9,15,21;
22:13,17,20;23:2,20,
24;24:1,16;26:11;
27:12,16,19;31:4,7,10,
14,18,24;32:6,8,13,17;
33:23;34:2,8,13;35:3;
36:2,9;38:13;41:11;
45:12,18,20;46:1;
55:14,16;58:20;59:3,5,
6,9,16,18,19;67:7,14;
68:16,21,23;69:2,5,8,9;
80:13,16,19;81:1,5,18;
82:11,14,20;83:1,7,10
**Kelley's (3)**
35:23;56:5;82:16
**kind (10)**
8:12;9:16;30:3;
42:23;46:3;49:2,5;
54:22;61:5;66:1
**kinds (1)**
70:19
**knew (1)**

83:13
**knowing (1)**
72:8
**knowledge (3)**
19:8,13,20
**knowledgeable (1)**
20:2
**known (3)**
8:19;15:10;43:2

**L**

**lacks (11)**
26:20;33:4,17;34:22;
35:24;38:18;45:11;
46:10;50:20;68:15;
70:9
**Lane (1)**
67:22
**large (1)**
74:12
**last (3)**
12:8;26:6;30:17
**later (5)**
13:6;22:14;34:16;
53:10;71:10
**lawsuit (4)**
43:13;67:15;75:13;
76:20
**lead (3)**
43:13;75:13;76:21
**leading (1)**
21:12
**leads (1)**
21:12
**learned (1)**
6:24
**ledger (8)**
9:2,6,8,10,13;54:16;
60:6,11
**leeway (2)**
19:22;21:7
**left (1)**
28:3
**legacy (1)**
72:13
**legal (8)**
15:4,8;19:6;22:2;
24:14,21;25:8,23
**length (1)**
30:5
**letter (1)**
42:14
**level (1)**
37:19
**LEZA (1)**
76:7
**liabilities (6)**
18:4;23:8;24:6;
35:12,14,15
**liability (3)**
17:24;35:5;50:8
**likely (1)**

43:13;75:13;76:20
**limited (1)**
25:11
**line (6)**
53:2;56:6;63:18;
65:11,13;66:3
**lines (4)**
19:1,2;64:18;65:3
**list (1)**
49:1
**listed (1)**
75:3
**lists (1)**
26:1
**little (10)**
5:15;9:18;14:11;
23:5;28:16;36:3;45:12;
46:3;47:7;66:22
**loaded (1)**
54:21
**loading (1)**
54:22
**loan (34)**
28:6,19;29:1,8,12,
21;37:19;44:16,18;
46:18,19,24;47:2,4;
49:16;52:22;53:4;
56:10;62:13;63:4,24;
64:4,10;65:8,22;67:19;
69:18;70:4,6;72:9;
70:20,24;75:1;77:20
**loans (42)**
18:10,11,16,16,16;
26:2,18,19;27:9,23;
28:22,23;29:2,3,8,22;
30:4,11,13;32:19;
34:21;35:8,10,14;
36:22;39:16;42:6;
44:18;47:9;49:21;50:2,
9,10,13;54:21;67:17;
70:20;72:1;73:3,5,8;
74:1
**logged (1)**
45:5
**logic (2)**
52:14,17
**logo (1)**
14:14
**long (3)**
7:24;8:5;21:11
**longer (1)**
48:1
**look (22)**
14:5;29:9;31:11;
32:15;34:14;35:5;42:1;
46:2,16;47:6;49:2,7;
53:18;56:10,14;59:20;
61:21;66:17;80:22;
81:2,3,16
**looked (2)**
65:19;77:18
**looking (3)**
43:4;66:16;75:17

Defendant's Expert Materials
1156

Looks (3)
  53:13;66:6;79:11
loss (10)
  60:23,24;61:3;68:3,
  4,8;69:11,12,17,20
losses (3)
  61:2,5;69:16
lot (5)
  13:19;44:14;74:11;
  75:6;78:15
lots (1)
  70:14
LPS (5)
  45:1,5,8;56:1;81:24
LSI (2)
  67:16,16
LT (1)
  62:8
LTCO (4)
  11:17;62:1,3,22

**M**

Mac (2)
  42:19;43:16
Mae (4)
  42:18,19;43:10,10
Maes (1)
  43:20
main (1)
  17:22
Mainly (1)
  8:14
maintenance (1)
  52:6
makes (1)
  41:20
making (1)
  15:5
manage (1)
  6:12
managed (3)
  7:16;8:10;66:13
many (7)
  6:13;10:7,13;70:7,
  11,24;71:8
map (1)
  44:20
marked (14)
  17:5;26:13;27:7;
  30:20;33:8,21;35:1;
  38:8;41:6;45:16;49:12;
  55:11;58:24;67:3
market (2)
  30:14;36:17
matches (1)
  55:20;56:3,6
matter (4)
  43:12;75:12;76:20;
  83:3
may (10)
  19:19;20:8;30:11;
  33:18;35:21;44:17;

45:2;46:4,14;65:21
maybe (3)
  31:17;38:4;80:13
mean (13)
  13:23;14:16,18;
  25:15,19;31:9;40:14;
  50:1;56:18;60:4;63:1;
  73:21;79:3
meaning (2)
  9:6;47:21
means (7)
  17:23;19:9;21:24;
  48:9;50:2;64:22;65:14
mechanism (1)
  79:8
meshing (1)
  39:18
method (2)
  28:12,16
might (11)
  20:10;46:2;47:12;
  56:16;64:4,5;69:23;
  72:3;78:1;81:19,23
million (3)
  29:13;69:18,19
mine (1)
  10:4
minus (3)
  61:3,7,19
minute (3)
  31:10;59:20;83:3
minutes (6)
  11:12;20:18;82:9,18,
  23;83:4
missing (1)
  67:9
mixed (1)
  73:11
moment (1)
  9:19
money (2)
  74:6;75:18
months (1)
  11:5
more (9)
  9:18;12:18;16:14,18;
  36:3;46:4;47:12;73:23;
  80:4
mortgage (2)
  26:7;35:4
most (4)
  19:13;20:2;54:8,9
move (8)
  16:21;39:1;52:8,18;
  53:2;57:16;68:1;69:24
moved (2)
  53:13;58:18
moving (4)
  27:5;52:7;57:12;
  58:6
MSP (20)
  8:14,15;39:4,14,16,
  17;42:5;45:3;46:9;

49:21,21;51:1,4;56:10;
  57:4;71:20,22;72:8,9,
  12
much (9)
  8:24;11:9;12:15;
  13:7;16:16;18:23;
  19:19;37:19;83:8
multiple (1)
  70:13
Mutual (20)
  14:16,17,17,18,19;
  32:20;33:14;34:5,21;
  48:3;50:9,10,12,16;
  51:6;68:10;69:1;74:1;
  76:3,5
mysterious (1)
  65:11
mystery (2)
  66:22;79:17

**N**

NA-156 (1)
  55:3
name (3)
  5:9;12:8;63:14
natural (1)
  68:8
necessarily (1)
  35:10
necessary (2)
  21:9;32:2
need (7)
  45:13;66:23;72:18;
  76:9;77:14;78:9;82:7
needed (1)
  58:18
needs (1)
  31:22
negligent (1)
  67:18
new (5)
  30:18;43:6;48:11;
  54:12;62:20
Newark (1)
  5:24
next (8)
  21:3;23:3;24:2;
  25:18,24;47:14;52:18;
  53:2
Nine (2)
  7:9,10
nobody's (1)
  79:4
Nods (2)
  74:8;77:17
None (2)
  49:7;61:4
non-monetary (1)
  57:10
note (2)
  53:3;81:8
Notes (1)

34:6
notice (2)
  62:11;67:19;68:17
number (24)
  10:21;35:20;41:9;
  42:15;44:3,9;46:18,19,
  20;49:15;51:7,7;52:11;
  53:4;55:5,17;59:11;
  60:4;61:8,10;66:11;
  70:4;80:3;81:6
numbered (1)
  74:18
numbers (5)
  43:9;44:2;47:15;
  61:24;70:11

**O**

object (2)
  16:7;61:17
Objection (48)
  9:4,21;10:10;14:21;
  15:2,23;16:4,14,17;
  18:1;19:6;20:23;22:1,
  11;23:18;24:7,14,20;
  25:3,22;26:20,24;28:1,
  8;29:17,23;33:4,5,6,16;
  34:22;36:12;38:16;
  39:9;40:11;43:11;
  45:10;46:10;50:19;
  56:20;58:16;64:6;70:9;
  73:16;74:21;75:11;
  76:17;78:5
objections (11)
  15:3,18;16:13,20;
  20:18;22:16,19,23;
  23:23;24:19,20
obligation (3)
  25:2;81:14,16
obligor (1)
  21:22
obligors (1)
  22:7
obtain (1)
  66:7
obtained (2)
  32:20;33:10
obviously (2)
  55:23;67:5
OCC (1)
  79:5
occurred (1)
  69:17
odd (1)
  80:3
off (6)
  18:17;20:17;78:4;
  80:13,15,18
offer (1)
  7:19
offset (3)
  58:3;65:23;66:5
offsets (1)

65:24
offsetting (1)
  65:16
old (1)
  62:23
old/INV (1)
  51:20
Once (4)
  21:18;28:24;29:4;
  40:2
one (33)
  11:2;14:1;24:9;
  28:21,23;31:7;33:24;
  34:3;37:1;39:19;40:9;
  44:8;49:9,22;51:5;
  54:17,24;55:15;57:12;
  61:15,16;62:13;63:7;
  64:13;65:11;66:24;
  70:1;77:23;78:14;82:9,
  22,23;83:3
ones (3)
  13:17;65:1;74:12
only (10)
  9:20,23;10:21;13:2;
  41:3;57:6,21;58:18;
  62:13;82:23
onto (1)
  54:21
operating (1)
  50:18
operational (1)
  9:23
opinion (1)
  82:14
order (5)
  44:18;51:17;58:4;
  62:18;69:24
ordered (1)
  58:10
orders (1)
  56:19
origin (1)
  67:9
originated (1)
  50:3
OSU (1)
  5:24
Otherwise (2)
  21:1;68:11
OTS (1)
  33:13
out (7)
  5:15;39:23;45:8,20;
  57:1;58:8;67:13
outside (9)
  5:11;28:13;58:10;
  66:14;71:20,22;72:8;
  76:23;78:18
over (20)
  13:12;17:8;18:12;
  21:2,23;23:12;30:16;
  38:22;39:22;40:3;46:2;
  48:2,21;60:15;61:21;

Defendant's Expert Materials
1157

63:16,24;64:4;68:2;
75:5
**overdrafts (2)**
18:22,24
**own (5)**
10:22;51:1,3;52:14;
62:4
**owned (3)**
8:9;52:16;70:20
**owns (1)**
10:21

**P**

**page (39)**
17:7,11,12,18,18,19;
18:6,8;21:22;23:3,4,6;
24:2,2,9,10;25:18,24;
26:5,6,15,15;28:3,5;
29:10,19;30:1,2;34:11,
12;35:22;36:3;38:10;
47:14;49:1;55:3;59:12;
67:13,18
**pages (2)**
33:23;34:1
**paid (4)**
29:13;51:21;57:1,3
**paper (1)**
61:5
**paragraph (1)**
17:18
**paraphrased (1)**
30:3
**part (11)**
9:9;16:24;18:18;
31:2,4,5,8,22;32:3;
44:11;56:11
**Partially (1)**
78:12
**participate (1)**
39:20
**participation (3)**
18:21;19:5,15
**participations (1)**
18:22
**particular (1)**
32:11
**partitioned (1)**
10:23
**partitioning (1)**
60:19
**party (2)**
41:16;47:19
**patient (1)**
82:11
**pay (4)**
36:18;41:14,21;42:1
**payee (23)**
14:5,7;41:15,17,22;
47:15,24;48:1,4,7;57:5,
5,7,12,16,19,20,20;
59:13;60:2,3,4;82:1
**payees (4)**

10:21,22,24;66:13
**paying (2)**
20:16;58:8-
**payments (2)**
34:17;35:7
**payroll (1)**
7:1
**PCI (1)**
73:5
**people (4)**
6:13;44:9;48:17;
54:8
**Perhaps (1)**
22:23
**Permanent (1)**
33:11
**permissible (1)**
76:15
**person (5)**
19:13;20:1;43:2;
48:12,15
**personal (3)**
31:15,16,18
**person's (1)**
19:8
**phone (2)**
11:10;13:13
**phrased (2)**
74:22;78:6
**place (1)**
53:15
**plaintiff (1)**
5:10
**platform (5)**
42:5;49:20,23;55:6,8
**platforms (3)**
49:22;51:2,4
**please (3)**
23:3,22;55:14
**pledged (1)**
47:9
**PLGD-LN (1)**
47:7
**plus (1)**
61:19
**pm (1)**
83:16
**point (7)**
20:8,10;21:4,17;
26:10;78:21,24
**pointing (1)**
61:24
**Polaris (1)**
6:18
**policies (2)**
76:24;77:8
**pool (9)**
28:22,22;29:1,3,8,
22;37:16;70:7,8
**pools (1)**
30:5
**portion (5)**
17:16;26:2;31:3;

35:19;77:3
**portions (1)**
77:4
**posed (1)**
82:22
**position (6)**
6:21;7:11,14,18,19,
22
**positive (2)**
61:8,11
**possession (1)**
81:16
**possibility (1)**
21:12
**possible (1)**
75:4
**possibly (1)**
58:14
**potential (1)**
61:1
**practical (1)**
7:2
**practices (1)**
78:3
**pre-9-1-09 (1)**
51:11
**pre-Chase (1)**
48:1
**precision (1)**
18:5
**Preconversion (2)**
51:13;52:13
**preparation (4)**
11:21;13:8,15;56:11
**prepared (1)**
31:13
**prepayments (1)**
30:15
**present (1)**
5:14
**presumed (1)**
30:7
**pretty (4)**
8:19,24;21:2;37:19
**previous (1)**
14:11
**price (4)**
23:12,15;29:13;30:7
**primary (1)**
22:9
**prime (1)**
72:24
**principles (1)**
76:13
**print (1)**
14:3
**prior (6)**
8:5;18:18;51:24;
56:10;66:17;68:11
**private (4)**
41:19;42:6,21,23
**Probably (10)**
9:14;11:5,11;12:17;

16:3;49:8;65:19;66:23;
74:4;77:14
**problem (1)**
83:9
**procedures (3)**
77:1;78:2,9
**processed (1)**
76:2
**produce (3)**
80:19,23;81:14
**produced (2)**
81:9,10
**production (2)**
65:12;71:17
**program (3)**
40:6,9;76:11
**programs (1)**
40:8
**progress (1)**
7:17
**promise (1)**
80:23
**proper (1)**
16:17
**property (3)**
36:17,18;37:8
**provide (1)**
27:15
**providers (1)**
45:9
**providing (1)**
27:16
**purchase (18)**
17:2,13,16;18:9;
19:14,20;20:3;21:5;
23:4,12,14;24:3,10;
26:5;28:12,16;29:10;
35:11
**purchased (9)**
23:6;24:5;26:17,19;
27:1;28:6;29:12;32:19;
35:13
**purpose (3)**
35:8,16;83:1
**put (4)**
38:21;40:17;66:12;
67:8

**Q**

**quasi (1)**
42:23
**quicker (1)**
16:16
**quite (2)**
8:7;65:10

**R**

**rates (1)**
30:14
**Rather (3)**
16:16,19;79:3

**read (7)**
17:8;18:12;21:23;
23:12;38:22;53:8;77:9
**real (3)**
8:9;60:3;74:7
**really (8)**
16:4;20:7;24:20;
28:13;39:18;42:20;
54:22;55:1
**reason (18)**
11:2,15;57:18,21,22;
61:21;62:3,4,5,6,9,16,
18,20,21,22,23;73:21
**recall (11)**
11:6;15:1;43:9,23;
44:1;66:19;73:15,20;
74:23;77:22;81:22
**receivable (1)**
77:8
**received (1)**
58:8
**receiver (7)**
17:3;24:4;25:19;
35:11;67:16;68:12;
69:6
**receivers (1)**
25:14
**receivership (4)**
14:20;15:7;50:17;
68:11
**Recess (2)**
36:8;58:22
**reconcile (1)**
57:4
**reconciliation (1)**
6:12
**record (17)**
16:13,19;17:10;
35:18;41:8;45:22;52:9;
56:4;61:1,23;69:19;
80:14,15,18;81:7,13;
82:15
**recorded (5)**
30:6;32:24;58:12;
62:7;75:16
**recording (1)**
77:7
**Records (1)**
18:17
**recoverable (2)**
47:21,21
**refer (9)**
14:13,15,17;33:18;
48:12;55:19;63:19;
72:23;78:10
**reference (1)**
50:24;69:11
**referencing (2)**
48:14;59:10
**referred (1)**
39:4
**referring (5)**
33:3;51:5;56:5,6;

Defendant's Expert Materials
1158

79:2
**refers (7)**
54:5,6;63:20;70:7;
73:1;79:7;81:5
**reflect (4)**
17:10;56:4;61:23;
82:15
**regarding (2)**
19:13;20:2
**reiterates (1)**
30:2
**relate (1)**
63:3
**related (2)**
39:21;77:6
**relating (2)**
21:5;71:17
**relevant (1)**
38:19
**remarkable (1)**
40:10
**remarks (3)**
31:15,17,19
**REO (5)**
7:20;8:9,11;9:14,15
**report (10)**
26:16,23;36:5;46:5,
9;73:10;79:7;80:20,24,
24
**reported (2)**
69:13,13
**reporting (3)**
79:8,13,15
**represent (4)**
23:16;46:19;52:3;
70:18
**representation (1)**
80:17
**represented (1)**
11:16
**representing (3)**
22:24;81:2,4
**represents (1)**
17:15
**repurchase (3)**
35:5,8;50:8
**requested (2)**
81:9,15
**require (1)**
79:15
**required (2)**
72:16;79:7
**requirements (1)**
38:15
**reserve (1)**
79:5
**reside (1)**
47:1
**resides (1)**
44:16
**respect (1)**
17:23
**respond (6)**

23:23;24:19;39:12;
46:12;56:23;73:19
**responses (1)**
83:10
**rest (1)**
29:5
**restrict (1)**
21:15
**retort (1)**
16:4
**retorting (5)**
16:16,19;22:19,20,
22
**reverse (2)**
51:17;62:19
**review (4)**
13:14,20;56:12;
65:22
**reviewed (2)**
14:4;66:20
**reviewing (1)**
74:24
**revolving (1)**
19:1
**ridiculous (1)**
20:19
**right (46)**
5:12;10:5;15:11;
17:20;21:1;22:7;24:6;
26:2;28:15;29:19;31:6;
36:24;40:17,21;41:3,
11;42:2;46:9;48:22;
49:10;53:20,21;54:12;
55:9;59:5,6;60:15,17;
61:14,15,21;63:17;
64:5,11;66:12;67:10,
24;68:5,6,22;69:8;
71:10;74:7,9;80:9;83:5
**rights (1)**
26:8
**risk (1)**
30:14
**Rule (1)**
21:10
**run (1)**
47:9;81:19
**running (1)**
20:17

**S**

**sales (1)**
8:11
**Same (8)**
26:24;30:23;31:17;
40:1,5;44:17;48:24;
79:22
**SAP (2)**
8:18,19
**Saratoga (1)**
67:21
**saw (2)**
57:22;69:10

**saying (5)**
17:23;23:7;29:9;
52:22;61:6
**Schedule (4)**
23:16,17,20;26:1
**school (2)**
5:17,21
**scope (1)**
28:14
**screen (10)**
11:15;43:5,7;46:14;
49:8,16;51:16;66:21;
70:5,6
**screens (2)**
14:3;56:13
**searching (1)**
55:15
**second (2)**
34:11;80:14
**secondary (1)**
22:9
**Securities (2)**
27:10;76:3
**security (1)**
37:8
**seeing (2)**
51:18;54:20
**seem (1)**
44:9
**seems (1)**
82:8
**segregated (1)**
47:4
**Senate (2)**
33:10,12
**send (1)**
58:11
**sense (1)**
38:22
**sent (2)**
41:23;80:20
**separate (2)**
34:2;51:3
**September (4)**
33:14;37:2;66:18;
67:13
**series (8)**
43:17,17,19,21;44:5,
23;57:13;58:13
**service (1)**
71:24
**servicer (1)**
54:21
**servicing (11)**
26:8;39:14,16,17,19;
52:1;71:20,23;72:14,
16,18
**set (1)**
57:20
**sets (2)**
62:12,13
**setting (1)**
26:18

**seven (2)**
6:24;82:23
**several (3)**
7:23;11:5;13:4
**share (3)**
45:18;55:14;67:7
**sheet (3)**
33:13;44:19;47:1
**sheets (1)**
47:3
**short (1)**
19:24
**shot (3)**
20:18;43:5,7
**showing (2)**
28:5;62:9
**shows (8)**
27:4;35:6;38:5;53:5,
11;54:11;65:11;81:23
**signage (1)**
79:11
**significance (1)**
44:14
**similarly (1)**
14:19
**simply (4)**
15:3,24;16:12,19
**single (2)**
29:7,21
**situation (1)**
75:7
**six (1)**
82:18
**skip (2)**
24:9;30:16
**small (1)**
48:17
**Smith (16)**
5:11;11:3,6;12:9,21,
21;13:23,24;14:24;
20:1;39:3;71:13;72:22;
73:13;77:23;82:17
**smoothly (1)**
23:1
**so-called (1)**
39:8
**software (3)**
8:12,20;76:11
**sold (1)**
69:18
**somebody (3)**
36:17;37:21;60:16
**someone (1)**
74:24
**sometime (2)**
37:3;80:21
**Sometimes (1)**
13:12
**Somewhat (1)**
47:17
**soon (1)**
21:2
**Sooner (1)**

71:10
**SOP (3)**
29:5;20;30:4
**SOP-3 (1)**
33:3
**Sorry (5)**
10:8;25:12;34:9;
61:7;65:6
**sort (3)**
46:9;69:23;80:4
**sound (1)**
51:12
**sounds (1)**
63:21
**speaking (4)**
12:15;13:7;19:11;
39:13
**speaks (15)**
18:2;19:21;22:1,12;
23:19;24:7;25:3,7,22;
26:4;29:24;30:8;33:5,
16;38:16
**special (1)**
53:15
**specific (7)**
9:12;48:7,12,14,15,
16;49:8
**specifically (12)**
10:8;11:14;13:20;
19:10;40:15;45:5;61:4;
66:19;72:8;73:20;
79:23;80:12
**spectrum (1)**
71:4
**speed (1)**
15:16
**spend (2)**
12:15;13:7
**spent (2)**
11:9;12:18
**spoke (5)**
11:4;12:3,7,12;52:10
**spreadsheet (2)**
67:11;68:19
**stamp (2)**
41:9;49:15
**Standards (1)**
28:18;36:24;78:4
**stands (2)**
15:2;62:8
**start (3)**
5:14;7:11;29:11
**started (1)**
7:13
**starting (3)**
9:7;26:10;59:22
**stated (1)**
68:4
**statement (4)**
27:20,21;35:24;73:6
**statements (2)**
15:9;34:7
**states (3)**

23:14;26:7;42:2
**step (1)**
55:1
**stop (2)**
20:15;22:18
**studied (1)**
5:23
**stuff (6)**
11:18;29:6;31:11;
49:4;73:2;81:8
**Subcommittee (2)**
33:11,12
**subject (6)**
14:20;23:8;30:4;
43:12;75:12;76:20
**sub-ledgers (2)**
9:8,9
**submits (1)**
57:2
**submitted (1)**
24:4
**subparagraph (1)**
18:15
**Subrogation (1)**
25:18
**Subsidiaries (2)**
34:6;75:21
**subsidiary (1)**
50:18
**substantially (1)**
30:12
**suit (1)**
68:13
**summary (4)**
46:9;59:3,7,9
**supervise (1)**
6:11
**supplemental (1)**
25:2
**Suppose (1)**
42:15
**Sure (1)**
9:11;18:12;32:16;
39:23;40:2,19;65:14,
18;78:7,24;80:18
**surrounding (1)**
35:7
**sworn (1)**
5:2
**system (20)**
39:14,16,17,19;
40:24;41:1;45:2;52:1;
55:23,24;57:1,3;62:5,
5;65:20;71:21,23;
72:15,16,19
**systems (5)**
39:18;71:24;72:2,7,
10

---

**T**

**T13 (2)**
46:21,23

**talk (1)**
11:21
**talking (6)**
11:6,9;13:21;64:14;
73:3;78:14
**talks (1)**
25:1
**team (3)**
48:11;57:4;69:22
**technical (1)**
50:15
**ten (1)**
11:11
**term (5)**
14:14;17:7;26:17;
27:1;38:2
**terms (1)**
22:13
**testimony (6)**
15:22;19:7;76:18,18,
19;83:15
**Thanks (1)**
43:1
**thereafter (1)**
37:3
**Thereupon (1)**
83:15
**third (3)**
41:16;47:19;49:1
**third-party (2)**
41:17;45:9
**Thomas (1)**
12:3,4
**though (1)**
55:22
**thoughts (1)**
82:8
**three (3)**
20:17;44:6,7;62:12,
13
**three-page (1)**
45:23
**tie (1)**
34:15
**times (1)**
44:9
**title (2)**
6:9;59:8
**today (4)**
11:22;51:2;52:3;
81:9
**together (2)**
34:9,9
**told (2)**
21:17;80:21
**top (8)**
35:21;46:16;49:17;
51:19;55:2,18;56:6;
59:22
**totally (1)**
75:24
**trades (1)**
37:9

**tran (3)**
51:20;58:13;65:15
**transaction (10)**
33:1;51:22,23;53:19;
57:8,11,14,18;58:5;
61:22
**transactions (11)**
13:2,5;30:6;38:20;
57:7;59:7;66:20;74:5,
12,19;75:2
**transcript (2)**
13:20,22
**transfer (6)**
27:10;49:16;53:5;
54:1;70:5,6
**transferred (3)**
35:15;50:17;52:23
**transfers (1)**
52:5
**treasury (2)**
7:13;79:6
**trial (1)**
15:21
**true (1)**
82:20
**truly (1)**
62:17
**trying (1)**
21:16
**turn (1)**
28:4
**turns (1)**
45:20
**Twice (1)**
58:17
**two (14)**
7:18;8:2,3;10:9;
12:17;30:16;33:23;
34:1,15;37:1;39:18;
40:8;49:22;80:11
**type (9)**
35:6,19;42:17;44:17;
46:5;47:4;67:11;77:8;
80:20
**types (3)**
13:5;20:6;22:7
**typically (3)**
47:1;52:5;61:6

---

**U**

**ultimately (1)**
15:20
**Unaudited (1)**
34:7
**under (8)**
6:14;15:6;18:15;
21:10;29:13;62:12;
76:15;77:1
**understood (1)**
77:10
**unless (1)**
16:11

**up (12)**
15:16;27:4;28:11;
38:5;40:19;44:4,8,23;
53:2;57:20;76:16;
81:24
**upon (1)**
19:24
**use (14)**
8:12,18;14:14;40:24;
45:4;48:6;49:5,6,9;
51:14;67:7;72:16,18;
76:7
**used (5)**
22:14;34:19;41:19;
47:24;48:10
**user (3)**
48:10,14;59:12
**users (1)**
48:15
**uses (2)**
48:1;55:23
**using (1)**
8:15;29:7;48:17
**usually (1)**
45:7

---

**V**

**Vague (10)**
9:4,21;28:8;36:12;
39:9;40:11;56:20;
73:16;74:21;78:5
**valid (1)**
15:23
**value (26)**
17:8,17,23;18:4,5;
23:15;26:2,8;30:7,13;
32:24;36:11,11,16,17,
18,22,23;37:3,5,12;
63:3,6;64:1,2;65:8
**Van (1)**
12:4
**vendor (1)**
57:2
**versus (1)**
5:7
**virtual (1)**
74:7
**VLS (2)**
72:4,7

---

**W**

**wait (2)**
31:10;82:9
**waiting (1)**
82:18
**WAMU (14)**
14:14,14;39:15;
49:21,24;50:3;51:1,10;
52:1,14;55:7,8;62:4,9
**Washington (20)**
14:16,16,17,18,19;

**32:20;33:14;34:5,20;**
48:3;50:9,9,12,16;
51:6;68:10;69:1;74:1;
76:3,5
**wasting (1)**
16:18
**way (5)**
16:6;44:4;60:13;
65:9;69:14
**weren't (2)**
73:9;75:3
**what's (9)**
5:19;41:12;44:11;
48:21;54:14,17;63:1,
18,22
**Whenever (1)**
15:21
**Whereas (1)**
36:18
**whole (2)**
18:18;71:4
**who's (1)**
43:2
**wish (1)**
31:12
**within (7)**
7:20;9:12;10:20;
11:23;24:12;40:5;57:5
**without (1)**
15:18
**witness (6)**
11:4;15:17;30:23;
31:2;61:24;83:9
**wonder (1)**
65:17
**wondering (1)**
69:10
**words (1)**
28:21
**work (7)**
71:8;75:15,20,20;
77:11,13;78:4
**worked (1)**
6:23
**works (1)**
19:18
**worth (1)**
55:15
**write (2)**
66:2;76:15
**write-down (5)**
62:17;66:4,6,8;79:10
**write-downs (7)**
64:12,15,16;65:2,6;
79:20,23
**write-up (10)**
64:10;66:3,8;78:16,
17;79:7,9,12,13,14
**write-ups (4)**
64:12;65:2,7;79:20
**writing (1)**
79:9
**written (1)**

---

Defendant's Expert Materials
1160

76:16

## X

**X01 (2)**
54:12;70:12
**X02 (1)**
70:5
**X7 (1)**
70:12
**X99 (1)**
71:5
**Xs (3)**
70:11,19;71:6

## Y

**year (1)**
46:17
**years (7)**
6:24;7:9,10,18,23;
8:2,3
**Yoo (131)**
5:11;9:4,21;10:10,
14;12:10;13:8,21;
14:21;15:1,11,15;16:2;
17:10,15;18:1,7;19:6,
12,17;20:5,10,14,20,
24;21:14,17;22:1,11,
15,18,22;23:18,22;
24:7,14,18;25:3,7,22;
26:4,20,24;27:11,13,
18;28:1,8;29:17,23;
30:8,22,24;31:5,8,12,
15,16,19,20;32:4,7,10,
16;33:4,16;34:1,4,11,
22;35:18;36:7,12;
37:10,14;38:12,16;
39:9;40:11;41:8;43:11;
45:10,19,22;46:10;
49:14;50:19;51:8;
55:13;56:4,20;58:16;
59:2,4,7,15;61:17,23;
63:8,12;64:6;67:5,10,
24;68:3,6,9,14,19,22,
24;69:4,7;70:9;73:16;
74:2,21;75:11;76:17;
78:5;80:17,18;81:3,11;
82:4,7,12,15,21;83:5,
12
**York (1)**
43:6

## 0

**002035 (1)**
49:15
**006 (1)**
53:14
**006013 (1)**
53:16
**013 (2)**
46:22;53:14

**030 (2)**
52:12,23
**07 (1)**
53:4
**08 (3)**
53:10,19,23
**09 (1)**
54:11

## 1

**1 (10)**
17:5,7,11,11,18,18,
19;18:7,8;43:22
**10 (7)**
45:16,22;59:22;60:2;
61:24;65:13,23
**109 (1)**
26:15
**10K (1)**
35:21
**10-Q (2)**
32:23,23
**11 (5)**
49:12,14;56:7;67:13,
20
**11:23 (1)**
83:16
**12 (1)**
55:11
**12-17 (1)**
53:4
**12-19 (2)**
53:10,19
**13 (8)**
46:17,22,23;47:2;
58:24;59:2;70:12;
83:15
**14 (8)**
59:23;60:2,22;65:13,
24;67:3,10;82:2
**141 (2)**
28:17,18
**14390 (1)**
67:21
**150 (4)**
78:22,23,24;80:1
**150,000 (1)**
63:16
**150-day (2)**
78:19,20
**156 (7)**
49:18,19,20,24;50:3;
51:3;55:6
**16 (3)**
60:22;65:24;82:1
**18 (1)**
67:13

## 2

**2 (10)**
18:6;26:11,13,15;

28:5;29:19;43:22;
65:11,13;66:3
**20 (2)**
24:2;71:1
**2005 (2)**
7:6,7
**2008 (3)**
33:15;37:2;66:18
**2009 (3)**
26:16,23;40:23
**2012 (2)**
67:13;80:21
**2013 (2)**
35:21;36:5
**2014 (2)**
35:21;83:16
**228 (1)**
54:14
**25 (2)**
37:2;66:18
**25th (1)**
33:14
**26 (2)**
21:10;35:21
**29 (1)**
24:10

## 3

**3 (16)**
17:12,18;27:7;30:1,
2;31:3,4,6,9,22,23;
32:3;43:24;64:18;65:3;
68:2
**3.2 (4)**
23:16,17,21;26:1
**30 (1)**
67:13
**3018113559 (1)**
67:19
**30183559 (1)**
53:3
**30B6 (1)**
11:3
**3-1 (1)**
53:22
**36 (1)**
26:5

## 4

**4 (9)**
30:18,20;31:1;32:5,
7,9;43:19;64:19;65:3
**400,000 (1)**
74:13
**435 (2)**
61:10,22
**463 (2)**
66:2,6
**463,000 (1)**
66:3
**465 (2)**

49:22;51:3
**47 (1)**
45:24

## 5

**5 (6)**
18:8;33:8,10;43:16,
17,18
**50 (1)**
70:24
**500 (2)**
43:17;58:2
**546,000 (1)**
74:13

## 6

**6 (4)**
33:21;34:4;43:20;
64:14
**600 (4)**
57:13;58:2,12,13

## 7

**7 (5)**
35:1,18;43:20;63:18;
64:14
**745 (17)**
9:14,16;38:20;57:8,
10,10;58:1,3,4,4,14;
59:7;65:15;74:5,12;
75:2,10
**78.1 (1)**
32:21
**79 (1)**
35:22

## 8

**8 (2)**
37:2;38:8
**8:15 (1)**
13:9
**801 (2)**
46:17;52:23
**801/0006 (1)**
44:10
**801006 (1)**
52:19
**80707 (1)**
51:22
**81.2 (1)**
26:19
**8-7-07 (1)**
51:18

## 9

**9 (4)**
23:4;41:6,8;61:24
**900 (1)**

44:4
**908 (5)**
50:22,23,24;51:6;
71:14
**91T00 (3)**
41:12,13,17
**9-2 (1)**
54:11
**9-2-09 (1)**
56:9
**9-24-09 (1)**
65:1
**9-24-2009 (1)**
62:12
**9-25 (1)**
64:24
**95R21 (2)**
47:16,24
**99 (2)**
71:3,5

Defendant's Expert Materials
1161

| Code | Flag | Name | Description |
|---|---|---|---|
| 78T41 | T | TECH FEE | Used for Claim Funds for Private Investor (Investor ID beginning with A - V). Used for the use of the LPS desktop system. Advances are then recovered from the vendor. |
| 93T20 | T | PRIVATE INVESTOR CLAIM | |
| 91T17 | T | CLAIM FUNDS FNMA/FHLMC | |
| 01T00 | T | | |
| 99N35 | N | HAFA RESERVE | |
| | T | WAMU-EMC MIP RECOVERABLE | MIP Recoverable. Insufficient funds collected at close for MI premiums. Advances are billed to originating channel. Used for Claim Funds for Government Investor or Lo Type Loans |
| 99T30 | T | HAFA SHRT SALE DIL INCEN | REO Tech Fees: Invoices paid to LPS on behalf of REO vendors for amounts disbursed on HUD. Advances are created in order to gross up Sales Proceeds due to investor or applied to Principal. 99T30 - Borrower Relocation Assistance paid to Borrower or Tenant - always $3,000. |
| 99T31 | T | HAFA SHRT SALE DIL INCEN | 99T31 - Subordinate Lien Release Amount (maximum $8,500). Also referred to as SLRA or Jr Lien. Payees are used for receivable due from US Treasury for amounts disbursed on HUD. Advances are created in order to gross up Sales Proceeds due to investor or applied to Principal. 99T30 - Borrower Relocation Assistance paid to Borrower or Tenant - always $3,000. 99T31 - Subordinate Lien Release Amount (maximum $8,500) reimburseable portion- 2/3 of SLRA to maximum of $5,000. Also referred to as SLRA or Jr Lien. Payee is used for receivable due from investor for Borrower Outreach amounts that were paid outside of the normal HUD process, primarily as a result of insufficient sales proceeds to cover outreach amount. |
| 31N01 | N | NON-PRIME SERVICED RECOV | Recovery collections received on Serviced accounts previously charged off |
| 30R01 | R | RECOVERY SERVICED-NP | Recovery collections received on Serviced accounts previously charged off |
| 30N01 | N | PRIME SERVICE RECOVERY | Recovery collections received on Serviced accounts previously charged off |
| 99T59 | T | CHASE MOD PROGRAMS | Payee 91R11- This Payee holds Mortgagor Recoverable advances for investor loans and Bank owned Government Loans. Fcl Receivable- CNMC servicing- Receivables are created by payment of invoices on Borrower's behalf for foreclosure related costs by Invoice processing and are life of loan entries |
| 91R11 | R | SERV OUT OF POCKETS | Payee 91T11- This Payee holds Third Party Recoverable advances for investor loans and Bank owned Government Loans. Fcl Receivable- CNMC servicing- Receivables are created by Invoice processing payment of invoices for foreclosure related costs that should be reimbursable by the vendor and are life of Loan entries. |
| 91T11 | T | SERVICED OOP | Client 465 Hope Now credit counseling fees provided by Homeowners Preservation Foundation that are collectable from investor. |
| 90T27 | T | A/R HOPE NOW CNSLNG | Client 465 FNMA Pool Buyout |
| 92T19 | T | FNMA LQUDTION ADV | |

Defendant's Expert Materials 1162

Loan Number: (                                          Borrower Name:

| LNTH | | | LOAN TRANSFER HISTORY | | | 03/01/16  16:07:22 |
|---|---|---|---|---|---|---|

| TRAN DATE | OLD/INV | NEW/INV | HT NH S/R/H | ADDITIONAL TRANSFER INFORMATION | | |
|---|---|---|---|---|---|---|
| DATE PAID | EFF DATE | EFF BALANCE | INV LOAN # | OLD S/F | NEW S/F | GF AFT B/B |

------------------------------- CLIENT 156 PRE 10-01-11 -------------------------------

| 08/20/14 | X99/013 | 901/032 2  N  MAINT  CATEGORY | | | |
|---|---|---|---|---|---|
| __/__/__ | 09/01/11 | 927800.00 | 0683745764 | .00000000 | .00000000 +00.000000 |

| 08/20/14 | X99/013 | 901/032 1  N  MAINT  INVESTOR | | | |
|---|---|---|---|---|---|
| __/__/__ | 09/01/11 | 1947159.72 | 0683745764 | .00000000 | .00000000 +00.000000 |

| 09/13/10 | ___/___ | A01/013 2  N  MAINT  CATEGORY AND INVESTOR LOAN # | | | |
|---|---|---|---|---|---|
| __/__/__ | 12/01/08 | 927800.00 | 0683745764 | .00000000 | .00000000 +00.000000 |

-----------------------------------------------------------------------------------------

BP Investigative Agency
Exhibit 5

Chase
EXHIBIT NO. 17
FOR IDENTIFICATION

Defendant's Expert Materials
1163

Loan Number: ___  __ -__                    Borrower Name:

```
LNTH                  ↑            LOAN TRANSFER HISTORY        04/17/14  09:56:32

TRAN DATE OLD/INV  NEW/INV HT NM S/R/M  ADDITIONAL TRANSFER INFORMATION
DATE PAID EFF DATE EFF BALANCE   INV LOAN #    OLD S/F     NEW S/F    GF AFT B/B
-------- CLIENT 156 PRE 10-01-11 --------- CLIENT 908 PRE 09-01-09 ------------
09/02/09  X01/228  A01/013 1  N  MAINT  INVESTOR
  __/__/__  03/01/08 3045704.34  3018113559  .00000000    .00000000 +00.000000

12/19/08  A11/006  A01/013 1  N  MAINT  INVESTOR
12/19/08  03/01/08 3045704.34   3018113559  .00000000    .00000000 +00.000000

12/17/07  A01/006  A11/006 1  N  MAINT  INVESTOR
12/17/07  01/01/08 3022794.12   3018113559  .00000000    .00000000 +00.000000

08/07/07  030/106  A01/006 1  N  MAINT  INVESTOR
08/07/07  09/01/07 2992265.00   3018113559  .00000000    .00000000 +00.000000
```

------------------------------------------------------------------------

CONFIDENTIAL Case 1:10-cv-02855 TIA Doc# 466-1   Filed: 06/19/15   Entered: 06/22/15 16:18:19 Page 40 of 43
RP Investigative Agency
**Defendant's Expert Materials**
**1164**

| DOCKET NO.: FST-CV13-6017139-S | : | SUPERIOR COURT |
|---|---|---|
| U.S. BANK TRUST, NA, Trustee, successor to JPMORGAN CHASE BANK, N.A. | : : : | J.D. OF STAMFORD/NORWALK |
| V. | : : | AT STAMFORD |
| EMMANUEL GERONIMOS, et al. | : | OCTOBER 25, 2016 |

## AMENDED AFFIDAVIT

I, William Paatalo, being first duly sworn, hereby declare as follows:

1.      I am an Oregon licensed private investigator under ORS 703.430, and have met the necessary requirements under ORS 703.415. My Oregon PSID number is 49411.

2.      I am over the age of eighteen years, am of sound mind, having never been convicted of a felony or a crime or moral turpitude. I am competent in all respects to make this declaration, and if called to testify, I could and would competently testify thereto.

3.      I have 17 years combined experience in law enforcement and the mortgage industry.  My Resume ("CV") is attached as **"Exhibit 1."**

4.      I have worked exclusively over the last 6 - years investigating foreclosure fraud, chain of title, and issues related to the securitization of residential and commercial mortgage loans, and have spent nearly 10,000 hours

1. Affidavit of William J. Paatalo

Defendant's Expert Materials
1047

conducting investigatory research specifically related to mortgage securitization and chain of title analysis.

5. I have performed such analyses for residential real estate located in many states, including but not limited to, Washington, Oregon, California, Arizona, Nevada, Florida, Ohio, Texas, Montana, New Jersey, and several other states.

6. As of this date, I have conducted close to 900 investigations in this area.

7. As a result of my education and experience I am familiar with and have sufficient training and expertise to qualify as an expert, and I have testified as an expert in state and federal judicial proceedings in various jurisdictions throughout the United States.

8. Most recently, I was admitted to testify at trial as an expert witness on February 25, 2015 in the following California Federal Bankruptcy case:

*Rivera v. Deutsche Bank National Trust Company, U.S. BK Court, Northern CA – Oakland – Case No. 14-54193-MEH-13.*

9. Some specific areas of my expertise that have been deemed qualified by the courts are as follows:

Defendant's Expert Materials
1048

- Knowledge of the "Pooling & Servicing Agreements" and various Securities & Exchange Commission (SEC) filings associated with mortgage-backed securitized trusts.
- Specific language in the PSA's and Prospectus / Prospectus Supplements involving securitization participants, key dates, "Servicer Advances," sources of third-party payments, and transfer and conveyancing requirements to name a few.
- Knowledge and use, as well as the interpretation of "MBS Data" showing "advance payments" made to the certificateholders / investors, as well as other information specific to accounting, chain of title, and other aspects of securitization.
- Chain of Title analyses based upon publicly recorded documents, documents produced in discovery, and documents attached as exhibits to foreclosure complaints. Documents typically include mortgages, deeds of trust, assignments, notes, and allonges; in addition to documents filed under penalty of perjury with the SEC.

10. My analysis in this case is factual, and not considered scientific in nature.

11. In developing the opinions in this affidavit, I relied upon documents filed under penalty of perjury with the U.S. Securities & Exchange Commission (SEC), publicly recorded documents in the Federal Court's PACER System, documents submitted by the Plaintiff(s) in this action, and documents from past investigations.

3. Affidavit of William J. Paatalo

Defendant's Expert Materials
1049

12.    I was retained by attorney James Graham to review the chain of title and securitization of the Geronimos Mortgage and Note. I was asked to point out any discrepancies or issues of fact regarding the chain of title and the securitization of the loan.

13.    The following documents were inspected and/ or marked as exhibits:

- Plaintiff's Motion for Summary Judgment & Exhibits filed July 10, 2014.

- Plaintiff's Affidavit of Alyssa Salyers in Support for Summary Judgment & Exhibits executed July 14, 2015.

**Exhibit 2** – JPMorgan Chase "Press Release" September 25, 2008.

**Exhibit 3** – Deposition Transcript – Crystal Davis

**Exhibit 4** – Crystal Davis Deposition Exhibit – Private Investor Codes

**Exhibit 5** – "3270 Explorer: Loan Transfer History" screenshot – Geronimos

**Exhibit 6** – "3270 Explorer: Loan Transfer History" screenshot – Kelley

**Exhibit 7** – Chase "Investor" disclosure letters

**Exhibit 8** – Comparable Case "Investor" disclosure letter and assignment

14. Having reviewed the above documents, my professional opinions are as follows:

      a. Washington Mutual Bank (WMB) sold the Geronimos Mortgage and

4. Affidavit of William J. Paatalo

Note to one of its non-bank subsidiaries who then securitized the loan and sold the securities to private investors. These sales transactions prior to the FDIC's takeover of WaMu are being concealed from the Court, along with the identity of the investor(s) for the subject loan. And,

b. As such, the original Plaintiff (JPMorgan Chase Bank, N.A.) (hereinafter "JPMC") acquired no more than the servicing rights to the Geronimos loan from the FDIC, and had no ownership interest to assign to the current Plaintiff.

## EVIDENCE IN SUPPORT OF OPINIONS

### I.    <u>WaMu's "Off-Balance Sheet Activities"</u>

15.    On April 13, 2011, the U.S. Senate's "Permanent Subcommittee On Investigations" published an investigative report that includes a detailed analysis of WaMu's securitization activities leading up to the financial collapse in 2008. The report can found be found at the following government website address:

<u>https://www.hsgac.senate.gov/subcommittees/investigations/media/senate-investigations-subcommittee-releases-levin-coburn-report-on-the-financial-crisis</u>

16.    The findings of fact in this report, combined with evidence in this Case and affidavit, lead me to the opinions I've outlined above.

17.    Key excerpts from the report are as follows:

Pg.116 –

5. Affidavit of William J. Paatalo

**E. Polluting the Financial System**

Washington Mutual, as the nation's largest thrift, was a leading issuer of home loans. When many of those loans began to go bad, they caused significant damage to the financial system.

According to a 2007 WaMu presentation, <u>by 2006, Washington Mutual was the second largest non agency issuer of mortgage backed securities in the United States, behind Countrywide.</u>

<u>By securitizing billions of dollars in poor quality loans, WaMu and Long Beach were able to decrease their risk exposure while passing along risk to others in the financial system.</u> They polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss. At times, WaMu securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors to whom it sold the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered and known to the bank.

Pg. 117 -

According to a 2007 WaMu presentation at a securities investor meeting in New York, in 2004, WaMu issued $37.2 billion in RMBS securitizations and was the sixth largest RMBS issuer in the United States. In 2005, it doubled its production, issuing $73.8 billion in securitizations, and became the third largest issuer. <u>In 2006, it issued $72.8 billion and was the second largest issuer, behind Countrywide.</u>

Pg. 119 -

"WaMu Capital Corp. acted as an underwriter of securitization transactions generally involving Washington Mutual Mortgage Securities Corp. or WaMu Asset Acceptance Corp. Generally, one of the two entities would sell loans into a securitization trust in exchange for securities backed by the loans in question, and WaMu Capital Corp. would then underwrite the securities consistent with industry standards. As an underwriter, WaMu Capital Corp. sold mortgage-backed

6. Affidavit of William J. Paatalo

securities to a wide variety of institutional investors. WCC sold WaMu and Long Beach loans and RMBS securities to insurance companies, pension funds, hedge funds, other banks, and investment banks. It also sold WaMu loans to Fannie Mae and Freddie Mac. <u>WCC personnel marketed WaMu and Long Beach loans both in the United States and abroad.</u>

Before WCC was able to act as a sole underwriter, WaMu and Long Beach worked with a variety of investment banks to arrange, underwrite, and sell its RMBS securitizations, including Bank of America, Credit Suisse, Deutsche Bank, Goldman Sachs, Lehman Brothers, Merrill Lynch, Royal Bank of Scotland, and UBS. To securitize its loans, WaMu typically assembled and sold a pool of loans to a qualifying special-purpose entity (QSPE) that it established for that purpose, typically a trust.

The QSPE then issued RMBS securities secured by future cash flows from the loan pool. Next, the QSPE – working with WCC and usually an investment bank – sold the RMBS securities to investors, and used the sale proceeds to repay WaMu for the cost of the loan pool. Washington Mutual Inc. generally retained the right to service the loans.

18.   This analysis is also supported by Washington Mutual, Inc.'s 10-Q

filing with the U.S. Securities and Exchange Commission (SEC) on June 30, 2008

which states on (p.60),

**Off-Balance Sheet Activities**

The Company transforms loans into securities through a process known as securitization. When the Company securitizes loans, the loans are usually sold to a qualifying special-purpose entity ("QSPE"), typically a trust. The QSPE, in turn, issues securities, commonly referred to as asset-backed securities, which are secured by future cash flows on the sold loans. The QSPE sells the securities to investors, which entitle the investors to receive specified cash flows during the term of the security. The QSPE uses the proceeds from the sale of these securities

7. Affidavit of William J. Paatalo

to pay the Company for the loans sold to the QSPE. These QSPEs are not consolidated within the financial statements since they satisfy the criteria established by Statement No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*. In general, these criteria require the QSPE to be legally isolated from the transferor (the Company), be limited to permitted activities, and have defined limits on the types of assets it can hold and the permitted sales, exchanges or distributions of its assets.

19. Having investigated the WaMu/FDIC/Chase fact pattern for more than six-years, and having investigated hundreds of foreclosure cases where JPMC claims sole ownership of specific WMB loans by virtue of the "Purchase & Assumption Agreement" (PAA) with the FDIC, one fact is now well established – no schedule or inventory of assets listing any specific WMB mortgage loan acquired by JPMC exists, or has ever been produced or disclosed. The reason for this fact is the vast majority of residential mortgage loans were securitized through WaMu's "Off-Balance Sheet Activities."

## II.    <u>JPMC did not acquire the assets of WaMu's non-bank subsidiaries.</u>

20. JPMC stated in its summary judgment motion, *"[p]ursuant to the terms and conditions of a Purchase and Assumption Agreement between the FDIC as receiver of Washington Mutual Bank and Chase dated September 25, 3008, Chase acquired certain assets, including all loans and loan commitments of Washington Mutual Ban[k"]*. (Chase MSJ, p.2,¶3). For years now, JPMC has been getting away with a massive presumption that it acquired everything Washington

8. Affidavit of William J. Paatalo

Defendant's Expert Materials
1054

Mutual by virtue of the PAA, yet the mortgage loans they claim to have acquired were never "on the books" of "Washington Mutual Bank."

21. Attached as **Exhibit 2** is JPMorgan Chase's own press release from September 25, 2008 which states the following on **p.1, ¶5,** *"JPMorgan Chase will not be acquiring any assets or liabilities of the bank's parent holding company (WM) or the holding company's non-bank subsidiaries."*

22. As outlined above, the two non-bank subsidiaries of Washington Mutual responsible for the securitization of mortgage-backed securities were "Washington Mutual Asset Acceptance Corporation" (WMAAC) and "Washington Mutual Mortgage Securities Corporation" (WMMSC).

23. Both WMAAC and WMMSC are still active and continue to file regular "ABS 15G – Asset Backed Security Reports" with the SEC. Here are the SEC links to both of these entities most recent filings:

**WMAAC "ABS 15G" filed May 12, 2016:**

http://www.secinfo.com/dsbR9.w1Du.htm

**WMMSC "ABS 15G" filed May 12, 2016:**

http://www.secinfo.com/dsbR9.w1dt.htm

24. Both WMMSC and WMAAC have regularly disclosed the following in these SEC filings:

WaMu Asset Acceptance Corp., as Securitizer, is filing this Form ABS-15G in respect of all mortgage-backed securities representing interests in pools of

9. Affidavit of William J. Paatalo

residential mortgage loans for which it acted as depositor and which are outstanding during the reporting period. On September 25, 2008, JPMorgan Chase Bank, National Association (*"JPMCB"*) acquired the banking operations of Washington Mutual Bank from the Federal Deposit Insurance Corporation (*"FDIC"*). It is JPMCB's position that certain of the repurchase obligations of Washington Mutual Bank remain with the FDIC receivership. Assets are reported herein in accordance with Rule 15Ga-1 regardless of the validity of the demand or defenses thereto, and nothing in this report shall constitute, or be deemed, a waiver of any rights, defenses, powers or privileges of any party relating to these assets.

25.   There have been voluminous "ABS 15G" reports filed by these entities post receivership, and each one contains an attached "Exhibit 99.1" listing "Demand in Dispute" assets, or what is commonly referred to as "put-back demands" against these entities by investors. The disputed amounts are enormous, and appear to total somewhere in the area of $145,000,000,000.00.

26.   I searched JPMorgan Chase's 10-K filings with the SEC to find out if there was any mention of these potential liabilities to its investors. I could not find any disclosures of these potential "repurchase" liabilities. Thus it appears that the investors who own these loans want their money back but are being ignored. JPMC, as servicer for these investors, is continuing to harvest the assets belonging to these investors through foreclosures when by its own admission, JPMC did not receive these non-bank subsidiaries' assets. It appears in this case that JPMC sold and assigned the Geronimos loan when it did not own the loan.

**III.   No schedule or inventory of assets listing any specific WMB mortgage loan acquired by JPMC exists.**

10. Affidavit of William J. Paatalo

35. The testimony of Lawrence Nardi, the operations unit manager and

mortgage officer of JPMC, who previously worked with WAMU and was picked

up by JPMC after WAMU failed confirms the non-existence of any schedule of

assets associated with the PAA. (*see*: Deposition of Lawrence Nardi in the matter

of *JPMorgan Chase Bank, N.A., as successor in interest to Washington Mutual*

*Bank v. Waisome*, Florida 5th Judicial Circuit Case No. 2009CA005717.

http://www.scrib.com/doc/102949976/120509JPMCvWaisomeFLLawrenceNa
rdiDeposition).

Here are the relevant questions and answers:

Q: (p.57, beginning at line 19) "Okay The are you aware of any type of schedule of loans that would have been created to represent the either the loans that were assets, loans or loans that were serviced by WAMU? Are you was the do you know if there is a schedule or database of loans like that?"

A: (p.58, beginning at line 1) "I know that there was a schedule contemplated in certain documents related to the purchase. That schedule has never materialized in any form. We've looked for it in countless other cases. We've never been able to produce it in any previous cases. It certainly be a wonderful thing to have, but it's as far as I know, it doesn't exist, although it was it was contemplated in the documents.

36. It is common knowledge that JPMC has also stated in court proceedings

that it is NOT the "successor in interest to WAMU." However, Mr. Nardi

contradicts that position in the same deposition:

Q: (p.260 beginning at line 18) "Have you ever in your duties of being a loan analyst loan operations specialist, have you ever seen a FDIC bill of sale or a receiver's deed or an assignment of mortgage or an allonge?"

11. Affidavit of William J. Paatalo

A: (p.260, beginning at line 23) "For loans, I'm assuming you're talking about the WAMU loan that was subject to the purchase here"

Q. (p.261, line 1) "Right."

A. (p.261, beginning at line 2) "No there is no assignments of mortgage. There's no allonges. There's no in the thousands of loans that I have come in contact with that were a part of this purchase, I've never once seen an assignment of mortgage. There is simply not they don't exist. Or allonges or anything transferring ownership from WAMU to Chase, in other words. Specifically, endorsements and things like that."

37. Furthermore, in the case of *Snyder v. JP Morgan Chase Bank*, 169 So. 3d 1270, (4th Dis. Court of Appeals, No. 4D134036) (7/29/2015), the Florida appellate court ruled that JPMC did not have standing to commence a foreclosure action based on an alleged acquisition of a note and mortgage from the WAMU debacle. The Court noted that the trial witness for JPMC testified that Chase did not own the subject note, later recanting the testimony and testifying JMPC owned the subject note. Consistent with the position of other courts, the *Snyder* court refused to accept the unfounded proposition that the unscheduled purchase and assumption agreement with the FDIC served as proof positive that it owned and possessed the right to foreclose on the note. The Court found there was no competent evidence that JPMC owned the note at the time suit was commenced.

## IV. **Private investors own the subject loan, and their identity is being concealed**.

27. Attached as **Exhibit 5** is the servicing system screenshot titled, "3270

Explorer: Loan Transfer History (LNTH)" which was provided to me by Mr. Graham through his discovery efforts. This document shows an investor code "AO1" beginning on "09/13/10." This document shows a shortened loan history (post-WaMu) between 12/01/2008 through 08/20/2014. The screenshot is missing the time period of 09/03/2004 through 09/25/2008. I believe this is intentional.

28.  From experience, I have seen complete LNTH screenshots for these WaMu loans provided by JPMC, but usually they are produced with great reluctance and through motions to compel. When produced, these LNTH screens tell an entirely different story about the loans; specifically, all the sales and transfers conducted prior to the FDIC's receivership.

29.  Attached as **Exhibit 6** is an identical – "3270 Explorer: Loan Loan Transfer History (LNTH)" screenshot provided by JPMC in a very similar case which I have been involved captioned *Kelley v. JPMorgan Chase Bank, N.A.*, U.S. BK CT, ND CA, Adv. Case No. 10-05245.

30.  Like Geronimos, the Kelley loan was also originated by Washington Mutual Bank, F.A. **Exhibit 6** shows the entire LNTH from origination through the FDIC receivership. The beginning "Investor Code" at the inception of the loan is "030" on 08/07/07. The loan is then sold and transferred to a "New/Inv" (new investor) on 09/01/07 with the "Investor Code – AO1." This is the same code appearing on the Geronimos screenshot.

13. Affidavit of William J. Paatalo

31. A deposition of JPMC employee "Crystal Davis" occurred in the Kelley case on August 13, 2014. A copy of the Davis Deposition Transcript was filed in the *PACER* System and a copy is attached to this affidavit as **Exhibit 3**. **Exhibit 4** is a glossary of codes exhibit provided by JPMC in that deposition.

32. Crystal Davis explains the investor codes on p.42 as follows:

(In reference to **Exhibit 4**)

Q. Now if you look to the right of that, it states that the claim – the investor IDs begin with an A through V; is that correct?

A. In the current MSP platform, yes, indicates private investor loans.

Q. And what would X,Y,Z indicate?

A. Those would indicate bank-owned assets.

33. It is very likely that the complete LNTH screenshot, if/when produced, will show a similar sales transaction from WMB to "New/Inv – AO1." The identity of investor "AO1" has not been disclosed and is being concealed from the Court and the Defendant.

34. As further proof that WaMu sold and securitized the loan to a private investor(s), the Note bears an endorsement "in blank" by an officer of WMB. From experience, it was common practice to endorse notes that were being prepared for immediate sale into the secondary market.

### V. Chase admits then denies.

52. In cases I have reviewed all across the country, borrowers have made

14. Affidavit of William J. Paatalo

**Defendant's Expert Materials**
**1060**

and continue to make, inquiries to their servicer "Chase" for the identity of the investor(s) of their WaMu loan(s) only to be told,

> "Your loan was sold into a public security managed by JPMorgan Chase Bank, N.A. and may include a number of investors. As the servicer of your loan, Chase is authorized by the security to handle any related concerns on their behalf."

53.     Attached as **Exhibit 7** are two letters provided by Chase to other borrower clients of mine with this exact language. In both of these cases, after having made these disclosures to the borrowers, JPMC took the position in court that it was the sole owner of the loans by virtue of the PAA, and there were no investors associated with these loans because, "<u>WaMu never sold or securitized the loans</u>."

54.     Attached as **Exhibit 8** is another recent letter from a comparable case in California whereby JPMC declared itself the beneficial owner of the Deed of Trust and Note by virtue of an assignment from the FDIC in 2012 (**Exhibit 8, P.3**). Subsequent to this assignment, JPMC executed a "Notice of Default" and "Notice of Trustee's Sale" intending to foreclose and sell the property on September 1, 2016 as the owner of the loan.

55.     However, in complete contradiction to the assignment and notices, my client received a letter from Chase disclosing that the investor of his loan is *"Deutsche Bank Nat Trust Co as Trustee for the WaMu 2007-FLEX1."* (**Exhibit 8, P.1**).

15. Affidavit of William J. Paatalo

Defendant's Expert Materials
1061

56. JPMC's claims of beneficial ownership of loans on one hand, while disclosing the existence of private investor ownership of the loans on the other hand, shows that JPMC is either lying to the borrowers or the Courts.

I declare that the foregoing statements are true and correct to the best of my present knowledge, information and belief.

Executed at Absarokee, Montana this 25th day of October, 2016.

_____
William Paatalo

STATE OF MONTANA      )
                            ) ss.
COUNTY OF STILLWATER )

On this 25th day of October 2016, before me, the undersigned officer, personally appeared William Paatalo, whose identity was satisfactorily proved to me, and who executed the foregoing instrument as his free act and deed and for the purposes therein contained, and acknowledged that the foregoing statements are true and correct.

In witness whereof I hereunto set my hand.

PAMELA S. OLIVER
NOTARY PUBLIC for the
STATE OF MONTANA
Residing at Fishtail, Montana
My Commission Expires
NOVEMBER 06, 2019

_____
Notary Public
My Commission Expires:
November 6, 2019

16. Affidavit of William J. Paatalo

# William J. Paatalo

Private Investigator – Oregon PSID# 49411
BP Investigative Agency, LLC
P.O. Box 838
Absarokee, MT 59001
(406) 328-4075
Bill.bpia@gmail.com

## Curriculum Vitae

William Paatalo has been a licensed private investigator since September of 2009. He has 17 years combined experience in both law enforcement and the mortgage industry which he has utilized to become a leading expert in the areas of chain of title analyses and securitization. He was a police officer with the St. Paul, Minnesota Police Department from 1990-1996 where he was assigned "Field Training Officer" duties in only his second year on the job, and also received multiple commendations.

Mr. Paatalo worked in the mortgage industry as a "loan officer" with Conseco Home Finance from 1999 – 2000, followed by two years of being a branch manager for multiple mortgage brokering firms. From 2002 – 2008, he became the President of Midwestern Mortgage, LLC f/k/a Wissota Mortgage, LLC in Wisconsin and Minnesota. As President of Wissota Mortgage, LLC, Mr. Paatalo was responsible for overseeing the origination, processing, and underwriting of mortgage loans, as well as managing a staff of 17 employees.

Mr. Paatalo has worked exclusively since 2010 investigating foreclosure fraud, chain of title, the securitization of residential and commercial mortgage loans, and accounting issues relevant to alleged "defaults." Mr. Paatalo is also a Certified Forensic Mortgage Loan Auditor through ("CFLA"), and has spent more than 10,000 hours conducting investigatory research specifically related to mortgage securitization and chain of title analysis. He has performed such analyses for residential real estate located in many states, including but not limited to, Washington, Oregon, California, Nevada, Florida, Montana, Texas, Arizona, Ohio, New Jersey, and several other states. To date, Mr. Paatalo has conducted nearly 900 investigations and has provided written

BP Investigative Agency
Exhibit 1

Defendant's Expert Materials
1063

expert testimony in the form of affidavits and declarations in approximately 90 -100 cases nationwide. Mr. Paatalo has been qualified in both state and federal courts as an expert, and personally appeared and testified at trial in the four cases outlined below. This experience has lead to Mr. Paatalo becoming one of the leading experts in this relatively new field.

Mr. Paatalo's specific areas of expertise allowed by the courts in the cases referenced below are as follows:

- Knowledge of the "Pooling & Servicing Agreements" and various Securities & Exchange Commission (SEC) filings associated with mortgage-backed securitized trusts.
- Specific language in the PSA's and Prospectus / Prospectus Supplements involving securitization participants, key dates, "Servicer Advances," sources of third-party payments, and transfer and conveyancing requirements to name a few.
- Knowledge and use of ABSNet, and the interpretation of its internal accounting data showing "advance payments" made to the certificateholders / investors, as well as other information specific to accounting, chain of title, and other aspects of securitization.
- Chain of Title analyses based upon publicly recorded documents, documents produced in discovery, and documents attached as exhibits to foreclosure complaints. Documents typically include mortgages, deeds of trust, assignments, notes, and allonges; in addition to documents filed under penalty of perjury with the SEC.

## Relevant Experience:

- Police Officer / "Field Training Officer" – St. Paul, MN 1990-1996.
- Oregon licensed private investigator under ORS 703.430, and has met the necessary requirements under ORS 703.415. To obtain his PI license, Mr. Paatalo met the requirement of 5,000 hours of investigation experience in the law enforcement field, and passed a thorough background investigation and criminal history check.
- Member of the "Oregon Association of Licensed Investigators" (OALI.)
- President of Midwestern Mortgage, LLC f/k/a Wissota Mortgage, LLC in Wisconsin and Minnesota from 2002 – 2008.

2. CV – William J. Paatalo

Defendant's Expert Materials
1064

**Education:**

A.A.S. – Law Enforcement – Normandale C.C., Bloomington, MN – 1986
Marketing Management Certificate – Concordia University, St. Paul, MN 2001
Forensic Loan Auditor Certification Training Course (CFLA) – 32 hrs. – San Diego, CA 2011

## Expert Testimony (Trial):

### FEDERAL CASES

*Robert T. Fanning, Debtor – U.S.Bankruptcy Court, District of Montana – BK Case No. 10-61660*

*Rivera v. Deutsche Bank National Trust Company, U.S. BK Court, Northern CA – Oakland – Case No. 14-54193-MEH-13.*

### STATE CASES

### OHIO

*Washington Mutual Bank fka Washington Mutual Bank, F.A. v. Jon A. Smetana, et al.,In The Court of Common Pleas, Cuyahoga County, Ohio Case No.CV-08-652392.*

### OREGON

*U.S. Bank, N.A.as Trustee v. Natache D. Rinegard-Guirma, et al. - Circuit Court For The State Of Oregon, County Of Multnomah - Case No. 1112-16030*

3. CV – William J. Paatalo

**Defendant's Expert Materials**
**1065**

# JPMORGAN CHASE & CO.



September 25, 2008

## JPMorgan Chase Acquires the Deposits, Assets and Certain Liabilities of Washington Mutual's Banking Operations

**Highly attractive, strategic transaction significantly strengthens consumer franchise.**

**Deal expected to be accretive to earnings immediately. Adds large, stable deposit base and recurring earnings stream to company.**

**Company intends to raise additional capital in conjunction with this transaction to maintain strong capital position.**

- *Acquisition creates largest U.S. depository institution, with over $900 billion of customer deposits*

- *Expansion into attractive California, Florida and Washington State markets creates nation's second-largest branch network; also strengthens existing presence in New York, Texas, Illinois, Arizona, New Jersey, Colorado, Connecticut and Utah*

- *Larger branch footprint will allow company to further extend and grow commercial banking, business banking, credit card, consumer lending and wealth management efforts*

New York, Sept. 25, 2008 – JPMorgan Chase & Co. (NYSE: JPM) tonight announced it has acquired all deposits, assets and certain liabilities of Washington Mutual's banking operations from the Federal Deposit Insurance Corporation (FDIC), effective immediately. Excluded from the transaction are the senior unsecured debt, subordinated debt, and preferred stock of Washington Mutual's banks. JPMorgan Chase will not be acquiring any assets or liabilities of the banks' parent holding company (WM) or the holding company's non-bank subsidiaries. As part of this transaction, JPMorgan Chase will make a payment of approximately $1.9 billion to the FDIC.

The acquisition expands Chase's consumer branch network into the attractive states of California, Florida and Washington State and creates the nation's second-largest branch network - with locations reaching 42% of the U.S. population. The combined 5,400 branches in 23 states will also serve as an excellent base to extend the reach of the business banking, commercial banking, credit card, consumer lending and wealth management businesses. The acquisition also extends Chase's retail branch network to additional states, including Georgia, Idaho, Nevada and Oregon.

The acquisition of Washington Mutual's banking operations is expected to be immediately accretive to earnings and to add more than 50

BP Investigative Agency
Exhibit 2

Defendant's Expert Materials
1066

cents per share in 2009. JPMorgan Chase expects to incur pretax merger costs of approximately $1.5 billion while achieving annual pretax cost savings of approximately $1.5 billion by 2010, net of significant investments in the business. The bank plans to complete most systems integrations and rebranding by year-end 2010, closing less than 10% of branches in the combined network in overlapping markets.

In conjunction with this acquisition, JPMorgan Chase will be marking down the acquired loan portfolio by approximately $31 billion, which primarily represents our estimate of remaining credit losses related to the impaired loans. JPMorgan Chase intends to raise additional capital in connection with this transaction to maintain the company's strong capital position.

"This deal makes excellent strategic sense for our company and our shareholders. Our people have worked hard to build a strong franchise and balance sheet - making this compelling transaction possible," said Jamie Dimon, Chairman and CEO. "As we have said in the past, increasing our regional banking presence not only strengthens our Retail business, but also benefits other business lines across our firm, including our commercial banking, business banking, credit card, and asset management groups."

"JPMorgan Chase is strongly committed to both a strong banking system and our responsibility as a good corporate citizen. We are active in the states and local communities where we do business," Dimon said. In July, the bank earned an outstanding rating from the Office of the Comptroller of the Currency for the company's work helping families buy homes, financing small businesses and making its communities better.

"We look forward to welcoming Washington Mutual's employees to JPMorgan Chase and working with them as we build a great company together," Dimon added.

"This acquisition makes us more convenient and valuable to our customers and meets our strategic goal of broadening our footprint to serve our current and future customers better," said Charlie Scharf, head of Chase's Retail business. He added, "Following a transition, Washington Mutual customers will be able to take advantage of Chase's broader network and a wider product range - all backed by the strength and security of JPMorgan Chase." Over time, Chase will provide more personal bankers, business bankers, loan officers and investment advisers to serve the needs of Washington Mutual customers and to expand their relationship with Chase.

Customers of both companies may continue banking as usual, and feel confident that their deposits are secure, now backed by the strength and security of JPMorgan Chase. Employees and vendors should continue to operate business as usual.

Chase expects to convert Washington Mutual's consumer banking, home lending and credit card businesses to the Chase brand and technology platforms over the next two years. Chase and Washington Mutual customers should be able to access the combined network of 14,000 ATMs without fees in the coming months.

## About JPMorgan Chase

JPMorgan Chase & Co. (NYSE: JPM) is a leading global financial services firm with assets of $2.0 trillion and operations in more than 60 countries. The firm is a leader in investment banking, financial services for consumers, small business and commercial banking, financial transaction processing, asset management, and private equity. A component of the Dow Jones Industrial Average, JPMorgan Chase serves millions of consumers in the United States and many of the world's most prominent corporate, institutional and government clients under its JPMorgan and Chase brands. Information about the firm is available at www.jpmorganchase.com.

JPMorgan Chase will host a conference call at 9:15 p.m. (Eastern Time) tonight, September 25, 2008. You may access the conference call

**Defendant's Expert Materials**
**1067**

by dialing 1-877-238-4671 (U.S. and Canada) / 1-719-785-5594 (International) - access code: 814030 or via live audio webcast at the jpmorganchase.com website under Investor Relations/Investor Presentations. Materials and further communication will be available on this website at the time of the call.

A replay of the conference call will be available beginning at approximately 1:00 a.m. on September 26 through midnight, Thursday, October 9 by telephone at (888) 348-4629 (U.S. and Canada); access code: 942856 or (719) 884-8882 (International). The replay will also be available via webcast on www.jpmorganchase.com under Investor Relations, Investor Presentations.

This press release includes contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. Such forward-looking statements are based upon the current beliefs and expectations of JPMorgan Chase's management and are subject to significant risks and uncertainties. Actual results may differ from those set forth in the forward-looking statements. Factors that could cause JPMorgan Chase's actual results to differ materially from those described in the forward-looking statements can be found in JPMorgan Chase's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2008 and June 30, 2008, Annual Report on Form 10-K for the year ended December 31, 2007 and Current Reports on Form 8-K, filed with the Securities and Exchange Commission and available on JPMorgan Chase's website (www.jpmorganchase.com) and on the Securities and Exchange Commission's website (www.sec.gov). JPMorgan Chase does not undertake to update the forward-looking statements to reflect the impact of circumstances or events that may arise after the date of the forward-looking statements.

| As of 6/30/08 | JPMorgan Chase | Washington Mutual | Combined |
|---|---|---|---|
| ($ billions) | | | |
| **Select Business Metrics** | | | |
| Footprint (states) | 17 | 15 | 23 states |
| Total Assets | $1776 | $310 | $2,036 |
| Total Managed Loans | $617 | $231 | $848 |
| Branches[1] | 3,203 | 2,207 | 5,410 |
| Total Deposits | $722.9 | $181.9 | $904.8 |
| Checking Accounts | 11.3mm | 12.7mm | 24.0mm |
| ATMs | 9,310 | 4,962 | 14,272 |
| Managed Credit Card Loans | $154.7 | $26.4 | $181.1 |
| Credit Cards Issued | 157.6mm | 12.7mm | 170.3mm |
| Employees | 195,594 | 43,198 | 238,792 |
| **Network Comparisons** | | | |
| U.S. Households | 25.0% | 30.3% | 42.3% |
| Average Income | $71,595 | $74,747 | $72,332 |

Defendant's Expert Materials
1068

| Businesses | 26.5% | 33.0% | 45.6% |
|---|---|---|---|
| US Population in Footprint | 75.0mm | 94.1mm | 129.9mm |
| 5yr US Population Growth Rate ('07-'12) | 3.3% | 5.6% | 4.9% |
| % of Population Growth in Footprint | 18.0% | 37.9% | 46.2% |

[1] Branch data is as of September 18, 2008

## What Washington Mutual Customers Should Know and Do

- Feel confident that their deposits are secure

- Continue banking as you have – assured that your bank is now backed by the strength and security of JPMorgan Chase

- Continue to use the same checks. All checks will be processed as usual

- Continue to use the same account numbers

- Continue to use the same ATM card and credit card

- Continue to use the same ATMs

- Continue to use the same branches

- Continue paying your mortgage and credit card as you have. Checks should be made payable the same as they have been in the past, and payment addresses remain unchanged

- Continue using the same contact phone numbers, online service and websites

- Know that you will learn well in advance of improvements, additional conveniences and other changes

Copyright 2015 JPMorgan Chase & Co.

Close window | Back to top

Defendant's Expert Materials
1069

**In Re:**

*JAMES MADISON KELLEY v.*

*JPMORGAN CHASE BANK*

*DEPOSITION OF CRYSTAL DAVIS*
*August 13, 2014*



Toll Free 866.760.DEPO
Main 408.371.0464
Fax 408.371.0402
www.torreano-depos.com
torreano-depos@sbcglobal.net

1999 South Bascom Avenue, Suite 700
Campbell, CA 95008

*Min-U-Script® with Word Index*

BP Investigative Agency
Exhibit 3

**Defendant's Expert Materials**
**1070**

## Page 1

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
 2         NORTHERN DISTRICT OF CALIFORNIA – DIVISION 5
 3   In Re:
     JAMES MADISON KELLEY,        )   Chapter 11
 4                                 )   Adv. Case No.
         Debtor.                   )   10-05245
 5
 6
 7   JAMES MADISON KELLEY,         )   Hon. Weissbrodt
 8        Plaintiff,               )
 9        vs.                      )
10   JPMORGAN CHASE BANK, NA,      )
     WASHINGTON MUTUAL BANK,       )
11   DOES (1-20),                  )
12        Defendants.              )
13
14
15                  DEPOSITION
16               of CRYSTAL DAVIS
17
18                Taken at Regus
19           470 Olde Worthington Road
                 Westerville, Ohio
20
21        on August 13, 2014, at 9:05 a.m.
22
         Reported by: Rhonda Lawrence
23                    –=0=–
24
```

## Page 2

```
 1   APPEARANCES:
 2
 3        James M. Kelley
          14390 Douglass Lane
 4        Saratoga, CA  95070
          408.402.1915
 5        jmadisonkelley@gmail.com
 6             Pro Se.
 7
     S. Christopher Yoo
 8   ALVARADO SMITH
     1 MacArthur Place, Suite 200
 9   Santa Ana, California  92707
     714.852.6800
10   cyoo@alvaradosmith.com
11        on behalf of the Defendants.
12                    –=0=–
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1                    STIPULATIONS
 2             It is stipulated by and between
 3   counsel for the respective parties that the
 4   deposition of CRYSTAL DAVIS, the Witness herein,
 5   called by the Plaintiff under the applicable
 6   Rules of Federal Civil Court Procedure, may be
 7   taken at this time by the notary pursuant to
 8   notice; that said deposition may be reduced to
 9   writing in stenotypy by the notary, whose notes
10   thereafter may be transcribed out of the
11   presence of the witness; and that the proof of
12   the official character and qualification of the
13   notary is waived.
14                    –=0=–
15
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1                INDEX OF EXAMINATION
 2                                              PAGE
 3   BY MR. KELLEY:                               5
 4                 INDEX OF EXHIBITS
 5   EXHIBIT        DESCRIPTION                  PAGE
 6     1      Excerpts from Purchase and          17
            Assumption Agreement
 7
       2      Chase annual report                26
 8
       3      Accounting for Certain Loans       27
            or Debt Securities
 9
10     4      10-Q                               30
11     5      Office of Thrift Supervision       33
            Fact Sheet
12
       6      Notes to Consolidated              33
13          Financial Statements
14     7      10K                                35
15     8      FFIEC guidelines                   38
16     9      Bates number JPM002040             41
17    10      Loan history                       45
18    11      Loan Transfer Screen               49
19    12      Account Activity                   55
20    13      Summary of 745 transactions        58
21    14      Spreadsheet                        67
22
23
24
```

Defendant's Expert Materials
1071

**Page 5**

1          CRYSTAL DAVIS
2 being first duly sworn, as hereinafter
3 certified, deposes and says as follows:
4          EXAMINATION
5 BY MR. KELLEY:
6     Q. This is the deposition of Crystal Davis
7 in the Kelley versus JPMorgan Chase Bank in a
8 case. Got it?
9          My name is James Kelley, and I'm the
10 plaintiff in the case. I guess we have
11 Christopher Yoo from Alvarado Smith, outside
12 attorney for Chase, and Crystal Davis — right?
13    A. Yeah.
14    Q. — present. So I'm just going to start
15 out by just asking you a little bit about your
16 background. You don't have to go back to grade
17 school.
18    A. Okay.
19    Q. So your — first of all, what's your
20 educational background?
21    A. I graduated high school.
22    Q. Okay.
23    A. And I had some college. I studied
24 English at OSU Newark. Did not graduate, did

**Page 6**

1 not get a degree.
2    Q. Okay. Did you take any courses in
3 accounting?
4    A. I did not.
5    Q. You did not. Okay.
6          What is your current job function?
7    A. Associate controller.
8    Q. Okay.
9    A. Well, that's the title.
10    Q. And what are — what does that entail?
11    A. I supervise a department of accountants
12 who manage the corporate advance reconciliation.
13    Q. How many people do that?
14    A. I have — under me, I have eight
15 employees.
16    Q. Eight.
17    A. Accountants.
18    Q. And this is at the Polaris facility?
19    A. No; Easton.
20    Q. Easton facility. Okay.
21          And how did you come to that position
22 with an English background?
23    A. So I worked at Harry & David Corporation
24 for seven years where I learned accounting and

**Page 7**

1 did payroll.
2    Q. Okay. So you have a practical
3 background?
4    A. Yes.
5    Q. Okay. And when did you join Chase?
6    A. 2005.
7    Q. 2005. Okay.
8          So you've been there for a while?
9    A. Nine years.
10    Q. Nine years. Okay.
11          And what position did you start in at
12 Chase?
13    A. I started at an entry-level treasury
14 accounting position.
15    Q. Okay.
16    A. So I managed just cash flow to the fed.
17    Q. And how did you progress from there?
18    A. I was in that position about two years,
19 and then I got an offer for a different position
20 within the REO accounting group, and I went to
21 that accounting group, and then got another
22 position in the corporate advance accounting
23 several years after that.
24    Q. Okay. So how long have you been in

**Page 8**

1 corporate advance accounting?
2    A. I have been there for two years.
3    Q. Two years.
4    A. Uh-huh.
5    Q. Okay. So how long were you — so prior
6 to corporate advance accounting, what were
7 you — what were you doing? I'm not quite
8 clear.
9    A. REO accounting, so real estate owned.
10 We managed all the accounting for that, all the
11 REO sales.
12    Q. And what kind of software do you use for
13 your accounting?
14    A. Mainly MSP.
15    Q. So you are using MSP?
16    A. Uh-huh.
17    Q. Any other?
18    A. We use SAP.
19    Q. SAP. Okay. That's a pretty well known
20 software brand.
21    A. Yes.
22    Q. Anything else?
23    A. That's it for accounting.
24    Q. Pretty much it?

Defendant's Expert Materials
1072

**Page 9**

1    A. Uh-huh.

2    Q. Okay. So you don't have general ledger

3  experience?

4    MR. YOO: Objection. Vague and

5  ambiguous.

6    A. General ledger meaning?

7    Q. Well, you know, starting from the

8  general ledger down to the sub-ledgers.

9    A. So all of our sub-ledgers are part of

10  the general ledger.

11    Q. Sure.

12    A. So I do have experience within specific

13  accounts of the general ledger.

14    Q. Probably characterized as REO -- the 745

15  advances are -- you consider those REO?

16    A. They can be. So 745 is any kind of

17  accounting adjustment.

18    Q. So we'll be getting a little bit more

19  into that in a moment.

20    So are you the only group doing this?

21    MR. YOO: Objection. Vague and

22  ambiguous as to "doing this."

23    Q. Are you the only operational group doing

24  corporate advances in this area --

**Page 10**

1    A. No.

2    Q. -- or are there other groups like

3  yours?

4    A. There are other groups like mine.

5    Q. That you know of, right?

6    A. Yes.

7    Q. How many other groups?

8    A. I don't specifically know. Sorry.

9    Q. Is it two?

10    MR. YOO: Objection. Asked and

11  answered.

12    Q. I'm just asking you approximately how

13  many.

14    MR. YOO: She said she doesn't know.

15    A. I don't know, to be honest.

16    Q. But there are other groups?

17    A. There are other groups, yes.

18    Q. And how do you know there are other

19  groups?

20    A. They're within accounting, and because

21  my group only owns a number of the payees, so

22  other groups would have to own the other payees.

23    Q. Okay. So it's divided by -- partitioned

24  by payees?

**Page 11**

1    A. Yes.

2    Q. I'm going to -- one reason for this

3  deposition is that Mr. Smith, who was a 30(B)(6)

4  witness in this case, indicated that he spoke

5  with you probably several months ago. Do you

6  recall talking to Mr. Smith?

7    A. I do.

8    Q. Okay. Could you tell me approximately

9  how much time you spent talking with him?

10    A. It was very brief. Our phone

11  conversation was brief. So probably five, ten

12  minutes.

13    Q. Okay. And what did he want to know?

14    A. He was asking me specifically about the

15  reason codes on the DDCH screen and what they

16  represented.

17    Q. And that would be codes like LTCO and

18  stuff like that?

19    A. Correct.

20    Q. And we'll get back to those.

21    Did you talk with anyone in preparation

22  for this deposition today?

23    A. Anyone within Chase?

24    Q. Well, anyone, about this deposition.

**Page 12**

1    A. Yes.

2    Q. Okay. Like who?

3    A. I spoke to Thomas from the --

4    Q. Thomas Van?

5    A. Yes.

6    Q. Okay.

7    A. And I spoke to Anne Fitz -- I forget

8  what her last name is. Fitzpatrick.

9    Q. Is that an Alvarado Smith employee?

10    MR. YOO: She's in-house counsel with

11  Chase.

12    Q. Oh, in-house counsel. So you spoke with

13  in-house counsel?

14    A. Yes.

15    Q. How much time did you spend speaking

16  with her?

17    A. Probably two hours.

18    Q. So you spent more time with them than

19  you did with Mr. --

20    A. Yes.

21    Q. -- Smith? So Mr. Smith didn't ask you

22  about the corporate advances?

23    A. He did.

24    Q. Did he? Okay. Did he ask you about

Defendant's Expert Materials
1073

**Page 13**

1  what they were for?
2  A. Only certain transactions he asked
3  about.
4  Q. Okay. Well, yeah, there are several
5  different types of transactions. We'll get to
6  the details later.
7  So how much time did you spend speaking
8  with Mr. Yoo in preparation for the deposition?
9  A. I got here at 8:15.
10  Q. This is the first time?
11  A. Yes.
12  Q. Okay. Sometimes they do it over the
13  phone.
14  The other thing is, did you review any
15  documents in preparation for this deposition?
16  A. I did.
17  Q. Okay. Could you tell me which ones they
18  were?
19  A. There were a lot. I don't know
20  specifically. I did review the transcript.
21  MR. YOO: She's talking the deposition
22  transcript.
23  Q. You mean Smith?
24  A. Mr. Smith, yeah.

**Page 14**

1  Q. I've got one here. I got the brief
2  form.
3  A. And then the print screens, DDCH
4  history, and I think that's all I reviewed.
5  Q. Okay. Did you look at the payee codes?
6  A. Uh-huh. I did.
7  Q. Are you familiar with the payee codes?
8  A. I am.
9  Q. Okay. Good.
10  Because there's been some ambiguity in
11  the previous depositions, a little confusion —
12  it's not just here. It's everywhere — I'm
13  going to ask that when we refer to a — that we
14  not use the term WAMU, because WAMU is a logo,
15  it's not a corporation. So I'll refer to
16  Washington Mutual Bank when I mean Washington
17  Mutual Bank. I'll refer to Washington Mutual
18  Bank FA when I mean Washington Mutual Bank FA.
19  And similarly, Washington Mutual Bank FSB, which
20  was not a subject of a receivership.
21  MR. YOO: Objection. Assumes facts not
22  in evidence.
23  MR. KELLEY: I believe it is in evidence
24  in the Smith deposition already.

**Page 15**

1  MR. YOO: I don't recall that, so my
2  objection stands. I'm not instructing her not
3  to answer. I'm just simply inserting objections
4  as to the general legal conclusions you're
5  making as to what all those entities are or are
6  not and whether those entities were under
7  receivership or not.
8  MR. KELLEY: Those are legal
9  conclusions. I think they're statements of
10  fact. It's well known.
11  MR. YOO: All right. According to you.
12  MR. KELLEY: Okay.
13  BY MR. KELLEY:
14  Q. So anyway —
15  MR. YOO: I think it would be — I think
16  it would speed up the deposition — I'll let you
17  ask any questions that you have for my witness,
18  and just let me insert my objections without
19  going back and forth. Because they're
20  ultimately for the Court to decide at the time
21  of trial. Whenever you intend to introduce
22  Ms. Davis' testimony, the Court will have to
23  determine whether my objection is valid or not.
24  So why don't we simply —

**Page 16**

1  MR. KELLEY: I understand.
2  MR. YOO: I'm not going to interrupt,
3  you and it will probably help me if you don't
4  retort my objection. Because it's really
5  irrelevant to the deposition of Ms. Davis. That
6  way it will go faster. Ask your questions.
7  I'll object. If I have think that she shouldn't
8  answer something, I'll instruct her not to
9  answer. We'll let the Court decide. I have no
10  intention of instructing her not to answer any
11  questions at this time unless the question is
12  improper. But if you simply ask your questions,
13  let me insert my objections for the record. If
14  I don't say anything more than objection, I'm
15  not instructing her not to answer. So it will
16  go much quicker. Rather than retorting whether
17  my objection is proper or improper. We're
18  wasting more time, you and me, cluttering the
19  record rather than you simply retorting to my
20  objections.
21  MR. KELLEY: Okay. Let's move on.
22  BY MR. KELLEY:
23  Q. I'm going to introduce into evidence
24  some documents here. This is part of the — to

Defendant's Expert Materials
1074

**Page 17**

1 make things clearer, these are excerpts from the
2 purchase and assumption agreement between the
3 FDIC receiver and JPMorgan Chase Bank.
4 =0=
5 (Deposition Exhibit 1 marked.)
6 =0=
7 Q. On page 1 of the exhibit the term "book
8 value" is defined. And could you read that over
9 and see if --
10 MR. YOO: Let the record reflect that
11 page 1 of Exhibit 1 appears -- is identified by
12 page 3.
13 MR. KELLEY: Of the purchase and
14 assumption agreement, yes.
15 MR. YOO: What Mr. Kelley represents is
16 that a portion of the purchase and assumption
17 agreement, and the book value is the first
18 paragraph of page 1 of Exhibit 1 -- or page 3,
19 which is the first page of Exhibit 1.
20 MR. KELLEY: You're right.
21 A. Okay.
22 Q. So the main interest here, I guess, is
23 they're saying book value means with respect to
24 any asset or any liability assumed.

**Page 18**

1 MR. YOO: Objection. The document
2 speaks for itself.
3 Q. So I want to make the distinction
4 between assets with book value and liabilities
5 with book value, just for precision.
6 Okay. Page 2.
7 MR. YOO: Of Exhibit 1.
8 Q. Yes. Exhibit 1, which is page 5 of the
9 purchase and assumption agreement. I
10 highlighted loans, and here they're defining
11 what loans the agreement applies to. And could
12 you read that over and just make sure you got
13 it.
14 A. Uh-huh.
15 Q. Under I, which is a subparagraph to
16 loans, it says, "Loans (including loans which
17 have been charged off the Accounting Records of
18 the Failed Bank in whole or in part prior to
19 Bank Closing)..."
20 And then it goes on and it says,
21 "participation agreements, interest in
22 participations, overdrafts of customers,"
23 et cetera. I'm not so much interested in
24 overdrafts here.

**Page 19**

1 "-- revolving commercial lines of
2 credit, home equity lines of credit,
3 Commitments," and so on.
4 So do you understand what a
5 participation agreement is?
6 MR. YOO: Objection. Calls for a legal
7 conclusion. Calls for testimony beyond this
8 person's knowledge.
9 If you understand what that means.
10 A. I don't know specifically what they're
11 speaking of there.
12 MR. YOO: Also, Ms. Davis is not the
13 person with the most knowledge regarding the
14 purchase and assumption agreement.
15 Q. So you don't know what a participation
16 agreement is?
17 MR. YOO: Asked and answered.
18 She works as an associate controller for
19 escrow advances. She may not have that much
20 knowledge about the purchase and assumption
21 agreement. So the document speaks for itself.
22 I'm going to give you some leeway to ask
23 her questions about it, but she clearly is here
24 based upon a short conversation that she had

**Page 20**

1 with Mr. Smith. She's not here as the person
2 most knowledgeable of Chase regarding the
3 purchase and assumption agreement.
4 MR. KELLEY: You've already said that.
5 MR. YOO: So again, I would caution you
6 to ask the types of questions that you're going
7 to ask her, because they're really -- at some
8 point it may become harassing.
9 MR. KELLEY: I'm not harassing her.
10 MR. YOO: I said at some point it might
11 become harassing as you keep on asking her
12 questions.
13 MR. KELLEY: I would ask you --
14 MR. YOO: Let me --
15 MR. KELLEY: -- to stop interrupting my
16 deposition. This is my deposition. I'm paying
17 for it. And you're running off at three or four
18 minutes a shot on your objections. That's
19 ridiculous.
20 MR. YOO: I'm entitled to it. I feel
21 comfortable.
22 MR. KELLEY: All you have to do is say
23 objection.
24 MR. YOO: Mr. Kelley, let me finish.

Defendant's Expert Materials
1075

**Page 21**

1 All right? Otherwise this deposition will be
2 over pretty soon. Let me finish, then you can
3 ask your next question.
4      At some point, if you keep asking her
5 questions relating to the purchase and
6 assumption agreement, it will become harassing.
7 I'm going to give you leeway to ask questions.
8 But understand that she's here --
9      MR. KELLEY: It is -- it is necessary to
10 ask those questions, and under Rule 26, I am
11 allowed to ask any question I want, as long as
12 it leads to or has the possibility of leading to
13 admissible evidence.
14      MR. YOO: Exactly.
15      MR. KELLEY: You can't restrict my
16 deposition arbitrarily like you're trying to do.
17      MR. YOO: I told you that at some point
18 it's going to become harassing. Once it becomes
19 harassing, I'm going to instruct her not to
20 answer.
21 BY MR. KELLEY:
22      Q. Down the page it defines obligor. Could
23 you read that over and let me know if you
24 understand what that means?

**Page 22**

1      MR. YOO: Objection. Document speaks
2 for itself. And calls for a legal conclusion.
3      Q. I'm just asking you if you understand
4 what it is?
5      A. Yes.
6      Q. You do? Okay. So it indicates that
7 there are different types of obligors, right?
8      A. Yes.
9      Q. Direct, indirect, primary, secondary,
10 joint --
11      MR. YOO: Objection. The document
12 speaks for itself.
13      MR. KELLEY: I am defining the terms
14 that are going to be used later on.
15      MR. YOO: Again, I'm just asserting my
16 objections.
17      MR. KELLEY: Yes, you are.
18      MR. YOO: Can you just stop from
19 retorting to my objections.
20      MR. KELLEY: Why are you retorting to
21 me?
22      MR. YOO: I'm not retorting anything.
23 I'm inserting objections. Perhaps you should
24 have counsel representing you so this will go

**Page 23**

1 smoothly.
2 BY MR. KELLEY:
3      Q. The next page, please. Borrower's
4 claims. That would be page 9 of the purchase
5 and assumption agreement. A little bit further
6 down the page I've highlighted assets purchased
7 by the assuming bank. And they're saying that
8 they're subject to all the liabilities
9 associated with them.
10      A. Yes.
11      Q. And then finally, we get down to asset
12 purchase price, and could you read that over.
13      A. Yes.
14      Q. So it states that the asset purchase
15 price will be the book value if there's no
16 Schedule 3.2. And I'll represent that there is
17 no Schedule 3.2.
18      MR. YOO: Objection. The document
19 speaks for itself.
20      MR. KELLEY: And there is no Schedule
21 3.2 there in the document.
22      MR. YOO: Can you please just -- you
23 don't have to respond to my objections.
24      MR. KELLEY: I don't have to.

**Page 24**

1 BY MR. KELLEY:
2      Q. Then the next page, which is page 20 of
3 the purchase and assumption agreement, I have,
4 "The Assuming Bank has submitted to the Receiver
5 $1.888 billion for the Assets purchased and
6 Liabilities Assumed hereunder," right?
7      MR. YOO: Objection. Document speaks
8 for itself.
9      Q. I'm going to skip one page of the
10 exhibit and go to page 29 of the purchase and
11 assumption agreement. These are indemnification
12 clauses within the contract, as you see from the
13 heading. Do you understand indemnification?
14      MR. YOO: Objection. Calls for legal
15 conclusion.
16      MR. KELLEY: I asked for her
17 understanding.
18      MR. YOO: Let me just assert my
19 objections. You don't have to respond to my
20 objections. It's really annoying. Objection.
21 Calls for legal conclusion.
22      Q. Do you understand what it is? You can
23 answer the question.
24      A. Yes.

Defendant's Expert Materials
1076

**Page 25**

1    Q.  Okay.  So you understand it.  It talks
2  about obligation supplemental?
3         MR. YOO: Objection.  Document speaks
4  for itself.
5    Q.  That's just another form of
6  indemnification?
7         MR. YOO: Document speaks for itself.
8  Asking for legal conclusion.
9    Q.  Do you understand that?
10    A.  Yes.
11    Q.  And limited guaranty of a corporation?
12    A.  I'm sorry, where is that?
13    Q.  Bottom.  It says the corporation
14  guarantees the receivers.  By corporation, I
15  mean FDIC.
16    A.  Yes.
17    Q.  That is the corporation, not Chase.
18         Okay.  Next page.  Subrogation clause.
19  Do you understand what they mean by receiver
20  corporation acting as a guarantor?
21    A.  Yes.
22         MR. YOO: Objection.  Document speaks
23  for itself.  Calls for legal conclusion.
24    Q.  And then the next page -- oh, there is a

**Page 26**

1  Schedule 3.2.  It says -- lists -- highlighted
2  portion is loans, right?  It says book value?
3    A.  Yes.
4         MR. YOO: Document speaks for itself.
5    Q.  And then on page 36 of the purchase and
6  assumption agreement, which is the last page of
7  the exhibit, it states that the mortgage
8  servicing rights would be at book value.
9         So we're done with that exhibit.  Those
10  form the starting point here.
11         MR. KELLEY: This will be Exhibit 2.
12              --o--
13         (Deposition Exhibit 2 marked.)
14              --o--
15    Q.  On Exhibit 2, this is a page -- page 109
16  from the JPMorgan Chase annual report in 2009.
17  And the term of interest is purchased
18  credit-impaired loans.  And they're setting the
19  purchased credit-impaired loans at 81.2 billion.
20         MR. YOO: Objection.  Document -- lacks
21  foundation as to the document.
22    Q.  The document is the JPMorgan Chase &
23  Company 2009 annual report.
24         MR. YOO: Same objection.

**Page 27**

1    Q.  Do you understand the term "purchased
2  credit-impaired"?
3    A.  Yes --
4    Q.  Okay.  Because it shows up everywhere.
5  Okay.  So keep moving.
6              --o--
7         (Deposition Exhibit 3 marked.)
8              --o--
9    Q.  Accounting for Certain Loans or Debts
10  Securities acquired in a transfer.
11         MR. YOO: Do you have a copy for me?
12         MR. KELLEY: Yes.
13         MR. YOO: If you could, just for ease of
14  this deposition, as you're introducing exhibits,
15  if you can provide me a copy, as well.
16         MR. KELLEY: I have been providing you
17  with copies.
18         MR. YOO: Thank you.
19  BY MR. KELLEY:
20    Q.  So are you familiar with this statement?
21    A.  I have not seen this statement.
22    Q.  Okay.  This governs the acquisition of
23  loans?
24    A.  Okay.

**Page 28**

1         MR. YOO: Objection.  Assumes facts not
2  in evidence.
3    Q.  Okay.  I left the first page on there
4  just to identify the document.  Could you turn
5  to page 2.  And it's showing the accounting for
6  a loan that has been purchased.  Have you done
7  anything with this, or are you familiar with it?
8         MR. YOO: Objection.  Vague and
9  ambiguous.
10    A.  I don't understand.
11    Q.  Let's back up.  Are you familiar with
12  the purchase method of accounting?
13    A.  It's really outside of my accounting
14  scope, so I'm not familiar.
15    Q.  Okay.  All right.  So I'm going to give
16  a little background here.  The purchase method
17  of accounting is dictated by FASB 141, which is
18  the Federal Accounting Standards Board 141.  A
19  loan that's acquired, whether it's impaired or
20  not, has to be accounted for individually.  In
21  other words, each one has to be examined.  So if
22  you have a pool of loans, if you acquired a pool
23  of loans, you'd have to examine each one
24  individually.  And then once that's done, then

Defendant's Expert Materials
1077

**Page 29**

1  the loan could be aggregated into a pool of
2  loans, but it can't be done -- it can't be
3  aggregated into a pool of loans until the
4  accounting is done. And then once that's done,
5  then the SOP governs the rest of it, the actual
6  accounting for the stuff.
7      In this case they're using a single
8  loan, but that could be a pool of loans. And
9  what they're saying here, if you look at this
10  page, is the purchase amount has to be
11  determined, and they start it as the beginning
12  carrying amount. So this loan was purchased at
13  under price. So $4 million was paid for. And
14  then they calculate what they think the future
15  cash flows are going to be and create a basis
16  for that.
17      MR. YOO: Objection. Assumes facts not
18  in evidence.
19  Q. All right. So anyway -- so this page 2
20  gives the actual accounting -- SOP accounting
21  for a single loan, but it would also apply to a
22  pool of loans.
23      MR. YOO: Objection. The document
24  speaks for itself.

**Page 30**

1  Q. Okay. So let's go to page 3. And on
2  page 3, if you go to B33, it reiterates what I
3  just kind of paraphrased earlier, and that was
4  loans subject to this SOP are acquired
5  individually and in pools, and arm's length
6  transactions should be recorded at their
7  acquisition price presumed to be fair value.
8      MR. YOO: The document speaks for
9  itself.
10  Q. And then at the bottom I highlighted, it
11  says, "The face amount of the loans may be
12  substantially different from the
13  acquisition-date fair value of the loans due to
14  changes in market interest rates, credit risk,
15  and expected prepayments."
16      I'm going to skip over these other two.
17  If you go back to the last -- oh, this is
18  actually a new thing here. Make that exhibit 4.
19          --o--
20      (Deposition Exhibit 4 marked.)
21          --o--
22      MR. YOO: Do you have a copy for me?
23      THE WITNESS: It's the same.
24      MR. YOO: No, it's different.

**Page 31**

1      Do you have an Exhibit 4 for me?
2      THE WITNESS: This is all part of
3  Exhibit 3. This is a portion.
4      MR. KELLEY: Oh, is that part of 3?
5      MR. YOO: I assume they're not part of
6  3, right?
7      MR. KELLEY: So you got one.
8      MR. YOO: This was attached as part of
9  Exhibit 3. Did you mean to include that?
10      MR. KELLEY: Well, just wait a minute,
11  will you? I've got to look at this stuff.
12      MR. YOO: Well, I wish you had come
13  better prepared.
14      MR. KELLEY: Could you keep your
15  personal remarks to yourself, Mr. Yoo.
16      MR. YOO: If you keep your personal
17  remarks to yourself, maybe I'll do the same.
18      MR. KELLEY: I don't make personal
19  remarks, Mr. Yoo; you do.
20      MR. YOO: Just let us know because I
21  think what Ms. Davis has is the actual Exhibit
22  3. So if you believe it needs to be part of
23  Exhibit 3, then give it back to us.
24      MR. KELLEY: I understand all that. You

**Page 32**

1  don't have to explain. Okay. Let's forget
2  about all that. It's not necessary. So this is
3  not part of Exhibit 3.
4      MR. YOO: So that's going to be Exhibit
5  4?
6      MR. KELLEY: Yeah, could you --
7      MR. YOO: That is already Exhibit 4.
8      MR. KELLEY: Oh, you want to make that
9  Exhibit 4?
10      MR. YOO: She's already done that. Do
11  you have a copy for me of this particular
12  document?
13      MR. KELLEY: Apparently not, or if it is
14  there, it will be hard to find. So we'll make a
15  copy for you. Could you look on hers?
16      MR. YOO: Sure.
17  BY MR. KELLEY:
18  Q. All this is is a footnote that indicates
19  the amount of purchased credit impaired loans
20  obtained from Washington Mutual. And it says
21  that there are 78.1 billion. And they didn't
22  include these in their accounting. This is
23  JPMorgan Chase 10-Q, footnote to the 10-Q. And
24  it says they were recorded at fair value on the

Defendant's Expert Materials
1078

**Page 33**

1 transaction date including adjustment for credit
2 impairment. So the credit impairment adjustment
3 they're referring to is SOP-3.
4 MR. YOO: Objection. Lacks foundation.
5 Objection document speaks for itself.
6 Objection, also, assumes facts not in evidence.
7 —o—
8 (Deposition Exhibit 5 marked.)
9 —o—
10 Q. Exhibit 5 is obtained from the Senate
11 Permanent Subcommittee and Investigations.
12 That's the Senate Subcommittee and
13 Investigations. And it is an OTS fact sheet on
14 Washington Mutual Bank issued on September 25th
15 of 2008, which was a bank close date.
16 MR. YOO: Objection. Document speaks
17 for itself. Lacks foundation.
18 Q. Okay. We may refer back to this. So I
19 don't have any questions for you.
20 —o—
21 (Deposition Exhibit 6 marked.)
22 —o—
23 MR. KELLEY: Did I give you two pages or
24 one?

**Page 34**

1 MR. YOO: Two pages.
2 MR. KELLEY: Yeah, this is a separate
3 one.
4 MR. YOO: Exhibit 6 appears to be a
5 document that indicates Washington Mutual, Inc.
6 and Subsidiaries, Notes to Consolidated
7 Financial Statements (Unaudited).
8 MR. KELLEY: Oh, excuse me. They do go
9 together. Sorry. They actually do go together.
10 So that's the end of it.
11 MR. YOO: Do you have a second page for
12 me? I already have the first page.
13 BY MR. KELLEY:
14 Q. So if you take a look at that,
15 guarantees. I'll tie these two corporate
16 advances later. Have you had any exposure to
17 guarantee payments?
18 A. No, I have not.
19 Q. So this exhibit is being used to
20 identify the guarantees made by Washington
21 Mutual, Inc. on the loans that it created.
22 MR. YOO: Objection. Lacks foundation.
23 Assumes facts not in evidence.
24 —o—

**Page 35**

1 (Deposition Exhibit 7 marked.)
2 —o—
3 MR. KELLEY: I've highlighted the areas
4 of interest. This has to do with mortgage
5 repurchase liability. And if you take a look at
6 the highlighted footnotes, it shows the type of
7 payments and other issues surrounding the
8 repurchase of loans. So the purpose of this
9 exhibit is to highlight that the acquisition of
10 the loans by Chase was not necessarily through
11 the purchase — through the receiver, but
12 through the liabilities acquired by Chase when
13 it purchased certain assets and certain
14 liabilities. So the loans could be acquired
15 through the liabilities and not be transferred
16 as assets. So that's the purpose of this
17 exhibit.
18 MR. YOO: For the record, Exhibit 7
19 appears to be a portion of some type of a
20 filing. It's identified by the date number on
21 top May 26, 2014, Corp 10K, 2013, and this
22 appears to be page 79 of that document. If it
23 is what it is, again, as to Mr. Kelley's
24 statement, assumes facts not in evidence, lacks

**Page 36**

1 foundation.
2 MR. KELLEY: Let me highlight that a
3 little bit more. At the bottom of the page it
4 indicates where this is from, it's JPMorgan
5 Chase & Company 2013 annual report.
6 Why don't we take a five-minute break.
7 MR. YOO: Okay.
8 (Recess.)
9 BY MR. KELLEY:
10 Q. Do you understand the difference between
11 book value and fair value?
12 MR. YOO: Objection. Vague and
13 ambiguous.
14 A. Yes.
15 Q. So could you give me an explanation?
16 A. So I believe fair value to be what the
17 market value is of the property, what somebody
18 would pay for the property. Whereas, book value
19 is what the bank carries that asset on its
20 books.
21 Q. So based on what we've seen earlier, the
22 loans were to be acquired at book value, but
23 then they had to be accounted for at fair value,
24 right, by these standards, so there's actually

Defendant's Expert Materials
1079

**Page 37**

1 two things, one is whatever was on the books on
2 September 25, 2008 -- yeah, '8, and then
3 sometime thereafter they do a fair value
4 calculation. Do you know how they do the fair
5 value calculation?
6 A. I do not.
7 Q. So they could, I guess, appraise the
8 property or they could -- if it's a security or
9 something, they could see what it trades for.
10 MR. YOO: She said she doesn't know.
11 Q. So you're not familiar with the actual
12 fair value calculation?
13 A. No.
14 MR. YOO: Asked and answered.
15 Q. But I do agree with your definition.
16 Are you familiar with pool accounting?
17 A. I'm not.
18 Q. You're not? Okay. So your activities
19 are pretty much loan level activities?
20 A. Yes.
21 Q. And then somebody else would aggregate?
22 A. Yes.
23 Q. Are you familiar with the FFIEC, the
24 Federal Financial Institutions Examinations

**Page 38**

1 Council, guidelines?
2 A. I'm not. I've heard that term, but I'm
3 not familiar.
4 Q. So you haven't -- maybe we should just
5 define it. It shows up in the comments field.
6 A. Okay.
7 =0=
8 (Deposition Exhibit 8 marked.)
9 =0=
10 Q. That's another page from the JPMorgan
11 Chase --
12 MR. YOO: Do you have a copy for me?
13 MR. KELLEY: Actually, no. We're going
14 to have to copy that. So this defines the FFIEC
15 cross-border disclosure requirements.
16 MR. YOO: Objection. Document speaks
17 for itself. Assumes facts not in evidence.
18 Lacks foundation.
19 Q. Okay. The document is relevant to the
20 comments field in some of the 745 transactions.
21 Anyway, I'll just put that in there.
22 Does that make sense? Read it over. Is
23 it clear-cut?
24 A. Yes.

**Page 39**

1 Q. Okay. Before we move on going through
2 some of these things, I wanted to ask you a few
3 questions. There was a -- I think Mr. Smith in
4 his deposition referred to a MSP conversion.
5 Are you familiar with that?
6 A. Yes.
7 Q. Could you explain to me exactly what was
8 going on with the so-called conversion?
9 MR. YOO: Objection. Vague and
10 ambiguous.
11 If you understand his question, go ahead
12 and respond.
13 A. So I think you're speaking about the
14 conversion of the MSP servicing system. So when
15 we acquired -- when Chase acquired the WAMU Bank
16 loans, they were on an MSP servicing system and
17 Chase was also on an MSP servicing system, so it
18 was really just meshing those two systems into
19 one, into our servicing system.
20 Q. Did you participate in that?
21 A. Just related to corporate advances.
22 Q. So they asked you to check things over,
23 make sure they were coming out --
24 A. Yes.

**Page 40**

1 Q. -- the same?
2 A. We had to make sure they balanced. Once
3 everything was brought over, that it balanced to
4 the beginning and ending balances.
5 Q. And was that all done within the same
6 program, or was it --
7 A. Yes.
8 Q. -- two different programs?
9 A. Just the one program.
10 Q. Okay. Anything remarkable about that?
11 MR. YOO: Objection. Vague and
12 ambiguous.
13 Q. Different chart of accounts?
14 A. I mean, I guess I don't understand
15 specifically the question. But there were
16 different accounts that we housed, yes.
17 Q. So you put them in the right box?
18 A. Yes.
19 Q. Make sure they add up at the end of the
20 day?
21 A. That's right.
22 Q. When was that completed?
23 A. Around December 2009.
24 Q. Did you then begin to use the system?

Defendant's Expert Materials
1080

Page 41

1  You had the converted system?
2  A. Yes.
3  Q. But only when it was finished, right?
4  A. Yes.
5           —o—
6  (Deposition Exhibit 9 marked.)
7           —o—
8  MR. YOO: For the record, Exhibit 9 is
9  document identified by Bates stamp number
10 JPM002040.
11 MR. KELLEY: That's right.
12 Q. So I've highlighted 91T00. What's
13 91T00?
14 A. It is a corporate advance pay.
15 Q. And what corporate advance payee?
16 A. It's a third party, so the T of the
17 91T00 indicates that it's a third-party payee.
18 Q. Okay.
19 A. And it's used to house private investor
20 claim funds. So when Chase makes a claim to the
21 investor and they pay the claim, funds would be
22 applied to this payee.
23 Q. Okay. So they sent them a bill?
24 A. Yeah.

Page 42

1  Q. They pay. Okay. Now, if you look to
2  the right of that, it states that the claim —
3  the investor IDs begin with an A through V; is
4  that correct?
5  A. In the current MSP platform, yes,
6  indicates private investor loans.
7  Q. And what would X, Y, Z indicate?
8  A. Those would indicate bank-owned assets.
9  Q. Okay. So W, X, Y, Z. Have you ever
10 seen a W?
11 A. I have.
12 Q. You have?
13 A. Uh-huh.
14 Q. Okay. What if there's no letter there?
15 Suppose it's just a number. What would that
16 indicate?
17 A. That would indicate another type of
18 investor. So it could be Fannie Mae, Freddie
19 Mac, Ginnie Mae.
20 Q. Oh, really?
21 A. Which are not considered private
22 investors.
23 Q. They're kind of quasi private?
24 A. Hybrid.

Page 43

1  Q. Yeah, they're hybrid. Okay. Thanks.
2  You're the first person who's known what that
3  is. I was in — just as an aside, I was in
4  court and a judge said — he was looking at a
5  screen shot, not from Chase, but from Bank of
6  New York, and he said, I never had anyone that
7  could explain a screen shot before in court. So
8  congratulations.
9  Do you happen to recall what the numbers
10 would be for Fannie Mae, Ginnie Mae?
11 MR. YOO: Objection. Completely
12 irrelevant to the subject matter of this
13 lawsuit. Not likely to lead to discoverable
14 evidence.
15 Q. Do you know?
16 A. Generally, Freddie Mac are in a 5
17 series, a 500 series, could be 5 whatever.
18 Q. 5 something?
19 A. Yeah, and then Fannie is in a 4 series.
20 and Ginnie Maes are in, I believe, 7 and 6
21 series.
22 Q. Have you ever seen a 1 or 2?
23 A. Not that I can recall.
24 Q. Okay. How about a 3?

Page 44

1  A. No, I don't recall.
2  Q. How high do the numbers go?
3  A. Investor IDs can be any number, and so
4  they can go all the way up to like the 900
5  series.
6  Q. So basically three digits?
7  A. Yes.. Three characters.
8  Q. Okay. One other thing, this has come up
9  a number of times and people don't seem to know
10 it. If I take an investor ID like 801/0006,
11 what's the /0006? Is that part of the investor
12 ID, or is that some other category?
13 A. It's what we call a category code. And
14 it doesn't always carry a lot of significance
15 other than to — those categories drive that —
16 where the loan resides into a different account
17 or call center. So it may be the same type of
18 loan, but in order to get those loans to be
19 driven to a different balance sheet we'd have to
20 change that category and have that category map
21 to the GL that it drives to.
22 Q. Excellent explanation. So it just
23 breaks the books up into a series of books?
24 A. Correct.

Defendant's Expert Materials
1081

Page 45

1   Q. Okay. Are you familiar with the LPS
2   desktop system? You may not be.
3   A. If it's interchangeable with MSP, I
4   don't know if they use those interchangeably,
5   but specifically I've never logged into an LPS
6   desktop.
7   It's usually external, I think, to
8   Chase, but it's done between -- out in the LPS
9   third-party providers for the banks.
10  MR. YOO: Objection. Assumes facts not
11  in evidence. Lacks foundation.
12  MR. KELLEY: Why don't we take a little
13  break, because I need to get a couple copies
14  made.
15          --=0=--
16  (Deposition Exhibit 10 marked.)
17          --=0=--
18  MR. KELLEY: Can you share that?
19  MR. YOO: I have no choice.
20  MR. KELLEY: It turns out you do have a
21  choice. I do have a copy of it.
22  MR. YOO: For the record, Exhibit 10 is
23  a three-page document identified as JPM001546
24  and 47.

Page 46

1   BY MR. KELLEY:
2   Q. You might want to look that over a
3   little bit. I've kind of highlighted some of
4   the areas of interest, but there may be more.
5       Have you seen this type of report
6   before?
7   A. I have not.
8   Q. Okay. It appears that it's a -- some
9   sort of MSP summary report, right?
10  MR. YOO: Objection. Lacks foundation.
11  Assumes facts not in evidence.
12      Go ahead and respond, if you can. If
13  you know what it is.
14  A. I've not seen this. It may be a screen
15  that I'm just not familiar with.
16  Q. Okay. But if you look at the top you
17  see the history year to date and INV 801 cat 13,
18  and then investor number. That's the loan
19  number. I'll represent that that is the loan
20  number. And then it has a date there. Do you
21  know what any of those things are, T13, for
22  example, cat 13, 013?
23  A. I don't know what T13 is. Cat 13,
24  again, drives where the -- where the loan will

Page 47

1   reside on the balance sheet, and typically a cat
2   13 indicates an arm loan.
3   Q. Okay. So the balance sheets are
4   segregated by loan type?
5   A. Correct.
6   Q. Okay. And if you look down there a
7   little bit further it says PLGD-LN.
8   A. Okay.
9   Q. Have you run across the pledged loans in
10  your dealings?
11  A. No, I have not.
12  Q. You might not. It's more of an investor
13  thing.
14      Let's go to the next page. There's some
15  payee numbers there at the bottom. Are you
16  familiar with that? 95R21.
17  A. Somewhat, yes.
18  Q. Okay. Could you explain? I guess T was
19  third party. I don't know what R is.
20  A. So R would indicate that it's a
21  recoverable balance, meaning recoverable to the
22  borrower.
23  Q. Okay.
24  A. I do know that 95R21 was a payee used

Page 48

1   pre-Chase. Chase no longer uses this payee. It
2   would have been converted over.
3   Q. So this was like a Washington Mutual
4   payee code?
5   A. That's correct. Yes.
6   Q. What code would they use now?
7   A. I don't know for this specific payee.
8   Q. Okay. Do you have any idea what in IV
9   means?
10  A. I do. That's a user ID, but it's used
11  by the invoice team, so it's new invoice.
12  Q. Does this refer to a specific person, or
13  just a group that does this function?
14  A. This specific user is referencing a
15  group, but users can be specific to a person.
16  Q. They could be -- they could be specific,
17  or it could be a small group of people using
18  this code to identify their group?
19  A. Yes.
20  Q. Got it. Okay. That helps.
21      And then what's the AR over here at the
22  far right on these entries?
23  A. I honestly don't know.
24  Q. So some of it is the same, some of it

Defendant's Expert Materials
1082

## Page 49

1  isn't. Down on the third page they have a list
2  of things that look like kind of definitions.
3      A. Okay.
4      Q. And have you ever seen stuff like this?
5  These are kind of like codes. Do you use these
6  now, or did you ever use them?
7      A. None of these codes look familiar.
8  They're probably specific to this screen, and
9  that's not one that I use.
10     Q. Okay. All right.
11                  —0—
12     (Deposition Exhibit 11 marked.)
13                  —0—
14     MR. YOO: Exhibit 11 is identified by
15  JPM Bates stamp number 002035.
16     Q. It says loan transfer screen, and then
17  we have at the top — if you go down there's
18  headers and go down further it says client 156.
19  Who is client 156?
20     A. Client 156 is just the platform where
21  Heritage WAMU loans are housed on MSP. So MSP
22  has two platforms, one being 465, which is for
23  Heritage Chase, and the other platform or client
24  is 156, which is Heritage WAMU.

## Page 50

1      Q. And what does that mean?
2      A. It just means that those loans on client
3  156 were originated by WAMU.
4      Q. So it doesn't indicate how they were
5  acquired?
6      A. No.
7      Q. So they could have been acquired as a
8  liability repurchase or — they're just
9  Washington Mutual Bank loans or Washington
10  Mutual Bank, FA loans?
11     A. Yes.
12     Q. Are there any Washington Mutual, FSP
13  loans in the Heritage thing? I don't think so.
14     A. I don't know the difference.
15     Q. It's a technical difference.
16  Apparently, Washington Mutual Bank, FSB wasn't
17  in receivership; it was just transferred as an
18  operating subsidiary.
19     MR. YOO: Objection. Assumes facts not
20  in evidence, lacks foundation. She said she
21  doesn't know.
22     Q. So what about client 908, who is that
23  client 908?
24     A. So 908 is just in reference to when —

## Page 51

1  before conversion, WAMU had its own MSP, they
2  had platforms. So like Chase today has client
3  465 and 156, they had their own separate
4  platforms or clients on MSP. That's just
5  referring to one of those.
6      Q. So is 908 a Washington Mutual Bank
7  number, or is it a Chase number?
8      MR. YOO: Asked and answered.
9      Q. I didn't understand.
10     A. It's WAMU.
11     Q. And then it says pre-9-1-09. Does that
12  sound like a conversion date?
13     A. Preconversion.
14     Q. And then after that they use something
15  else which they don't indicate here on this
16  screen, I guess. Let's go down to the bottom
17  because they're in reverse order date-wise.
18  What we're seeing here is a date 8-7-07. Could
19  you explain this? The captions are at the top
20  old/INV and EFF date and then we have tran date
21  and then date paid. Could you explain to me the
22  80707 entry transaction date?
23     A. It appears that's a transaction that
24  happened prior to conversion, so that happened

## Page 52

1  in the WAMU servicing system. I can explain it
2  as far as how Chase would currently -- what
3  these would represent in Chase today, but I
4  don't know what they were doing here.
5  Typically, when you see these transfers and they
6  just say maintenance investor, it could be that
7  they were just moving it into a different GL, so
8  they had to move it into a different investor
9  category to record it in that GL account.
10     Q. You spoke earlier this apparently --
11  they're indicating the investor number here is
12  030. Do you know what that is?
13     A. I do not. Those are all preconversion
14  and WAMU had their own logic for the investor
15  IDs that is different than Chase is. Where we
16  had W, X, Y, Z are bank owned, they had a
17  different logic.
18     Q. So if you move to the column next to
19  that you see the 801006, which I think you've
20  already explained adequately.
21     A. Uh-huh.
22     Q. And what they're saying is that the loan
23  was transferred from 030 to 801; is that
24  correct?

**Defendant's Expert Materials**
**1083**

**Page 53**

1   A. Appears to be.

2   Q. And then let's move up to the next line.

3 I'll just make a note that that ████████ is a

4 loan number at issue here. On 12-17 of '07 it

5 shows another transfer.

6   A. That appears correct.

7   Q. So the investor went from A01 to A11.

8 Would that be a correct read?

9   A. Yes.

10   Q. And then later on in 12-19 of '08 it

11 shows the -- well, go ahead and tell me what

12 happened there.

13   A. Looks like it moved from investor ID,

14 A11 category 006 into A01 category 013.

15   Q. Okay. And again, we don't place special

16 interest on the 006013?

17   A. Correct.

18   Q. So if you look at the dates below that

19 it says the transaction date is 12-19 of '08,

20 right?

21   A. Right.

22   Q. It says the effective date is 3-1 of

23 '08.

24   A. Correct.

**Page 54**

1   Q. How can you effect a backwards transfer?

2 Have you ever seen this done?

3   A. I have. I don't know what that

4 indicates.

5   Q. And it refers to -- do you know what the

6 N refers to?

7   A. I do not.

8   Q. You're doing better than most people.

9 Congratulations. Most of them are baffled by

10 this.

11     And then on 9-2 of '09 it shows an

12 entirely new investor, X01, right?

13   A. Yes.

14   Q. And what's the 228 here?

15   A. Again, just a category that drives

16 ledger.

17   Q. Okay. This one here is -- what's it

18 doing? It's going from AX01 to A01?

19   A. I believe this is when conversion

20 happened, and what you're seeing there is these

21 loans being loaded onto the Chase servicer. So

22 it's really just loading them into this kind of

23 generic investor ID, and then you see a changing

24 back to the correct one that it came from. So

**Page 55**

1 it's really just a step in the conversion.

2   Q. Okay. So just to be clear, the very top

3 of the page it has JPMorgan Chase Bank NA-156?

4   A. Yes.

5   Q. Is that Chase's number?

6   A. 156 indicates that's on the platform for

7 Heritage WAMU.

8   Q. Okay. Platform Heritage WAMU. All

9 right. Okay. Thank you.

10     =0=

11     (Deposition Exhibit 12 marked.)

12     =0=

13     MR. YOO: Do you have a copy for me?

14     MR. KELLEY: Will you share, please. I

15 have one here, but it's not worth searching for.

16 BY MR. KELLEY:

17   Q. So this is JPM001134 Bates number. I've

18 highlighted the thing at the top. This appears

19 to refer to an investor change and effective

20 date. So apparently that matches with this?

21   A. Yes.

22   Q. So even though this is not a Chase --

23 Chase uses this system, obviously, but it's not,

24 I don't think, an internal accounting system,

**Page 56**

1 it's an LPS?

2   A. No.

3   Q. So anyway, that matches.

4     MR. YOO: Let the record reflect that

5 Mr. Kelley's referring to -- when he says it

6 matches, he's referring to the top line of

7 Exhibit 11.

8   Q. Investor change and effective date

9 9-2-09.

10     Did you look at MSP for this loan prior

11 as part of your preparation for this deposition?

12   A. I did review it, just the corporate

13 advance screens.

14   Q. Okay. You didn't look at anything else?

15   A. No.

16   Q. I might ask you, how do you get your

17 instructions to apply a corporate advance? I

18 mean, how do you know what to do in your job?

19 Do you get orders?

20     MR. YOO: Objection. Vague and

21 ambiguous.

22     If you understand his question, go ahead

23 and respond.

24   A. We don't apply the corporate advance, so

Defendant's Expert Materials
1084

Page 57

1 those are paid out through an invoice system.
2 So the vendor submits an invoice, the invoice is
3 paid through another system and is booked into
4 MSP. What my team does is we reconcile the
5 activity within the payee to ensure if the payee
6 is for inspections that we're only getting
7 inspection transactions in that payee.
8    Q. So every 745 transaction will have,
9 what, an invoice?
10    A. Not a 745. So a 745 is a non-monetary
11 transaction. It's an adjusting entry. It could
12 just be us moving it from one payee to another.
13 Invoices are booked with a 600 series
14 transaction code.
15    Q. I think we have something on that. So
16 how would you know to move to a different payee
17 code?
18    A. We would see transaction with reason
19 codes that do not apply to that payee. So if a
20 payee is set up as an inspection payee, we
21 should only see inspection reason codes. So if
22 we saw a reason code hit that was not
23 inspection-related, we would know that it didn't
24 belong.

Page 58

1    Q. So for every 745 is there going to be a
2 600 or 500?
3    A. No. A 745 is going to be offset with
4 another 745. So in order to do a 745
5 transaction there has to be a debit and a
6 credit, but there's no invoice. So it's moving
7 things internally on our books. There's no cash
8 received and we're not paying cash out.
9    Q. As an example, if an appraisal was
10 ordered by Chase by an outside firm, then that
11 firm would send Chase an invoice, it would be
12 recorded as a 600?
13    A. 600 series tran, yes.
14    Q. And would there also possibly be a 745
15 entry?
16    MR. YOO: Objection. Asked and
17 answered. Twice.
18    A. Only if the funds needed to be moved
19 into a different account.
20    MR. KELLEY: I want to take a
21 five-minute break.
22    (Recess.)
23    --=0=--
24    (Deposition Exhibit 13 marked.)

Page 59

1    --=0=--
2    MR. YOO: Exhibit 13 appears to be --
3    MR. KELLEY: This is a summary.
4    MR. YOO: That's something that you
5 generated, right, Mr. Kelley?
6    MR. KELLEY: Right.
7    MR. YOO: Summary of 745 transactions is
8 the title of the document.
9    MR. KELLEY: Yes. And it's a summary of
10 the Chase discovery referencing the Chase Bates
11 number in the first column. So that would be
12 the go-to page. And it has a user column, a
13 date, it's got the payee codes, and the comments
14 field is extracted from those documents.
15    MR. YOO: Again, this document was
16 generated by Mr. Kelley. This is not a Chase
17 document.
18    MR. KELLEY: No, it's not.
19 BY MR. KELLEY:
20    Q. Take a look at that for a minute.
21    A. Okay.
22    Q. I guess starting at the top, the 10 and
23 14, do you know what that is?
24    A. I do.

Page 60

1    Q. What is it?
2    A. So the 10 and 14 is a contra payee.
3    Q. Is that a real payee?
4    A. By payee, I mean that it's a number
5 assigned to a GL.
6    Q. General ledger?
7    A. Yes.
8    Q. So it doesn't have any further
9 identification?
10    A. No, other than it would just indicate a
11 general ledger account that this activity would
12 be hitting.
13    Q. Okay. So it's headed that way?
14    A. Yes.
15    Q. All right. And when it gets over there,
16 then somebody else does something with it,
17 right?
18    A. Yes.
19    Q. So it's a partitioning of the accounting
20 functions, I take it?
21    A. Yes.
22    Q. And then 16 and 14?
23    A. That is the -- it's a credit loss, GL.
24    Q. What is a credit loss?

Defendant's Expert Materials
1085

**Page 61**

1  A. It's just where we record potential
2  losses on our books.
3  Q. So if it's minus, is that a loss?
4  A. None of these will specifically be
5  losses, they're just kind of paper accounting,
6  where we're saying a credit is typically a --
7  I'm sorry, a minus would indicate a credit, and
8  something that was just a positive number would
9  be a debit.
10  Q. So the bottom there's a 435 number as
11  positive?
12  A. Uh-huh.
13  Q. There's a debit?
14  A. On the right, yes.
15  Q. So is that -- so which one is the right
16  one?
17     MR. YOO: Object.
18  A. All of these appear to be.
19  Q. Well, they're plus and minus.
20  A. Some of them are just changing the
21  reason code, so if you look over to the right,
22  that 435 transaction --
23     MR. YOO: Let the record reflect that
24  the witness is pointing to numbers 9 and 10,

**Page 62**

1  LTCO.
2  A. So that -- they're actually just
3  changing a reason code there from LTCO to CMVC.
4  During conversion WAMU had their own reason code
5  system. Chase has our reason code system. So
6  they're just doing an entry to change the reason
7  code in how it's recorded.
8  Q. So the LT stands for what?
9  A. That was a WAMU reason code showing
10  their conversion balance.
11  Q. Why are there -- if you notice, there
12  are three sets of entries under 9-24-2009.
13  That's only one loan. Why are there three sets
14  of entries?
15  A. Again, that goes back to if they were
16  doing an entry, they're just flipping the reason
17  code. So it's not truly a write-down. It's
18  adjusting that reason code. In order to do that
19  they have to reverse what was done on the other
20  reason code and then do an entry for the new
21  reason code.
22  Q. And the reason code is LTCO?
23  A. Well, that was the old reason code, so
24  they changed it to CMVC.

**Page 63**

1  Q. What's CMVC mean?
2  A. That's a contra conversion balance.
3  Q. Does this relate to the fair value of
4  the loan?
5  A. It does.
6  Q. You're not familiar with fair value
7  calculations. I think we asked that one.
8     MR. YOO: Asked and answered.
9  Q. Some other group does that; is that
10  correct?
11  A. That's correct.
12     MR. YOO: Asked and answered.
13  Q. Do you know what group does it? Do they
14  have a name?
15  A. I don't know.
16  Q. There's over 150,000 employees.
17  A. Right.
18  Q. So the CAMV on the line 7, what's that
19  refer to?
20  A. CAMV refers to a contra anniversary.
21  Q. So sounds like a drug deal, contras. So
22  what's that all about? Why do they have to do
23  this on anniversary dates?
24  A. Because a loan can depreciate over time.

**Page 64**

1  So they have to keep their value, their fair
2  value analysis current. So they make these
3  adjusting entries.
4  Q. But a loan might not depreciate over
5  time, it might appreciate, right?
6     MR. YOO: Objection.
7  Q. Is that correct?
8  A. That's correct.
9  Q. So what do you do in that circumstance?
10  A. They could do a write-up on the loan.
11  Q. Okay. All right. So what are these?
12  Are these write-ups or write-downs?
13  A. Which one?
14  Q. I'm talking about the CAMV on 6 and 7.
15  A. Those would be write-downs.
16  Q. So these guys are write-downs.
17  A. Uh-huh.
18  Q. Okay. And then if we go to lines 3 and
19  4, it says CAMV?
20  A. Again, that's anniversary contra.
21  Q. So they're adjusting them annually, is
22  that what that means?
23  A. They could be, yes.
24  Q. Because these are 9-25 and the other

Defendant's Expert Materials
1086

Page 65

1 ones were 9-24-09. Okay. Anyway, are those
2 write-ups or write-downs?
3 A. Lines 3 and 4?
4 Q. Uh-huh.
5 A. Those are -- those appear to be
6 write-downs. They are going -- I'm sorry,
7 write-ups.
8 Q. So the loan is appreciating in value?
9 A. It appears that way.
10 Q. That's quite a bit. And then we have
11 the mysterious line 2. It just shows the one
12 entry. This is the actual document production
13 from Chase. So there is no 10 and 14 in line 2.
14 So I'm not sure what that means.
15 A. If this was a 745 tran, there would have
16 to be an offsetting entry.
17 Q. So why isn't it there, I wonder?
18 A. I'm not sure where this came from. It
19 would have to be there. If we looked probably
20 through the system.
21 Q. You guys may have to fix that.
22 A. In my review of the loan, I believe that
23 there was the offset because my balance on 10
24 and 14 and 16 were, you know, equal offsets.

Page 66

1 Q. That's kind of what I was expecting.
2 Then it's a write -- so is 463 -- excuse me,
3 line 2, the 463,000, is that a write-up or
4 write-down?
5 A. Assuming that there was an offset of the
6 463, that looks like it would be a write-down.
7 Q. Do you know how they obtain this
8 write-up or write-down, or do they just hand it
9 to you?
10 A. I do not.
11 Q. So they give you the number and you see
12 it's put in right?
13 A. These payees are managed by another
14 group in accounting outside of what my group
15 does.
16 Q. Okay. When you were looking at these,
17 did you look at any adjustments made prior to
18 September 25, 2008?
19 A. I don't recall specifically what the
20 transactions were, but I reviewed all of the
21 DDCH screen.
22 Q. There's a little mystery here.
23 Okay. I probably need to make a copy of
24 this. This is the best one. Why don't we make

Page 67

1 this -- I know this by heart anyway.
2 -=0=-
3 (Deposition Exhibit 14 marked.)
4 -=0=-
5 MR. YOO: Obviously, you don't have a
6 copy for me?
7 MR. KELLEY: Share, and then I'll use
8 this thing here, which I don't want to put into
9 evidence because it's missing the origin.
10 MR. YOO: All right. Exhibit 14 appears
11 to be some type of a spreadsheet. It's
12 identified by filing date with the court on
13 September 11, 2012, page 18 out of 30.
14 BY MR. KELLEY:
15 Q. Okay. And this is the lawsuit between
16 LSI -- that the FDIC receiver made against LSI
17 Appraisal Company asserting that the loans were
18 made grossly negligent. And on that page you'll
19 notice that the loan in question▮▮▮▮▮▮▮, is
20 there. It's about 11 above the bottom. It
21 says, Saratoga, gives the address, 14390
22 Douglass Lane.
23 A. Okay.
24 MR. YOO: On the bottom, right?

Page 68

1 Q. From the bottom, yeah. And if you move
2 over to column 3, it --
3 MR. YOO: The loss amount?
4 Q. The loss amount is stated as
5 $436,506.26; is that right?
6 A. All right.
7 Q. In this case they're claiming that this
8 is a natural loss --
9 MR. YOO: Okay.
10 Q. -- that apparently Washington Mutual
11 incurred prior to the receivership. Otherwise,
12 the receiver wouldn't be able to bring this
13 suit.
14 MR. YOO: Okay. Assumes facts not in
15 evidence. Lacks foundation.
16 MR. KELLEY: Well, foundation, or I'll
17 take judicial notice of this elsewhere in the
18 case.
19 MR. YOO: This is a spreadsheet that was
20 created by the FDIC, correct?
21 MR. KELLEY: By their attorneys.
22 MR. YOO: Right.
23 MR. KELLEY: Yes.
24 MR. YOO: Again, not by Chase, not by

Defendant's Expert Materials
1087

**Page 69**

1  Washington Mutual.
2      MR. KELLEY: That's correct. It was
3  created by the --
4      MR. YOO: Counsel --
5      MR. KELLEY: -- counsel for the
6  receiver.
7      MR. YOO: FDIC?
8      MR. KELLEY: Right.
9  BY MR. KELLEY:
10     Q. And I was wondering if you saw any
11  reference to this loss amount in there.
12  Incidentally, if there was a loss, how would
13  that be reported? Would that be reported
14  through your group in any way?
15     A. No, my group doesn't directly handle
16  losses.
17     Q. So if a -- if a loss occurred based on
18  they bought the loan for a million and they sold
19  it for half a million, they take a -- record a
20  half-a-million-dollar loss, you wouldn't see any
21  of that in your group?
22     A. Not my team directly, no.
23     Q. You might get some sort of thing --
24  order to move things around or whatever. Okay.

**Page 70**

1  Okay. That's it on that one.
2      We see in the documents -- I'm just
3  going to ask you some questions -- that the
4  investor number or IDX99 appears on the loan
5  transfer screen. Actually, X02 appears on the
6  loan transfer screen. And my question to you
7  is: How many -- and it refers to a pool, I
8  think, investor pool.
9      MR. YOO: Objection. Lacks foundation,
10  assumes facts not in evidence.
11     Q. How many numbers -- Xs are there? Have
12  you seen an X01 and X7 or 13?
13     A. Yes, there are multiple.
14     Q. There's lots of them?
15     A. Uh-huh.
16     Q. And is there -- what are these
17  categories?
18     A. The investor -- it can represent
19  different kinds of things, but all Xs are Chase
20  owned, so they're bank-owned loans.
21     Q. And they're consistent with that code
22  that we discussed earlier?
23     A. Yes.
24     Q. So how many have you seen? Are there 50

**Page 71**

1  of them or 20 of them?
2      A. No, there's --
3      Q. 99?
4      A. It can go the whole spectrum.
5      Q. So it could be X99 -- there could be 99
6  different Xs?
7      A. That's correct.
8      Q. And you work with how many of those?
9      A. It would be all of them.
10     Q. Sooner or later, right?
11     A. Yeah.
12     Q. Thank you. You answered a question that
13  Mr. Smith couldn't answer. He didn't know who
14  client 908 was.
15     A. Good.
16     Q. I'm going to ask you this: I've never
17  seen any document production relating to the
18  HELOC that's in this case. Do you also handle
19  HELOCs?
20     A. If they're outside of the MSP servicing
21  system, I would not.
22     Q. So they could be outside the MSP
23  servicing system?
24     A. There are other systems that service

**Page 72**

1  HELOC loans, yes.
2      Q. Could you explain what other systems
3  might be.
4      A. I believe they're VLS for Fortracs,
5  F-O-R-T-R-A-C-S.
6      Q. Anything else?
7      A. Just VLS. So those are the systems that
8  are outside MSP. Not knowing specifically what
9  this loan -- if it would be on MSP or these
10  other systems.
11     Q. I was just curious as to why they would
12  account -- wouldn't MSP be able to handle a
13  HELOC, or is this just a legacy thing?
14     A. No, there are issues with that servicing
15  system that they can't do everything that's
16  required, so they use another servicing system.
17  I don't know what those things are.
18     Q. So they need to use another servicing
19  system?
20     A. Yes.
21     Q. Okay. You also answered a question
22  Mr. Smith couldn't answer with the A through B.
23      Okay. What does CI refer to? It says
24  like a prime or CI.

Defendant's Expert Materials
1088

**Page 73**

1  A. That refers to credit impaired.

2  Q. Oh, okay. So that's the stuff we were
3  talking about earlier, credit-impaired loans?

4  A. Yes.

5  Q. They call them PCI loans in the annual
6  statement?

7  A. Yes.

8  Q. So some of the loans that were acquired
9  apparently weren't credit impaired. It's not
10  clear from the annual report whether they were
11  included -- you know, they mixed them altogether
12  or what, but I think they didn't.

13  Did Mr. Smith ask you at all about the
14  corporate advance adjustments, the contra
15  accounts? Do you recall him asking?

16  MR. YOO: Objection. Vague and
17  ambiguous.

18  If you understand his question, you can
19  respond.

20  A. I don't specifically recall him asking
21  anything other than what those reason codes mean
22  as a CAMV, and then I explained the contra.

23  Q. So he didn't ask in more detail.

24  I think I asked you earlier, you don't

**Page 74**

1  deal with Washington Mutual, FSB loans?

2  MR. YOO: Asked and answered.

3  A. I don't believe so.

4  Q. Yeah, probably not.

5  On these 745 transactions, they indicate
6  the direction of the flow of money, whether it's
7  virtual or real, right?

8  A. (Nods.)

9  Q. It could go A to B or B to A, right?

10  A. Yes.

11  Q. Okay. And have you seen a lot of these
12  very large 745 transactions like the ones you
13  see here where they're 400,000 or 546,000?

14  A. Yes.

15  Q. You have?

16  A. Yes.

17  Q. Okay. And are they -- have you ever
18  seen them where the -- these numbered
19  transactions exceed the actual amount of the
20  loan?

21  MR. YOO: Objection. Vague and
22  ambiguous as phrased.

23  A. Not that I recall.

24  Q. I was reviewing someone else's loan file

**Page 75**

1  and I found they had a $570,000 loan and he had
2  $700,000 in his 745 transactions, and they
3  weren't listed as contra, they were just --

4  A. It's possible, because fees could
5  compound over time.

6  Q. Well, that would be a lot of
7  compounding. Okay. So if they had a situation
8  where a hurricane came in and blew down the
9  garage and there was no insurance, would that be
10  handled as a 745 adjustment?

11  MR. YOO: Objection. Improper
12  hypothetical. Irrelevant to the subject matter
13  of the lawsuit and not likely to lead to the
14  discovery of admissible evidence.

15  A. I don't know how that would work and how
16  it would be recorded.

17  Q. I'm just looking at these huge amounts
18  of money flowing back and forth. Okay. Let's
19  see what else we have here.

20  Do you ever work -- you don't work
21  directly with any of the subsidiaries of Chase,
22  do you?

23  A. No.

24  Q. You're just totally internal?

**Page 76**

1  A. Internal.

2  Q. So you've never processed something for
3  Washington Mutual Securities Corporation?

4  A. No.

5  Q. Washington Mutual asset?

6  A. No.

7  Q. Do you ever use LEZA?

8  A. No. I've never heard of it.

9  Q. You don't need it?

10  A. Huh-uh.

11  Q. That's another software program.

12  Are you familiar with GAAP, generally
13  accepted accounting principles?

14  A. Yes.

15  Q. Under GAAP, is it permissible to write
16  up something after it's been written down?

17  MR. YOO: Objection. Calls for
18  testimony -- expert testimony, and calls for
19  testimony that's completely irrelevant to the
20  subject matter of the lawsuit and not likely to
21  lead to any discovery of any admissible
22  evidence.

23  A. That would be outside of what I do, so I
24  wouldn't be familiar with those policies or

Defendant's Expert Materials
1089

**Page 77**

1 procedures under GAAP.
2   Q. So you're not familiar with the GAAP?
3   A. With that portion of the GAAP.
4   Q. Okay. What portions of the GAAP are you
5 familiar with?
6   A. Anything that would be related to
7 corporate advance recording, accounts
8 receivable, those type of policies.
9   Q. I should have let you read that. Okay.
10   So if I understood you correctly, you
11 actually don't work with HELOCs?
12   A. Correct.
13   Q. You don't work with iVolt either?
14 Probably don't need to?
15   A. No.
16   Q. Do you know about it?
17   A. (Nods.)
18   Q. Have you ever looked at it?
19   A. Yes.
20   Q. Okay. Are the loan documents displayed
21 in color?
22   A. I don't recall.
23   Q. Smith got that one. He said they are.
24 So...

**Page 78**

1   I might ask you, is there -- do you have
2 an internal document guidelines and procedures,
3 business practices for what you do, or do you
4 just work off of the accounting standards?
5   MR. YOO: Objection. Vague and
6 ambiguous as phrased.
7   A. I'm not sure what you're asking there.
8   Q. Do you have a book that they give you of
9 procedures, here's what you need to do, you can
10 go refer to that book?
11   A. For some things, but not all.
12   Q. Partially?
13   A. Yeah.
14   Q. Now, one other thing we were talking
15 about, which we didn't go into in a lot of depth
16 was the -- this FFIEC write-up thing. It says
17 C150, FFIEC write-up. Do you know what that is?
18   A. I don't know outside of just the
19 description that it's a 150-day contra. I don't
20 know what the 150-day would indicate, from what
21 point.
22   Q. So C150 is 150 days?
23   A. It does indicate 150 days, but I'm not
24 sure 150 days from what point.

**Page 79**

1   Q. Great. So the FFIEC, of course, appears
2 to be referring to that entity. Apparently,
3 this is rather huge. I mean, an institution
4 nobody's ever heard of. My understanding is it
5 says between the federal reserve, the OCC, the
6 FDIC, and the treasury department. So this
7 write-up refers to a report required by the
8 FFIEC. They do have a reporting mechanism. So
9 would you be writing -- is that a write-up or
10 write-down there?
11   A. Based on the signage, it looks as if
12 it's a write-up.
13   Q. So it's a write-up going to -- reporting
14 a write-up to the FFIEC. I guess the question
15 is, since they require foreign reporting, what
16 that has to do with anything. So another
17 mystery.
18   A. Yeah.
19   Q. Okay. Is there any group at Chase that
20 handles these FFIEC write-ups or write-downs or
21 whatever?
22   A. It would be the same group that does the
23 write-downs, but I don't know who specifically
24 that group is.

**Page 80**

1   Q. So the C150, you said it was 150 days?
2   A. Uh-huh.
3   Q. That's an odd number of days. Do you
4 know any more about that sort of thing?
5   A. I don't.
6   Q. Have you ever seen C300 or --
7   A. I believe there's a C360.
8   Q. That would be like annual or something,
9 right?
10   So you have a C180, C150?
11   A. I think it's just those two
12 specifically.
13   MR. KELLEY: Maybe we can go off the
14 record here for a second.
15   (A discussion is held off the record.)
16   MR. KELLEY: So will you make that
17 representation again, Mr. Yoo.
18   MR. YOO: Sure. Off the record
19 Mr. Kelley had asked that Chase produce to him a
20 FFIEC report that was sent by Chase to some type
21 of governmental agency sometime in 2012. I told
22 him that I would look into it, but I did not
23 promise or guarantee him that we would produce
24 such a report if such a report exists.

Defendant's Expert Materials
1090

**Page 81**

1      MR. KELLEY: Okay. And now you're
2 representing that you're going to look into it?
3      MR. YOO: I'm going to look into it.
4 But that's all I'm representing to you.
5      MR. KELLEY: Okay. And that refers to
6 Chase Bates number document JPM002000.
7      While we're on the record with this
8 stuff, I want to make note that no documents
9 were produced today. Documents were requested
10 at the deposition. They were not produced.
11      MR. YOO: Ms. Davis is appearing in her
12 individual capacity as an employee. She's not a
13 custodial record of Chase. She has no
14 obligation to produce any documents, especially
15 the document that was requested. That's not in
16 her possession. She has no obligation to look
17 for them.
18 BY MR. KELLEY:
19      Q. I might ask you, have you ever run
20 across the initials FNFS in the comment fields
21 of some of these documents?
22      A. I don't recall that, no.
23      Q. You might not because it generally shows
24 up in LPS documents.

**Page 82**

1      In connection with the payee code 16 and
2 14, the comment field they have CI. What does
3 that indicate?
4      MR. YOO: Asked and answered.
5      A. Credit impaired.
6      Q. Oh, okay. Got it.
7      MR. YOO: Do you need time to gather
8 your thoughts? It seems like it's not conducive
9 to wait five minutes for you to ask one
10 question.
11      MR. KELLEY: Be patient.
12      MR. YOO: That's not how a deposition
13 should be taken.
14      MR. KELLEY: Well, that's your opinion.
15      MR. YOO: Let the record reflect that
16 Mr. Kelley's browsing through the deposition of
17 Mr. Smith to generate a question, and, in fact,
18 we've been here waiting five, six minutes for
19 each question to be asked.
20      MR. KELLEY: That's not true.
21      MR. YOO: I've been counting the time.
22 In fact, one question was posed to me, in
23 seven minutes only one question has been asked
24 to the deponent.

**Page 83**

1      MR. KELLEY: The purpose of the
2 deposition is to determine the facts in the
3 case; it doesn't matter if it takes one minute
4 or five minutes.
5      MR. YOO: All right. So admitted by
6 you.
7      MR. KELLEY: Okay. I'm done. Thank you
8 very much, Crystal. I appreciate it.
9      THE WITNESS: No problem.
10      MR. KELLEY: Your responses were very
11 clear.
12      MR. YOO: She answered every question
13 she knew.
14      -=O=-
15      Thereupon, the testimony of August 13,
16 2014, was concluded at 11:23 p.m.
17      -=O=-
18
19
20
21
22
23
24

**Page 84**

1             CERTIFICATE
2 STATE OF OHIO     :
3                SS:
    COUNTY OF FRANKLIN :
4      I, Rhonda Lawrence, a Notary Public in
5 and for the State of Ohio, duly commissioned and
qualified, do hereby certify that the
6 within-named CRYSTAL DAVIS was first duly sworn
to testify to the truth, the whole truth, and
7 nothing but the truth in the cause aforesaid;
that the testimony then given was reduced to
8 stenotypy in the presence of said witness,
afterwards transcribed; that the foregoing is a
9 true and correct transcript of the testimony;
that this deposition was taken at the time and
10 place in the foregoing caption specified.
11      I do further certify that I am not a
relative, employee or attorney of any of the
12 parties hereto; that I am not a relative or
employee of any attorney or counsel employed by
13 the parties hereto; that I am not financially
interested in the action; and further, I am not,
14 nor is the court reporting firm with which I am
affiliated, under contract as defined in Civil
Rule 28(D).
15
     In witness whereof, I have hereunto
16 set my hand and affixed my seal of office at
Columbus, Ohio, on this 27th day of August,
17 2014.
18
19
20
21
22           Rhonda Lawrence
23           Notary Public, State of Ohio.
24 My commission expires: October 8, 2018

Defendant's Expert Materials
1091

**$**

**$1.888 (1)**
24:5
**$4 (1)**
29:13
**$436,506.26 (1)**
68:5
**$570,000 (1)**
75:1
**$700,000 (1)**
75:2

**/**

**/0006 (1)**
44:11

**=**

**=0=— (28)**
17:4,6;26:12,14;
27:6,8;30:19,21;33:7,9,
20,22;34:24;35:2;38:7,
9;41:5,7;45:15,17;
49:11,13;55:10,12;
58:23;59:1;67:2,4
**=0=— (2)**
83:14,17

**A**

**A01 (3)**
53:7,14;54:18
**A11 (2)**
53:7,14
**able (2)**
68:12;72:12
**above (1)**
67:20
**accepted (1)**
76:13
**According (1)**
15:11
**account (5)**
44:16;52:9;58:19;
60:11;72:12
**accountants (2)**
6:11,17
**accounted (2)**
28:20;36:23
**accounting (33)**
6:3,24;7:14,20,21,
22;8:1,6,9,10,13,23;
9:17;10:20;18:17;27:9;
28:5,12,13,17,18;29:4,
6,20,20;32:22;37:16;
55:24;60:19;61:5;
66:14;76:13;78:4
**accounts (5)**
9:13;40:13,16;73:15;
77:7

**acquired (12)**
27:10;28:19,22;30:4;
35:12,14;36:22;39:15,
15;50:5,7;73:8
**acquisition (3)**
27:22;30:7;35:9
**acquisition-date (1)**
30:13
**across (2)**
47:9;81:20
**acting (1)**
25:20
**activities (2)**
37:18,19
**activity (2)**
57:5;60:11
**actual (2)**
29:5,20;31:21;37:11;
65:12;74:19
**actually (7)**
30:18;34:9;36:24;
38:13;62:2;70:5;77:11
**add (1)**
40:19
**address (1)**
67:21
**adequately (1)**
52:20
**adjusting (4)**
57:11;62:18;64:3,21
**adjustment (4)**
9:17;33:1,2;75:10
**adjustments (2)**
66:17;73:14
**admissible (3)**
21:13;75:14;76:21
**admitted (1)**
83:5
**advance (11)**
6:12;7:22;8:1,6;
41:14,15;56:13,17,24;
73:14;77:7
**advances (6)**
9:15,24;12:22;19:19;
34:16;39:21
**again (11)**
20:5;22:15;35:23;
46:24;53:15;54:15;
59:15;62:15;64:20;
68:24;80:17
**against (1)**
67:16
**agency (1)**
80:21
**aggregate (1)**
37:21
**aggregated (2)**
29:1,3
**ago (1)**
11:5
**agree (1)**
37:15
**agreement (15)**

17:2,14,17;18:9,11;
19:5,14,16,21;20:3;
21:6;23:5;24:3,11;26:6
**agreements (1)**
18:21
**ahead (4)**
39:11;46:12;53:11;
56:22
**allowed (1)**
21:11
**altogether (1)**
73:11
**Alvarado (2)**
5:11;12:9
**always (1)**
44:14
**ambiguity (1)**
14:10
**ambiguous (10)**
9:5,22;28:9;36:13;
39:10;40:12;56:21;
73:17;74:22;78:6
**amount (8)**
29:10,12;30:11;
32:19;68:3,4;69:11;
74:19
**amounts (1)**
75:17
**analysis (1)**
64:2
**Anne (1)**
12:7
**anniversary (3)**
63:20,23;64:20
**annoying (1)**
24:20
**annual (6)**
26:16,23;36:5;73:5,
10;80:8
**annually (1)**
64:21
**answered (12)**
10:11;19:17;37:14;
51:8;58:17;63:8,12;
71:12;72:21;74:2;82:4;
83:12
**Apparently (7)**
32:13;50:16;52:10;
55:20;68:10;73:9;79:2
**appear (2)**
61:18;65:5
**appearing (1)**
81:11
**appears (15)**
17:11;34:4;35:19,22;
46:8;51:23;53:1,6;
55:18;59:2;65:9;67:10;
70:4,5;79:1
**applied (1)**
41:22
**applies (1)**
18:11
**apply (4)**

29:21;56:17,24;
57:19
**appraisal (2)**
58:9;67:17
**appraise (1)**
37:7
**appreciate (2)**
64:5;83:8
**appreciating (1)**
65:8
**approximately (2)**
10:12;11:8
**AR (1)**
48:21
**arbitrarily (1)**
21:16
**area (1)**
9:24
**areas (2)**
35:3;46:4
**arm (1)**
47:2
**arm's (1)**
30:5
**Around (2)**
40:23;69:24
**aside (1)**
43:3
**assert (1)**
24:18
**asserting (2)**
22:15;67:17
**asset (5)**
17:24;23:11,14;
36:19;76:5
**assets (6)**
18:4;23:6;24:5;
35:13,16;42:8
**assigned (1)**
60:5
**Associate (2)**
6:7;19:18
**associated (1)**
23:9
**assume (1)**
31:5
**assumed (2)**
17:24;24:6
**Assumes (12)**
14:21;28:1;29:17;
33:6;34:23;35:24;
38:17;45:10;46:11;
50:19;68:14;70:10
**assuming (3)**
23:7;24:4;66:5
**assumption (12)**
17:2,14,16;18:9;
19:14,20;20:3;21:6;
23:5;24:3,11;26:6
**attached (1)**
31:8
**attorney (1)**
5:12

**attorneys (1)**
68:21
**August (1)**
83:15
**AX01 (1)**
54:18

**B**

**B33 (1)**
30:2
**back (10)**
5:16;11:20;15:19;
28:11;30:17;31:23;
33:18;54:24;62:15;
75:18
**background (5)**
5:16,20;6:22;7:3;
28:16
**backwards (1)**
54:1
**baffled (1)**
54:9
**balance (7)**
44:19;47:1,3,21;
62:10;63:2;65:23
**balanced (1)**
40:2,3
**balances (1)**
40:4
**Bank (22)**
5:7;14:16,17,18,18,
19;17:3;18:18,19;23:7;
24:4;33:14,15;36:19;
39:15;43:5;50:9,10,16;
51:6;52:16;55:3
**bank-owned (2)**
42:8;70:20
**banks (1)**
45:9
**based (4)**
19:24;36:21;69:17;
79:11
**basically (1)**
44:6
**basis (1)**
29:15
**Bates (5)**
41:9;49:15;55:17;
59:10;81:6
**become (2)**
20:8,11;21:6,18
**becomes (1)**
21:18
**begin (2)**
40:24;42:3
**beginning (2)**
29:11;40:4
**belong (1)**
57:24
**below (1)**
53:18
**best (1)**

Defendant's Expert Materials
1092

66:24
**better (2)**
31:13;54:8
**beyond (1)**
19:7
**bill (1)**
41:23
**billion (3)**
24:5;26:19;32:21
**bit (7)**
5:15;9:18;23:5;36:3;
46:3;47:7;65:10
**blew (1)**
75:8
**Board (1)**
28:18
**book (13)**
17:7,17,23;18:4,5;
23:15;26:2,8;36:11,18,
22;78:8,10
**booked (2)**
57:3,13
**books (6)**
36:20;37:1;44:23,23;
58:7;61:2
**borrower (1)**
47:22
**Borrower's (1)**
23:3
**Bottom (9)**
25:13;30:10;36:3;
47:15;51:16;61:10;
67:20,24;68:1
**bought (1)**
69:18
**box (1)**
40:17
**brand (1)**
8:20
**break (3)**
36:6;45:13;58:21
**breaks (1)**
44:23
**brief (3)**
11:10,11;14:1
**bring (1)**
68:12
**brought (1)**
40:3
**browsing (1)**
82:16
**business (1)**
78:3

---

**C**

**C150 (4)**
78:17,22;80:1,10
**C180 (1)**
80:10
**C300 (1)**
80:6
**C360 (1)**

80:7
**calculate (1)**
29:14
**calculation (3)**
37:4,5,12
**calculations (1)**
63:7
**call (3)**
44:13,17;73:5
**Calls (8)**
19:6,7;22:2;24:14,
21;25:23;76:17,18
**came (3)**
54:24;65:18;75:8
**CAMV (5)**
63:18,20;64:14,19;
73:22
**can (20)**
9:16;21:2;22:18;
23:22;24:22;27:15;
43:23;44:3,4;45:18;
46:12;48:15;52:1;54:1;
63:24;70:18;71:4;
73:18;78:9;80:13
**capacity (1)**
81:12
**captions (1)**
51:19
**carries (1)**
36:19
**carry (1)**
44:14
**carrying (1)**
29:12
**case (8)**
5:8,10;11:4;29:7;
68:7,18;71:18;83:3
**cash (4)**
7:16;29:15;58:7,8
**cat (4)**
46:17,22,23;47:1
**categories (2)**
44:15;70:17
**category (8)**
44:12,13,20,20;52:9;
53:14,14;54:15
**caution (1)**
20:5
**center (1)**
44:17
**certain (4)**
13:2;27:9;35:13,13
**certified (1)**
5:3
**cetera (1)**
18:23
**change (4)**
44:20;55:19;56:8;
62:6
**changed (1)**
62:24
**changes (1)**
30:14

**changing (3)**
54:23;61:20;62:3
**characterized (1)**
9:14
**characters (1)**
44:7
**charged (1)**
18:17
**chart (1)**
40:13
**Chase (47)**
5:7,12;7:5,12;11:23;
12:11;17:3;20:2;25:17;
26:16,22;32:23;35:10,
12;36:5;38:11;39:15,
17;41:20;43:5;45:8;
48:1;49:23;51:2,7;
52:2,3,15;54:21;55:3,
22,23;58:10,11;59:10,
10,16;62:5;65:13;
68:24;70:19;75:21;
79:19;80:19,20;81:6,
13
**Chase's (1)**
55:5
**check (1)**
39:22
**choice (2)**
45:19,21
**Christopher (1)**
5:11
**CI (3)**
72:23,24;82:2
**circumstance (1)**
64:9
**claim (4)**
41:20,20,21;42:2
**claiming (1)**
68:7
**claims (1)**
23:4
**clause (1)**
25:18
**clauses (1)**
24:12
**clear (4)**
8:8;55:2;73:10;
83:11
**clear-cut (1)**
38:23
**clearer (1)**
17:1
**clearly (1)**
19:23
**client (9)**
49:18,19,20,23;50:2,
22,23;51:2;71:14
**clients (1)**
51:4
**close (1)**
33:15
**Closing (1)**
18:19

**cluttering (1)**
16:18
**CMVC (3)**
62:3,24;63:1
**code (21)**
44:13;48:4,6,18;
57:14,17,22;61:21;
62:3,4,5,7,9,17,18,20,
21,22,23;70:21;82:1
**codes (10)**
11:15,17;14:5,7;
49:5,7;57:19,21;59:13;
73:21
**college (1)**
5:23
**color (1)**
77:21
**column (4)**
52:18;59:11,12;68:2
**comfortable (1)**
20:21
**coming (1)**
39:23
**comment (2)**
81:20;82:2
**comments (3)**
38:5,20;59:13
**commercial (1)**
19:1
**Commitments (1)**
19:3
**Company (3)**
26:23;36:5;67:17
**completed (1)**
40:22
**Completely (2)**
43:11;76:19
**compound (1)**
75:5
**compounding (1)**
75:7
**concluded (1)**
83:16
**conclusion (6)**
19:7;22:2;24:15,21;
25:8,23
**conclusions (2)**
15:4,9
**conducive (1)**
82:8
**confusion (1)**
14:11
**congratulations (2)**
43:8;54:9
**connection (1)**
82:1
**consider (1)**
9:15
**considered (1)**
42:21
**consistent (1)**
70:21
**Consolidated (1)**

34:6
**contra (8)**
60:2;63:2,20;64:20;
73:14,22;75:3;78:19
**contract (1)**
24:12
**contras (1)**
63:21
**controller (2)**
6:7;19:18
**conversation (2)**
11:11;19:24
**conversion (11)**
39:4,8,14;51:1,12,
24;54:19;55:1;62:4,10;
63:2
**converted (2)**
41:1;48:2
**copies (2)**
27:17;45:13
**copy (11)**
27:11,15;30:22;
32:11,15;38:12,14;
45:21;55:13;66:23;
67:6
**Corp (1)**
35:21
**corporate (15)**
6:12;7:22;8:1,6;
9:24;12:22;34:15;
39:21;41:14,15;56:12,
17,24;73:14;77:7
**Corporation (8)**
6:23;14:15;25:11,13,
14,17,20;76:3
**correctly (1)**
77:10
**Council (1)**
38:1
**counsel (6)**
12:10,12,13;22:24;
69:4,5
**counting (1)**
82:21
**couple (1)**
45:13
**course (1)**
79:1
**courses (1)**
6:2
**Court (6)**
15:20,22;16:9;43:4,
7;67:12
**create (1)**
29:15
**created (3)**
34:21;68:20;69:3
**credit (14)**
19:2,3;30:14;32:19;
33:1,2;58:6;60:23,24;
61:6,7;73:1,9;82:5
**credit-impaired (4)**
26:18,19;27:2;73:3

**Defendant's Expert Materials**
**1093**

cross-border (1)
  38:15
CRYSTAL (4)
  5:1,6,12;83:8
curious (1)
  72:11
current (3)
  6:6;42:5;64:2
currently (1)
  52:2
custodial (1)
  81:13
customers (1)
  18:22

**D**

date (17)
  33:1,15;35:20;46:17,
  20;51:12,18,20,20,21,
  22;53:19,22;55:20;
  56:8;59:13;67:12
dates (2)
  53:18;63:23
date-wise (1)
  51:17
David (1)
  6:23
DAVIS (7)
  5:1,6,12;16:5;19:12;
  31:21;81:11
Davis' (1)
  15:22
day (1)
  40:20
days (5)
  78:22,23,24;80:1,3
DDCH (3)
  11:15;14:3;66:21
deal (2)
  63:21;74:1
dealings (1)
  47:10
debit (3)
  58:5;61:9,13
Debts (1)
  27:9
December (1)
  40:23
decide (2)
  15:20;16:9
define (1)
  38:5
defined (1)
  17:8
defines (2)
  21:22;38:14
defining (2)
  18:10;22:13
definition (1)
  37:15
definitions (1)
  49:2

degree (1)
  6:1
department (2)
  6:11;79:6
deponent (1)
  82:24
deposes (1)
  5:3
deposition (35)
  5:6;11:3,22,24;13:8,
  15,21;14:24;15:16;
  16:5;17:5;20:16,16;
  21:1,16;26:13;27:7,14;
  30:20;33:8,21;35:1;
  38:8;39:4;41:6;45:16;
  49:12;55:11;56:11;
  58:24;67:3;81:10;
  82:12,16;83:2
depositions (1)
  14:11
depreciate (2)
  63:24;64:4
depth (1)
  78:15
description (1)
  78:19
desktop (2)
  45:2,6
detail (1)
  73:23
details (1)
  13:6
determine (2)
  15:23;83:2
determined (1)
  29:11
dictated (1)
  28:17
difference (3)
  36:10;50:14,15
different (18)
  7:19;13:5;22:7;
  30:12,24;40:8,13,16;
  44:16,19;52:7,8,15,17;
  57:16;58:19;70:19;
  71:6
digits (1)
  44:6
Direct (1)
  22:9
direction (1)
  74:6
directly (3)
  69:15,22;75:21
disclosure (1)
  38:15
discoverable (1)
  43:13
discovery (3)
  59:10;75:14;76:21
discussed (1)
  70:22
discussion (1)

80:15
displayed (1)
  77:20
distinction (1)
  18:3
divided (1)
  10:23
document (34)
  18:1;19:21;22:1,11;
  23:18,21;24:7;25:3,7,
  22;26:4,20,21,22;28:4;
  29:23;30:8;32:12;33:5,
  16;34:5;35:22;38:16,
  19;41:9;45:23;59:8,15,
  17;65:12;71:17;78:2;
  81:6,15·
documents (10)
  13:15;16:24;59:14;
  70:2;77:20;81:8,9,14,
  21,24—
done (12)
  26:9;28:6,24;29:2,4,
  4;32:10;40:5;45:8;
  54:2;62:19;83:7
Douglass (1)
  67:22
down (11)
  9:8;21:22;23:6,11;
  47:6;49:1,17,18;51:16;
  75:8;76:16
drive (1)
  44:15
driven (1)
  44:19
drives (3)
  44:21;46:24;54:15
drug (1)
  63:21
due (1)
  30:13
duly (1)
  5:2
During (1)
  62:4

**E**

earlier (6)
  30:3;36:21;52:10;
  70:22;73:3,24
ease (1)
  27:13
Easton (2)
  6:19,20
educational (1)
  5:20
EFF (1)
  51:20
effect (1)
  54:1
effective (3)
  53:22;55:19;56:8
eight (2)

6:14,16
either (1)
  77:13
else (7)
  8:22;37:21;51:15;
  56:14;60:16;72:6;
  75:19
else's (1)
  74:24
elsewhere (1)
  68:17
employee (2)
  12:9;81:12
employees (2)
  6:15;63:16
end (2)
  34:10;40:19
ending (1)
  40:4
English (1)
  5:24;6:22
ensure (1)
  57:5
entail (1)
  6:10·
entirely (1)
  54:12
entities (2)
  15:5,6
entitled (1)
  20:20
entity (1)
  79:2
entries (4)
  48:22;62:12,14;64:3
entry (8)
  51:22;57:11;58:15;
  62:6,16,20;65:12,16
entry-level (1)
  7:13
equal (1)
  65:24
equity (1)
  19:2
escrow (1)
  19:19
especially (1)
  81:14
estate (1)
  8:9
et (1)
  18:23
even (1)
  55:22
everywhere (2)
  14:12;27:4
evidence (19)
  14:22,23;16:23;
  21:13;28:2;29:18;33:6;
  34:23;35:24;38:17;
  43:14;45:11;46:11;
  50:20;67:9;68:15;
  70:10;75:14;76:22

Exactly (2)
  21:14;39:7
EXAMINATION (1)
  5:4
Examinations (1)
  37:24
examine (1)
  28:23
examined (1)
  28:21
example (1)
  46:22;58:9
exceed (1)
  74:19·
Excellent (1)
  44:22
excerpts (1)
  17:1
excuse (2)
  34:8;66:2
Exhibit (47)
  17:5,7,11,18,19;18:7,
  8;24:10;26:7,9,11,13,
  15;27:7;30:18,20;31:1,
  3,9,21,23;32:3,4,7,9;
  33:8,10,21;34:4,19;
  35:1,9,17,18;38:8;41:6,
  8;45:16,22;49:12,14;
  55:11;56:7;58:24;59:2;
  67:3,10
exhibits (1)
  27:14
exists (1)
  80:24
expected (1)
  30:15
expecting (1)
  66:1
experience (2)
  9:3,12
expert (1)
  76:18
explain (8)
  32:1;39:7;43:7;
  47:18;51:19,21;52:1;
  72:2
explained (2)
  52:20;73:22
explanation (2)
  36:15;44:22
exposure (1)
  34:16
external (1)
  45:7
extracted (1)
  59:14

**F**

FA (3)
  14:18,18;50:10
face (1)
  30:11

Defendant's Expert Materials
1094

facility (2)
  6:18,20
fact (4)
  15:10;33:13;82:17,
  22
facts (13)
  14:21;28:1;29:17;
  33:6;34:23;35:24;
  38:17;45:10;46:11;
  50:19;68:14;70:10;
  83:2
Failed (1)
  18:18
fair (12)
  30:7,13;32:24;36:11,
  16,23;37:3,4,12;63:3,6;
  64:1
familiar (19)
  14:7;27:20;28:7,11,
  14;37:11,16,23;38:3;
  39:5;45:1;46:15;47:16;
  49:7;63:6;76:12,24;
  77:2,5
Fannie (3)
  42:18;43:10,19
far (2)
  48:22;52:2
FASB (1)
  28:17
faster (1)
  16:6
FDIC (6)
  17:3;25:15;67:16;
  68:20;69:7;79:6
fed (1)
  7:16
Federal (3)
  28:18;37:24;79:5
feel (1)
  20:20
fees (1)
  75:4
few (1)
  39:2
FFIEC (9)
  37:23;38:14;78:16,
  17;79:1,8,14,20;80:20
field (4)
  38:5,20;59:14;82:2
fields (1)
  81:20
file (1)
  74:24
filing (2)
  35:20;67:12
finally (1)
  23:11
Financial (2)
  34:7;37:24
find (1)
  32:14
finish (2)
  20:24;21:2

finished (1)
  41:3
firm (2)
  58:10,11
first (9)
  5:2,19;13:10;17:17,
  19;28:3;34:12;43:2;
  59:11
Fitz (1)
  12:7
Fitzpatrick (1)
  12:8
five (4)
  11:11;82:9,18;83:4
five-minute (2)
  36:6;58:21
fix (1)
  65:21
flipping (1)
  62:16
flow (2)
  7:16;74:6
flowing (1)
  75:18
flows (1)
  29:15
FNFS (1)
  81:20
follows (1)
  5:3
footnote (2)
  32:18,23
footnotes (1)
  35:6
foreign (1)
  79:15
forget (1)
  12:7;32:1
form (3)
  14:2;25:5;26:10
forth (2)
  15:19;75:18
Fortracs (1)
  72:4
F-O-R-T-R-A-C-S (1)
  72:5
found (1)
  75:1
foundation (12)
  26:21;33:4,17;34:22;
  36:1;38:18;45:11;
  46:10;50:20;68:15,16;
  70:9
four (1)
  20:17
Freddie (2)
  42:18;43:16
FSB (3)
  14:19;50:16;74:1
FSP (1)
  50:12
function (2)
  6:6;48:13

functions (1)
  60:20
funds (3)
  41:20,21;58:18
further (4)
  23:5;47:7;49:18;
  60:8
future (1)
  29:14

---

**G**

---

GAAP (6)
  76:12,15;77:1,2,3,4
garage (1)
  75:9
gather (1)
  82:7
general (8)
  9:2,6,8,10,13;15:4;
  60:6,11
Generally (3)
  43:16;76:12;81:23
generate (1)
  82:17
generated (2)
  59:5,16
generic (1)
  54:23
gets (1)
  60:15
Ginnie (3)
  42:19;43:10,20
gives (2)
  29:20;67:21
GL (5)
  44:21;52:7,9;60:5,23
goes (2)
  18:20;62:15
Good (2)
  14:9;71:15
go-to (1)
  59:12
governmental (1)
  80:21
governs (2)
  27:22;29:5
grade (1)
  5:16
gradnate (1)
  5:24
graduated (1)
  5:21
Great (1)
  79:1
grossly (1)
  67:18
group (19)
  7:20,21;9:20,23;
  10:21;48:13,15,17,18;
  63:9,13;66:14,14;
  69:14,15,21;79:19,22,
  24

groups (7)
  10:2,4,7,16,17,19,22
guarantee (2)
  34:17;80:23
guarantees (3)
  25:14;34:15,20
guarantor (1)
  25:20
guaranty (1)
  25:11
guess (8)
  5:10;17:22;37:7;
  40:14;47:18;51:16;
  59:22;79:14
guidelines (2)
  38:1;78:2
guys (2)
  64:16;65:21

---

**H**

---

half (1)
  69:19
half-a-million-dollar (1)
  69:20
hand (1)
  66:8
handle (3)
  69:15;71:18;72:12
handled (1)
  75:10
handles (1)
  79:20
happen (1)
  43:9
happened (4)
  51:24,24;53:12;
  54:20
harassing (6)
  20:8,9,11;21:6,18,19
hard (1)
  32:14
Harry (1)
  6:23
headed (1)
  60:13
headers (1)
  49:18
heading (1)
  24:13
heard (3)
  38:2;76:8;79:4
heart (1)
  67:1
held (1)
  80:15
HELOC (3)
  71:18;72:1,13
HELOCs (2)
  71:19;77:11
help (1)
  16:3
helps (1)

48:20
hereinafter (1)
  5:2
here's (1)
  78:9
hereunder (1)
  24:6
Heritage (6)
  49:21,23,24;50:13;
  55:7,8
high (2)
  5:21;44:2
highlight (2)
  35:9;36:2
highlighted (9)
  18:10;23:6;26:1;
  30:10;35:3,6;41:12;
  46:3;55:18
history (2)
  14:4;46:17
hit (1)
  57:22
hitting (1)
  60:12
home (1)
  19:2
honest (1)
  10:15
honestly (1)
  48:23
hours (1)
  12:17
house (1)
  41:19
honsed (2)
  40:16;49:21
huge (2)
  75:17;79:3
Huh-uh (1)
  76:10
hurricane (1)
  75:8
Hybrid (2)
  42:24;43:1
hypothetical (1)
  75:12

---

**I**

---

ID (5)
  44:10,12;48:10;
  53:13;54:23
idea (1)
  48:8
identification (1)
  60:9
identified (6)
  17:11;35:20;41:9;
  45:23;49:14;67:12
identify (3)
  28:4;34:20;48:18
IDs (3)
  42:3;44:3;52:15

Defendant's Expert Materials
1095

**IDX99 (1)**
70:4
**impaired (5)**
28:19;32:19;73:1,9;
82:5
**impairment (2)**
33:2,2
**improper (3)**
16:12,17;75:11
**Inc (2)**
34:5,21
**Incidentally (1)**
69:12
**include (2)**
31:9;32:22
**included (1)**
73:11
**including (2)**
18:16;33:1
**incurred (1)**
68:11
**indemnification (3)**
24:11,13;25:6
**indicate (13)**
42:7,8,16,17;47:20;
50:4;51:15;60:10;61:7;
74:5;78:20,23;82:3
**indicated (1)**
11:4
**indicates (9)**
22:6;32:18;34:5;
36:4;41:17;42:6;47:2;
54:4;55:6
**indicating (1)**
52:11
**indirect (1)**
22:9
**individual (1)**
81:12
**individually (3)**
28:20,24;30:5
**in-house (3)**
12:10,12,13
**initials (1)**
81:20
**insert (2)**
15:18;16:13
**inserting (2)**
15:3;22:23
**inspection (3)**
57:7,20,21
**inspection-related (1)**
57:23
**inspections (1)**
57:6
**institution (1)**
79:3
**Institutions (1)**
37:24
**instruct (2)**
16:8;21:19
**instructing (3)**
15:2;16:10,15

**instructions (1)**
56:17
**insurance (1)**
75:9
**intend (1)**
15:21
**intention (1)**
16:10
**interchangeable (1)**
45:3
**interchangeably (1)**
45:4
**interest (7)**
17:22;18:21;26:17;
30:14;35:4;46:4;53:16
**interested (1)**
18:23
**internal (4)**
55:24;75:24;76:1;
78:2
**internally (1)**
58:7
**interrupt (1)**
16:2
**interrupting (1)**
20:15
**into (20)**
9:19;16:23;29:1,3;
39:18,19;44:16,23;
45:5;52:7,8;53:14;
54:22;57:3;58:19;67:8;
78:15;80:22;81:2,3
**introduce (2)**
15:21;16:23
**introducing (1)**
27:14
**INV (1)**
46:17
**Investigations (2)**
33:11,13
**investor (23)**
41:19,21;42:3,6,18;
44:3,10,11;46:18;
47:12;52:6,8,11,14;
53:7,13;54:12,23;
55:19;56:8;70:4,8,18
**investors (1)**
42:22
**invoice (8)**
48:11,11;57:1,2,2,9;
58:6,11
**Invoices (1)**
57:13
**irrelevant (4)**
16:5;43:12;75:12;
76:19
**issue (1)**
53:4
**issued (1)**
33:14
**issues (2)**
35:7;72:14
**IV (1)**

**48:8**
**iVolt (1)**
77:13

**J**

**James (1)**
5:9
**job (2)**
6:6;56:18
**join (1)**
7:5
**joint (1)**
22:10
**JPM (1)**
49:15
**JPM001134 (1)**
55:17
**JPM001546 (1)**
45:23
**JPM002000 (1)**
81:6
**JPM002040 (1)**
41:10
**JPMorgan (8)**
5:7;17:3;26:16,22;
32:23;36:4;38:10;55:3
**judge (1)**
43:4
**judicial (1)**
68:17

**K**

**keep (6)**
20:11;21:4;27:5;
31:14,16;64:1
**KELLEY (88)**
5:5,7,9;14:23;15:8,
12,13;16:1,21,22;
17:13,15,20;20:4,9,13,
15,22,24;21:9,15,21;
22:13,17,20;23:2,20,
24;24:1,16;26:11;
27:12,16,19;31:4,7,10,
14,18,24;32:6,8,13,17;
33:23;34:2,8,13;35:3;
36:2,9;38:13;41:11;
45:12,18,20;46:1;
55:14,16;58:20;59:3,5,
6,9,16,18,19;67:7,14;
68:16,21,23;69:2,5,8,9;
80:13,16,19;81:1,5,18;
82:11,14,20;83:1,7,10
**Kelley's (1)**
35:23;56:5;82:16
**kind (10)**
8:12;9:16;30:3;
42:23;46:3;49:2,5;
54:22;61:5;66:1
**kinds (1)**
70:19
**knew (1)**

**83:13**
**knowing (1)**
72:8
**knowledge (3)**
19:8,13,20
**knowledgeable (1)**
20:2
**known (3)**
8:19;15:10;43:2

**L**

**lacks (11)**
26:20;33:4,4,17;34:22;
35:24;38:18;45:11;
46:10;50:20;68:15;
70:9
**Lane (1)**
67:22
**large (1)**
74:12
**last (3)**
12:8;26:6;30:17
**later (5)**
13:6;22:14;34:16;
53:10;71:10
**lawsuit (4)**
43:13;67:15;75:13;
76:20
**lead (3)**
43:13;75:13;76:21
**leading (1)**
21:12
**leads (1)**
21:12
**learned (1)**
6:24
**ledger (8)**
9:2,6,8,10,13;54:16;
60:6,11
**leeway (1)**
19:22;21:7
**left (1)**
28:3
**legacy (1)**
72:13
**legal (8)**
15:4,8;19:6;22:2;
24:14,21;25:8,23
**length (1)**
30:5
**letter (1)**
42:14
**level (1)**
37:19
**LEZA (1)**
76:7
**liabilities (6)**
18:4;23:8;24:6;
35:12,14,15
**liability (3)**
17:24;35:5;50:8
**likely (3)**

**43:13;75:13;76:20**
**limited (1)**
25:11
**line (6)**
53:2;56:6;63:18;
65:11,13;66:3
**lines (4)**
19:1,2;64:18;65:3
**list (1)**
49:1
**listed (1)**
75:3
**lists (1)**
26:1
**little (10)**
5:15;9:18;14:11;
23:5;28:16;36:3;45:12;
46:3;47:7;66:22
**loaded (1)**
54:21
**loading (1)**
54:22
**loan (34)**
28:6,19;29:1,8,12,
21;37:19;44:16,18;
46:18,19,24;47:2,4;
49:16;52:22;53:4;
56:10;62:13;63:4,24;
64:4,10;65:8,22;67:19;
69:18;70:4,6;72:9;
74:20,24;75:1;77:20
**loans (42)**
18:10,11,16,16,16;
26:2,18,19;27:9,23;
28:22,23;29:2,3,8,22;
30:4,11,13;32:19;
34:21;35:8,10,14;
36:22;39:16;42:6;
44:18;47:9;49:21;50:2,
9,10,13;54:21;67:17;
70:20;72:1;73:3,5,8;
74:1
**logged (1)**
45:5
**logic (2)**
52:14,17
**logo (1)**
14:14
**long (3)**
7:24;8:5;21:11
**longer (1)**
48:1
**look (22)**
14:5;29:9;31:11;
32:15;34:14;35:5;42:1;
46:2,16;47:6;49:2,7;
53:18;56:10,14;59:20;
61:21;66:17;80:22;
81:2,3,16
**looked (2)**
65:19;77:18
**looking (3)**
43:4;66:16;75:17

Min-U-Script®

TORREANO REPORTING AND VIDEO
www.torreano-depos.com    (866) 760-DEPO

(5) IDX99 – looking

**Defendant's Expert Materials
1096**

**Looks (3)**
53:13;66:6;79:11
**loss (10)**
60:23,24;61:3;68:3,
4,8;69:11,12,17,20
**losses (3)**
61:2,5;69:16
**lot (5)**
13:19;44:14;74:11;
75:6;78:15
**lots (1)**
70:14
**LPS (5)**
45:1,5,8;56:1;81:24
**LSI (2)**
67:16,16
**LT (1)**
62:8
**LTCO (4)**
11:17;62:1,3,22

**M**

**Mac (2)**
42:19;43:16
**Mae (4)**
42:18,19;43:10,10
**Maes (1)**
43:20
**main (1)**
17:22
**Mainly (1)**
8:14
**maintenance (1)**
52:6
**makes (1)**
41:20
**making (1)**
15:5
**manage (1)**
6:12
**managed (3)**
7:16;8:10;66:13
**many (7)**
6:13;10:7,13;70:7,
11,24;71:8
**map (1)**
44:20
**marked (14)**
17:5;26:13;27:7;
30:20;33:8,21;35:1;
38:8;41:6;45:16;49:12;
55:11;58:24;67:3
**market (2)**
30:14;36:17
**matches (3)**
55:20;56:3,6
**matter (4)**
43:12;75:12;76:20;
83:3
**may (10)**
19:19;20:8;30:11;
33:18;35:21;44:17;

45:2;46:4,14;65:21
**maybe (3)**
31:17;38:4;80:13
**mean (13)**
13:23;14:16,18;
25:15,19;31:9;40:14;
50:1;56:18;60:4;63:1;
73:21;79:3
**meaning (2)**
9:6;47:21
**means (7)**
17:23;19:9;21:24;
48:9;50:2;64:22;65:14
**mechanism (1)**
79:8
**meshing (1)**
39:18
**method (2)**
28:12,16
**might (11)**
20:10;46:2;47:12;
56:16;64:4,5;69:23;
72:3;78:1;81:19,23
**million (3)**
29:13;69:18,19
**mine (1)**
10:4
**minus (3)**
61:3,7,19
**minute (3)**
31:10;59:20;83:3
**minutes (6)**
11:12;20:18;82:9,18,
23;83:4
**missing (1)**
67:9
**mixed (1)**
73:11
**moment (1)**
9:19
**money (2)**
74:6;75:18
**months (1)**
11:5
**more (9)**
9:18;12:18;16:14,18;
36:3;46:4;47:12;73:23;
80:4
**mortgage (2)**
26:7;35:4
**most (4)**
19:13;20:2;54:8,9
**move (8)**
16:21;39:1;52:8,18;
53:2;57:16;68:1;69:24
**moved (2)**
53:13;58:18
**moving (4)**
27:5;52:7;57:12;
58:6
**MSP (20)**
8:14,15;39:4,14,16,
17;42:5;45:3;46:9;

49:21,21;51:1,4;56:10;
57:4;71:20,22;72:8,9,
12
**much (9)**
8:24;11:9;12:15;
13:7;16:16;18:23;
19:19;37:19;83:8
**multiple (1)**
70:13
**Mutual (20)**
14:16,17,17,18,19;
32:20;33:14;34:5,21;
48:3;50:9,10,12,16;
51:6;68:10;69:1;74:1;
76:3,5
**mysterious (1)**
65:11
**mystery (2)**
66:22;79:17

**N**

**NA-156 (1)**
55:3
**name (3)**
5:9;12:8;63:14
**natural (1)**
68:8
**necessarily (1)**
35:10
**necessary (2)**
21:9;32:2
**need (7)**
45:13;66:23;72:18;
76:9;77:14;78:9;82:7
**needed (1)**
58:18
**needs (1)**
31:22
**negligent (1)**
67:18
**new (5)**
30:18;43:6;48:11;
54:12;62:20
**Newark (1)**
5:24
**next (8)**
21:3;23:3;24:2;
25:18,24;47:14;52:18;
53:2
**Nine (2)**
7:9,10
**nobody's (1)**
79:4
**Nods (2)**
74:8;77:17
**None (2)**
49:7;61:4
**non-monetary (1)**
57:10
**note (2)**
53:3;81:8
**Notes (1)**

34:6
**notice (3)**
62:11;67:19;68:17
**number (24)**
10:21;35:20;41:9;
42:15;44:3,9;46:18,19,
20;49:15;51:7,7;52:11;
53:4;55:5,17;59:11;
60:4;61:8,10;66:11;
70:4;80:3;81:6
**numbered (1)**
74:18
**numbers (5)**
43:9;44:2;47:15;
61:24;70:11

**O**

**object (2)**
16:7;61:17
**Objection (48)**
9:4,21;10:10;14:21;
15:2,23;16:4,14,17;
18:1;19:6;20:23;22:1,
11;23:18;24:7,14,20;
25:3,22;26:20,24;28:1,
8;29:17,23;33:4,5,6,16;
34:22;36:12;38:16;
39:9;40:11;43:11;
45:10;46:10;50:19;
56:20;58:16;64:6;70:9;
73:16;74:21;75:11;
76:17;78:5
**objections (11)**
15:3,18;16:13,20;
20:18;22:16,19,23;
23:23;24:19,20
**obligation (3)**
25:2;81:14,16
**obligor (1)**
21:22
**obligors (1)**
22:7
**obtain (1)**
66:7
**obtained (2)**
32:20;33:10
**obviously (2)**
55:23;67:5
**OCC (1)**
79:5
**occurred (1)**
69:17
**odd (1)**
80:3
**off (6)**
18:17;20:17;78:4;
80:13,15,18
**offer (1)**
7:19
**offset (3)**
58:3;65:23;66:5
**offsets (1)**

65:24
**offsetting (1)**
65:16
**old (1)**
62:23
**old/INV (1)**
51:20
**Once (4)**
21:18;28:24;29:4;
40:2
**one (33)**
11:2;14:1;24:9;
28:21,23;31:7;33:24;
34:3;37:1;39:19;40:9;
44:8;49:9,22;51:5;
54:17,24;55:15;57:12;
61:15,16;62:13;63:7;
64:13;65:11;66:24;
70:1;77:23;78:14;82:9,
22,23;83:3
**ones (3)**
13:17;65:1;74:12
**only (10)**
9:20,23;10:21;13:2;
41:3;57:6,21;58:18;
62:13;82:23
**onto (1)**
54:21
**operating (1)**
50:18
**operational (1)**
9:23
**opinion (1)**
82:14
**order (5)**
44:18;51:17;58:4;
62:18;69:24
**ordered (1)**
58:10
**orders (1)**
56:19
**origin (1)**
67:9
**originated (1)**
50:3
**OSU (1)**
5:24
**Otherwise (2)**
21:1;68:11
**OTS (1)**
33:13
**out (7)**
5:15;39:23;45:8,20;
57:1;58:8;67:13
**outside (9)**
5:11;28:13;58:10;
66:14;71:20,22;72:8;
76:23;78:18
**over (20)**
13:12;17:8;18:12;
21:2,23;23:12;30:16;
38:22;39:22;40:3;46:2;
48:2,21;60:15;61:21;

Defendant's Expert Materials
1097

63:16,24;64:4;68:2;
75:5
**overdrafts (2)**
18:22,24
**own (5)**
10:22;51:1,3;52:14;
62:4
**owned (3)**
8:9;52:16;70:20
**owns (1)**
10:21

**P**

**page (39)**
17:7,11,12,18,18,19;
18:6,8;21:22;23:3,4,6;
24:2,2,9,10;25:18,24;
26:5,6,15,15;28:3,5;
29:10,19;30:1,2;34:11,
12;35:22;36:3;38:10;
47:14;49:1;55:3;59:12;
67:13,18
**pages (2)**
33:23;34:1
**paid (4)**
29:13;51:21;57:1,3
**paper (1)**
61:5
**paragraph (1)**
17:18
**paraphrased (1)**
30:3
**part (11)**
9:9;16:24;18:18;
31:2,4,5,8,22;32:3;
44:11;56:11
**Partially (1)**
78:12
**participate (1)**
39:20
**participation (1)**
18:21;19:5,15
**participations (1)**
18:22
**particular (1)**
32:11
**partitioned (1)**
10:23
**partitioning (1)**
60:19
**party (2)**
41:16;47:19
**patient (1)**
82:11
**pay (4)**
36:18;41:14,21;42:1
**payee (23)**
14:5,7;41:15,17,22;
47:15,24;48:1,4,7;57:5,
5,7,12,16,19,20,20;
59:13;60:2,3,4;82:1
**payees (1)**

10:21,22,24;66:13
**paying (2)**
20:16;58:8
**payments (2)**
34:17;35:7
**payroll (1)**
7:1
**PCI (1)**
73:5
**people (4)**
6:13;44:9;48:17;
54:8
**Perhaps (1)**
22:23
**Permanent (1)**
33:11
**permissible (1)**
76:15
**person (5)**
19:13;20:1;43:2;
48:12,15
**personal (3)**
31:15,16,18
**person's (1)**
19:8
**phone (2)**
11:10;13:13
**phrased (2)**
74:22;78:6
**place (1)**
53:15
**plaintiff (1)**
5:10
**platform (5)**
42:5;49:20,23;55:6,8
**platforms (3)**
49:22;51:2,4
**please (3)**
23:3,22;55:14
**pledged (1)**
47:9
**PLGD-LN (1)**
47:7
**plus (1)**
61:19
**pm (1)**
83:16
**point (7)**
20:8,10;21:4,17;
26:10;78:21,24
**pointing (1)**
61:24
**Polaris (1)**
6:18
**policies (2)**
76:24;77:8
**pool (9)**
28:22,22;29:1,3,8,
22;37:16;70:7,8
**pools (1)**
30:5
**portion (5)**
17:16;26:2;31:3;

35:19;77:3
**portions (1)**
77:4
**posed (1)**
82:22
**position (6)**
6:21;7:11,14,18,19,
22
**positive (2)**
61:8,11
**possession (1)**
81:16
**possibility (1)**
21:12
**possible (1)**
75:4
**possibly (1)**
58:14
**potential (1)**
61:1
**practical (1)**
7:2
**practices (1)**
78:3
**pre-9-1-09 (1)**
51:11
**pre-Chase (1)**
48:1
**precision (1)**
18:5
**Preconversion (2)**
51:13;52:13
**preparation (4)**
11:21;13:8,15;56:11
**prepared (1)**
31:13
**prepayments (1)**
30:15
**present (1)**
5:14
**presumed (1)**
30:7
**pretty (4)**
8:19,24;21:2;37:19
**previous (1)**
14:11
**price (4)**
23:12,15;29:13;30:7
**primary (1)**
22:9
**prime (1)**
72:24
**principles (1)**
76:13
**print (2)**
14:3
**prior (6)**
8:5;18:18;51:24;
56:10;66:17;68:11
**private (1)**
41:19;42:6,21,23
**Probably (10)**
9:14;11:5,11;12:17;

16:3;49:8;65:19;66:23;
74:4;77:14
**problem (1)**
83:9
**procedures (3)**
77:1;78:2,9
**processed (1)**
76:2
**produce (3)**
80:19,23;81:14
**produced (2)**
81:9,10
**production (2)**
65:12;71:17
**program (3)**
40:6,9;76:11
**programs (1)**
40:8
**progress (1)**
7:17
**promise (1)**
80:23
**proper (1)**
16:17
**property (3)**
36:17,18;37:8
**provide (1)**
27:15
**providers (1)**
45:9
**providing (1)**
27:16
**purchase (18)**
17:2,13,16;18:9;
19:14,20;20:3;21:5;
23:4,12,14;24:3,10;
26:5;28:12,16;29:10;
35:11
**purchased (9)**
23:6;24:5;26:17,19;
27:1;28:6;29:12;32:19;
35:13
**purpose (3)**
35:8,16;83:1
**put (4)**
38:21;40:17;66:12;
67:8

**Q**

**quasi (1)**
42:23
**quicker (1)**
16:16
**quite (2)**
8:7;65:10

**R**

**rates (1)**
30:14
**Rather (3)**
16:16,19;79:3

**read (7)**
17:8;18:12;21:23;
23:12;38:22;53:8;77:9
**real (3)**
8:9;60:3;74:7
**really (8)**
16:4;20:7;24:20;
28:13;39:18;42:20;
54:22;55:1
**reason (18)**
11:2,15;57:18,21,22;
61:21;62:3,4,5,6,9,16,
18,20,21,22,23;73:21
**recall (11)**
11:6;15:1;43:9,23;
44:1;66:19;73:15,20;
74:23;77:22;81:22
**receivable (1)**
77:8
**received (1)**
58:8
**receiver (7)**
17:3;24:4;25:19;
35:11;67:16;68:12;
69:6
**receivers (1)**
25:14
**receivership (4)**
14:20;15:7;50:17;
68:11
**Recess (2)**
36:8;58:22
**reconcile (1)**
57:4
**reconciliation (1)**
6:12
**record (17)**
16:13,19;17:10;
35:18;41:8;45:22;52:9;
56:4;61:1,23;69:19;
80:14,15,18;81:7,13;
82:15
**recorded (5)**
30:6;32:24;58:12;
62:7;75:16
**recording (1)**
77:7
**Records (1)**
18:17
**recoverable (2)**
47:21,21
**refer (9)**
14:13,15,17;33:18;
48:12;55:19;63:19;
72:23;78:10
**reference (2)**
50:24;69:11
**referencing (2)**
48:14;59:10
**referred (1)**
39:4
**referring (5)**
33:3;51:5;56:5,6;

Min-U-Script®

TORREANO REPORTING AND VIDEO
www.torreano-depos.com    (866) 760-DEPO

(7) overdrafts - referring

Defendant's Expert Materials
1098

79:2
**refers (7)**
54:5,6;63:20;70:7;
73:1;79:7;81:5
**reflect (4)**
17:10;56:4;61:23;
82:15
**regarding (2)**
19:13;20:2
**reiterates (1)**
30:2
**relate (1)**
63:3
**related (2)**
39:21;77:6
**relating (2)**
21:5;71:17
**relevant (1)**
38:19
**remarkable (1)**
40:10
**remarks (3)**
31:15,17,19
**REO (5)**
7:20;8:9,11;9:14,15
**report (10)**
26:16,23;36:5;46:5,
9;73:10;79:7;80:20,24,
24
**reported (2)**
69:13,13
**reporting (3)**
79:8,13,15
**represent (4)**
23:16;46:19;52:3;
70:18
**representation (1)**
80:17
**represented (1)**
11:16
**representing (3)**
22:24;81:2,4
**represents (2)**
17:15
**repurchase (3)**
35:5,8;50:8
**requested (2)**
81:9,15
**require (1)**
79:15
**required (2)**
72:16;79:7
**requirements (1)**
38:15
**reserve (1)**
79:5
**reside (1)**
47:1
**resides (1)**
44:16
**respect (1)**
17:23
**respond (6)**

23:23;24:19;39:12;
46:12;56:23;73:19
**responses (1)**
83:10
**rest (1)**
29:5
**restrict (1)**
21:15
**retort (1)**
16:4
**retorting (5)**
16:16,19;22:19,20,
22
**reverse (2)**
51:17;62:19
**review (4)**
13:14;20:56:12;
65:22
**reviewed (2)**
14:4;66:20
**reviewing (1)**
74:24
**revolving (1)**
19:1
**ridiculous (1)**
20:19
**right (46)**
5:12;10:5;15:11;
17:20;21:1;22:7;24:6;
26:2;28:15;29:19;31:6;
36:24;40:17,21;41:3,
11;42:2;46:9;48:22;
49:10;53:20,21;54:12;
55:9;59:5,6;60:15,17;
61:14,15,21;63:17;
64:5,11;66:12;67:10,
24;68:5,6,22;69:8;
71:10;74:7,9;80:9;83:5
**rights (1)**
26:8
**risk (1)**
30:14
**Rule (1)**
21:10
**run (1)**
47:9;81:19
**running (1)**
20:17

---

## S

**sales (1)**
8:11
**Same (8)**
26:24;30:23;31:17;
40:1,5;44:17;48:24;
79:22
**SAP (2)**
8:18,19
**Saratoga (1)**
67:21
**saw (2)**
57:22;69:10

**saying (5)**
17:23;23:7;29:9;
52:22;61:6
**Schedule (4)**
23:16,17,20;26:1
**school (2)**
5:17,21
**scope (1)**
28:14
**screen (10)**
11:15;43:5,7;46:14;
49:8,16;51:16;66:21;
70:5,6
**screens (2)**
14:3;56:13
**searching (1)**
55:15
**second (2)**
34:11;80:14
**secondary (1)**
22:9
**Securities (2)**
27:10;76:3
**security (1)**
37:8
**seeing (2)**
51:18;54:20
**seem (1)**
44:9
**seems (1)**
82:8
**segregated (1)**
47:4
**Senate (2)**
33:10,12
**send (1)**
58:11
**sense (1)**
38:22
**sent (2)**
41:23;80:20
**separate (2)**
34:2;51:3
**September (4)**
33:14;37:2;66:18;
67:13
**series (8)**
43:17,17,19,21;44:5,
23;57:13;58:13
**service (1)**
71:24
**servicer (1)**
54:21
**servicing (11)**
26:8;39:14,16,17,19;
52:1;71:20,23;72:14,
16,18
**set (1)**
57:20
**sets (2)**
62:12,13
**setting (1)**
26:18

**seven (2)**
6:24;82:23
**several (3)**
7:23;11:5;13:4
**share (3)**
45:18;55:14;67:7
**sheet (3)**
33:13;44:19;47:1
**sheets (1)**
47:3
**short (1)**
19:24
**shot (3)**
20:18;43:5,7
**showing (2)**
28:5;62:9
**shows (8)**
27:4;35:6;38:5;53:5,
11;54:11;65:11;81:23
**signage (1)**
79:11
**significance (1)**
44:14
**similarly (1)**
14:19
**simply (4)**
15:3,24;16:12,19
**single (2)**
29:7,21
**situation (1)**
75:7
**six (1)**
82:18
**skip (2)**
24:9;30:16
**small (1)**
48:17
**Smith (16)**
5:11;11:3,6;12:9,21,
21;13:23,24;14:24;
20:1;39:3;71:13;72:22;
73:13;77:23;82:17
**smoothly (1)**
23:1
**so-called (1)**
39:8
**software (2)**
8:12,20;76:11
**sold (1)**
69:18
**somebody (3)**
36:17;37:21;60:16
**someone (1)**
74:24
**sometime (2)**
37:3;80:21
**Sometimes (1)**
13:12
**Somewhat (1)**
47:17
**soon (1)**
21:2
**Sooner (1)**

71:10
**SOP (3)**
29:5;20;30:4
**SOP-3 (1)**
33:3
**Sorry (5)**
10:8;25:12;34:9;
61:7;65:6
**sort (3)**
46:9;69:23;80:4
**sound (1)**
51:12
**sounds (1)**
63:21
**speaking (4)**
12:15;13:7;19:11;
39:13
**speaks (15)**
18:2;19:21;22:1,12;
23:19;24:7;25:3,7,22;
26:4;29:24;30:8;33:5,
16;38:16
**special (1)**
53:15
**specific (7)**
9:12;48:7,12,14,15,
16;49:8
**specifically (12)**
10:8;11:14;13:20;
19:10;40:15;45:5;61:4;
66:19;72:8;73:20;
79:23;80:12
**spectrum (1)**
71:4
**speed (1)**
15:16
**spend (2)**
12:15;13:7
**spent (2)**
11:9;12:18
**spoke (5)**
11:4;12:3,7,12;52:10
**spreadsheet (2)**
67:11;68:19
**stamp (2)**
41:9;49:15
**Standards (3)**
28:18;36:24;78:4
**stands (2)**
15:2;62:8
**start (3)**
5:14;7:11;29:11
**started (1)**
7:13
**starting (3)**
9:7;26:10;59:22
**stated (1)**
68:4
**statement (4)**
27:20,21;35:24;73:6
**statements (1)**
15:9;34:7
**states (3)**

Defendant's Expert Materials
1099

23:14;26:7;42:2
**step (1)**
55:1
**stop (2)**
20:15;22:18
**studied (1)**
5:23
**stuff (6)**
11:18;29:6;31:11;
49:4;73:2;81:8
**Subcommittee (2)**
33:11,12
**subject (6)**
14:20;23:8;30:4;
43:12;75:12;76:20
**sub-ledgers (2)**
9:8,9
**submits (1)**
57:2
**submitted (1)**
24:4
**subparagraph (1)**
18:15
**Subrogation (1)**
25:18
**Subsidiaries (1)**
34:6;75:21
**subsidiary (1)**
50:18
**substantially (1)**
30:12
**suit (1)**
68:13
**summary (4)**
46:9;59:3,7,9
**supervise (1)**
6:11
**supplemental (1)**
25:2
**Suppose (1)**
42:15
**Sure (11)**
9:11;18:12;32:16;
39:23;40:2,19;65:14,
18;78:7,24;80:18
**surrounding (1)**
35:7
**sworn (1)**
5:2
**system (20)**
39:14,16,17,19;
40:24;41:1;45:2;52:1;
55:23,24;57:1,3;62:5,
5;65:20;71:21,23;
72:15,16,19
**systems (5)**
39:18;71:24;72:2,7,
10

**T**

**T13 (2)**
46:21,23

**talk (1)**
11:21
**talking (6)**
11:6,9;13:21;64:14;
73:3;78:14
**talks (1)**
25:1
**team (3)**
48:11;57:4;69:22
**technical (1)**
50:15
**ten (1)**
11:11
**term (5)**
14:14;17:7;26:17;
27:1;38:2
**terms (1)**
22:13
**testimony (6)**
15:22;19:7;76:18,18,
19;83:15
**Thanks (1)**
43:1
**thereafter (1)**
37:3
**Thereupon (1)**
83:15
**third (3)**
41:16;47:19;49:1
**third-party (2)**
41:17;45:9
**Thomas (2)**
12:3,4
**though (1)**
55:22
**thoughts (1)**
82:8
**three (5)**
20:17;44:6,7;62:12,
13
**three-page (1)**
45:23
**tie (1)**
34:15
**times (1)**
44:9
**title (2)**
6:9;59:8
**today (4)**
11:22;51:2;52:3;
81:9
**together (2)**
34:9,9
**told (2)**
21:17;80:21
**top (8)**
35:21;46:16;49:17;
51:19;55:2,18;56:6;
59:22
**totally (1)**
75:24
**trades (1)**
37:9

**tran (3)**
51:20;58:13;65:15
**transaction (10)**
33:1;51:22,23;53:19;
57:8,11,14,18;58:5;
61:22
**transactions (11)**
13:2,5;30:6;38:20;
57:7;59:7;66:20;74:5,
12,19;75:2
**transcript (2)**
13:20,22
**transfer (6)**
27:10;49:16;53:5;
54:1;70:5,6
**transferred (3)**
35:15;50:17;52:23
**transfers (1)**
52:5
**treasury (2)**
7:13;79:6
**trial (1)**
15:21
**true (1)**
82:20
**truly (1)**
62:17
**trying (1)**
21:16
**turn (1)**
28:4
**turns (1)**
45:20
**Twice (1)**
58:17
**two (14)**
7:18;8:2,3;10:9;
12:17;30:16;33:23;
34:1,15;37:1;39:18;
40:8;49:22;80:11
**type (9)**
35:6,19;42:17;44:17;
46:5;47:4;67:11;77:8;
80:20
**types (3)**
13:5;20:6;22:7
**typically (3)**
47:1;52:5;61:6

**U**

**ultimately (1)**
15:20
**Unaudited (1)**
34:7
**under (8)**
6:14;15:6;18:15;
21:10;29:13;62:12;
76:15;77:1
**understood (1)**
77:10
**unless (1)**
16:11

**up (12)**
15:16;27:4;28:11;
38:5;40:19;44:4,8,23;
53:2;57:20;76:16;
81:24
**upon (1)**
19:24
**use (14)**
8:12,18;14:14;40:24;
45:4;48:6;49:5,6,9;
51:14;67:7;72:16,18;
76:7
**used (5)**
22:14;34:19;41:19;
47:24;48:10
**user (3)**
48:10,14;59:12
**users (1)**
48:15
**uses (2)**
48:1;55:23
**using (1)**
8:15;29:7;48:17
**usually (1)**
45:7

**V**

**Vague (10)**
9:4,21;28:8;36:12;
39:9;40:11;56:20;
73:16;74:21;78:5
**valid (1)**
15:23
**value (26)**
17:8,17,23;18:4,5;
23:15;26:2,8;30:7,13;
32:24;36:11,11,16,17,
18,22,23;37:3,5,12;
63:3,6;64:1,2;65:8
**Van (1)**
12:4
**vendor (1)**
57:2
**versus (1)**
5:7
**virtual (1)**
74:7
**VLS (2)**
72:4,7

**W**

**wait (2)**
31:10;82:9
**waiting (1)**
82:18
**WAMU (14)**
14:14,14;39:15;
49:21,24;50:3;51:1,10;
52:1,14;55:7,8;62:4,9
**Washington (20)**
14:16,16,17,18,19;

32:20;33:14;34:5,20;
48:3;50:9,9,12,16;
51:6;68:10;69:1;74:1;
76:3,5
**wasting (1)**
16:18
**way (5)**
16:6;44:4;60:13;
65:9;69:14
**weren't (2)**
73:9;75:3
**what's (9)**
5:19;41:12;44:11;
48:21;54:14,17;63:1,
18,22
**Whenever (1)**
15:21
**Whereas (1)**
36:18
**whole (2)**
18:18;71:4
**who's (1)**
43:2
**wish (1)**
31:12
**within (7)**
7:20;9:12;10:20;
11:23;24:12;40:5;57:5
**without (1)**
15:18
**witness (6)**
11:4;15:17;30:23;
31:2;61:24;83:9
**wonder (1)**
65:17
**wondering (1)**
69:10
**words (1)**
28:21
**work (7)**
71:8;75:15,20,20;
77:11,13;78:4
**worked (1)**
6:23
**works (1)**
19:18
**worth (1)**
55:15
**write (2)**
66:2;76:15
**write-down (5)**
62:17;66:4,6,8;79:10
**write-downs (7)**
64:12,15,16;65:2,6;
79:20,23
**write-up (10)**
64:10;66:3,8;78:16,
17;79:7,9,12,13,14
**write-ups (4)**
64:12;65:2,7;79:20
**writing (1)**
79:9
**written (1)**

Defendant's Expert Materials
1100

76:16

## X

**X01 (2)**
54:12;70:12
**X02 (1)**
70:5
**X7 (1)**
70:12
**X99 (1)**
71:5
**Xs (3)**
70:11,19;71:6

## Y

**year (1)**
46:17
**years (7)**
6:24;7:9,10,18,23;
8:2,3
**Yoo (131)**
5:11;9:4,21;10:10,
14;12:10;13:8,21;
14:21;15:1,11,15;16:2;
17:10,15;18:1,7;19:6,
12,17;20:5,10,14,20,
24;21:14,17;22:1,11,
15,18,22;23:18,22;
24:7,14,18;25:3,7,22;
26:4,20,24;27:11,13,
18;28:1,8;29:17,23;
30:8,22,24;31:5,8,12,
15,16,19,20;32:4,7,10,
16;33:4,16;34:1,4,11,
22;35:18;36:7,12;
37:10,14;38:12,16;
39:9;40:11;41:8;43:11;
45:10,19,22;46:10;
49:14;50:19;51:8;
55:13;56:4,20;58:16;
59:2,4,7,15;61:17,23;
63:8,12;64:6;67:5,10,
24;68:3,6,9,14,19,22,
24;69:4,7;70:9;73:16;
74:2,21;75:11;76:17;
78:5;80:17,18;81:3,11;
82:4,7,12,15,21;83:5,
12
**York (1)**
43:6

## 0

**002035 (1)**
49:15
**006 (1)**
53:14
**006013 (1)**
53:16
**013 (2)**
46:22;53:14

**030 (2)**
52:12,23
**07 (1)**
53:4
**08 (3)**
53:10,19,23
**09 (1)**
54:11

## 1

**1 (10)**
17:5,7,11,11,18,18,
19;18:7,8;43:22
**10 (7)**
45:16,22;59:22;60:2;
61:24;65:13,23
**109 (1)**
26:15
**10K (1)**
35:21
**10-Q (2)**
32:23,23
**11 (5)**
49:12,14;56:7;67:13,
20
**11:23 (1)**
83:16
**12 (1)**
55:11
**12-17 (1)**
53:4
**12-19 (2)**
53:10,19
**13 (8)**
46:17,22,23;47:2;
58:24;59:2;70:12;
83:15
**14 (8)**
59:23;60:2,22;65:13,
24;67:3,10;82:2
**141 (2)**
28:17,18
**14390 (1)**
67:21
**150 (4)**
78:22,23,24;80:1
**150,000 (1)**
63:16
**150-day (2)**
78:19,20
**156 (7)**
49:18,19,20,24;50:3;
51:3;55:6
**16 (3)**
60:22;65:24;82:1
**18 (1)**
67:13

## 2

**2 (10)**
18:6;26:11,13,15;

28:5;29:19;43:22;
65:11,13;66:3
**20 (2)**
24:2;71:1
**2005 (2)**
7:6,7
**2008 (3)**
33:15;37:2;66:18
**2009 (3)**
26:16,23;40:23
**2012 (2)**
67:13;80:21
**2013 (2)**
35:21;36:5
**2014 (2)**
35:21;83:16
**228 (1)**
54:14
**25 (2)**
37:2;66:18
**25th (1)**
33:14
**26 (2)**
21:10;35:21
**29 (1)**
24:10

## 3

**3 (16)**
17:12,18;27:7;30:1,
2;31:3,4,6,9,22,23;
32:3;43:24;64:18;65:3;
68:2
**3.2 (4)**
23:16,17,21;26:1
**30 (1)**
67:13
**3018113559 (1)**
67:19
**30183559 (1)**
67:19
**30B6 (1)**
11:3
**3-1 (1)**
53:22
**36 (1)**
26:5

## 4

**4 (9)**
30:18,20;31:1;32:5,
7,9;43:19;64:19;65:3
**400,000 (1)**
74:13
**435 (2)**
61:10,22
**463 (2)**
66:2,6
**463,000 (1)**
66:3
**465 (2)**

49:22;51:3
**47 (1)**
45:24

## 5

**5 (6)**
18:8;33:8,10;43:16,
17,18
**50 (1)**
70:24
**500 (2)**
43:17;58:2
**546,000 (1)**
74:13

## 6

**6 (4)**
33:21;34:4;43:20;
64:14
**600 (4)**
57:13;58:2,12,13

## 7

**7 (5)**
35:1,18;43:20;63:18;
64:14
**745 (17)**
9:14,16;38:20;57:8,
10,10;58:1,3,4,4,14;
59:7;65:15;74:5,12;
75:2,10
**78.1 (1)**
32:21
**79 (1)**
35:22

## 8

**8 (2)**
37:2;38:8
**8:15 (1)**
13:9
**801 (2)**
46:17;52:23
**801/0006 (1)**
44:10
**801006 (1)**
52:19
**80707 (1)**
51:22
**81.2 (1)**
26:19
**8-7-07 (1)**
51:18

## 9

**9 (3,4)**
23:4;41:6,8;61:24
**900 (1)**

44:4
**908 (5)**
50:22,23,24;51:6;
71:14
**91T00 (3)**
41:12,13,17
**9-2 (1)**
54:11
**9-2-09 (1)**
56:9
**9-24-09 (1)**
65:1
**9-24-2009 (1)**
62:12
**9-25 (1)**
64:24
**95R21 (2)**
47:16,24
**99 (2)**
71:3,5

Defendant's Expert Materials
1101

| Code | Type | Name | Description |
|---|---|---|---|
| 76T41 | T | WAMU-EMC MIP RECOVERABLE | MIP Recoverable. Insufficient funds collected at close for MI premiums. Advances are billed to originating channel. |
| 93T20 | T | TECH FEE | REO Tech Fees: Invoices paid to LPS on behalf of REO vendors for the use of the LPS desktop system. Advances are then recovered from the vendor. |
| 00T16 | T | PRIVATE INVESTOR CLAIM | Used for Claim Funds for Private Investors (Investor ID beginning with A - V). |
| 91T17 | T | CLAIM FUNDS FNMA/FHLMC | Used for Claim Funds for Government Investor or Lo Type Loans. |
| 93N35 | N | HAFA RESERVE | Reserve for over 60 HAFA balances on Serviced loans. |
| 93T30 | T | HAFA SHRT SALE DIL INCEN | Payees are used for receivable due from US Treasury for amounts disbursed on HUD. Advances are created in order to gross up Sales Proceeds due to Investor or applied to Principal. 93T30 - Borrower Relocation Assistance paid to Borrower or Tenant - always $3,000. 93T31 - Subordinate Lien Release Amount (maximum $8,500), reimburseable portion- 2/3 of SLRA to maximum of $5,000. Also referred to as SLRA or Jr Lien. |
| 93T31 | T | HAFA SHRT SALE DIL INCEN | Payees are used for receivable due from US Treasury for amounts disbursed on HUD. Advances are created in order to gross up Sales Proceeds due to Investor or applied to Principal. 93T30 - Borrower Relocation Assistance paid to Borrower or Tenant - always $3,000. 93T31 - Subordinate Lien Release Amount (maximum $8,500), reimburseable portion- 2/3 of SLRA to maximum of $5,000. Also referred to as SLRA or Jr Lien. Payee is used for receivable due from Investor for Borrower Outreach amounts that were paid outside of the normal HUD process, primarily as a result of insufficient sales proceeds to cover outreach amount. |
| 99T59 | T | CHASE MOD PROGRAMS | |
| 30NG1 | N | PRIME SERVICE RECOVERY | Recovery collections received on Serviced accounts previously charged off. |
| 3DR01 | R | RECOVERY SERVICED-NP | Recovery collections received on Serviced accounts previously charged off. |
| 31N01 | N | NON-PRIME SERVICED RECOV | Recovery collections received on Serviced accounts previously charged off. |
| 91R11 | R | SERV OUT OF POCKETS | Payee 91R11- This Payee holds Mortgagor Recoverable advances for Investor loans and Bank owned Government Loans. Fcl Receivable- CMMC servicing - Receivables are created by payment of invoices on Borrower's behalf for foreclosure related costs by investor. |
| 91T11 | T | SERVICED OOP | Payee 91T11- This Payee holds Third Party Recoverable advances for Investor loans and Bank owned Government Loans. Fcl Receivable- CMMC servicing - Receivables are created by invoice processing payment of invoices for foreclosure related costs that should be reimbursable by the vendor and are life of Loan entities. |
| 92T19 | T | A/R HOPE NOW CNSLNG | Client 465 Hope Now credit counseling fees provided by Homeowners Preservation Foundation that are collectable from investor. |
| 90T27 | T | FNMA LQUDTION ADV | Client 465 FNMA Pool Buyout |

CONFIDENTIAL

Defendant's Expert Materials
1102

**156 - JPMORGAN CHASE BANK, N.A.**

Loan Number: [                    Borrower Name:                              ]

LNTH                              LOAN TRANSFER HISTORY          03/01/16  16:07:22

| TRAN DATE | OLD/INV | NEW/INV | HT | NW | S/R/M | ADDITIONAL TRANSFER INFORMATION | | | |
|---|---|---|---|---|---|---|---|---|---|
| DATE PAID | EFF DATE | EFF | BALANCE | INV LOAN # | OLD S/F | NEW S/F | GF AFT B/B | | |

------------------------------ CLIENT 156 PRE 10-01-11 ------------------------------

| 08/20/14 | X99/013 | 901/032 2 | N | MAINT | CATEGORY | | | | |
| __/__/__ | 09/01/11 | 927800.00 | 0683745764 | .00000000 | .00000000 | +00.000000 | | | |

| 08/20/14 | X99/013 | 901/032 1 | N | MAINT | INVESTOR | | | | |
| __/__/__ | 09/01/11 | 1947159.72 | 0683745764 | .00000000 | .00000000 | +00.000000 | | | |

| 09/13/10 | __/___ | A01/013 2 | N | MAINT | CATEGORY AND INVESTOR LOAN # | | | | |
| __/__/__ | 12/01/08 | 927800.00 | 0683745764 | .00000000 | .00000000 | +00.000000 | | | |

BP Investigative Agency
Exhibit 5

Printed By: I480335   on 3/2/2016 3:07:28 PM



Chase
EXHIBIT NO. 12
FOR IDENTIFICATION

**Defendant's Expert Materials**
**1103**

Loan Number: ___ __ -     Borrower Name:

```
LNTH                    *           LOAN TRANSFER HISTORY        04/17/14  09:56:32

TRAN DATE OLD/INV  NEW/INV HT NM S/R/M  ADDITIONAL TRANSFER INFORMATION
DATE PAID EFF DATE EFF BALANCE     INV LOAN #   OLD S/F    NEW S/F  GF AFT B/B
-------- CLIENT 156 PRE 10-01-11 --------- CLIENT 908 PRE 09-01-09 -----------
09/02/09  X01/228  A01/013 1  N  MAINT  INVESTOR
__/__/__  03/01/08 3045704.34   3018113559   .00000000   .00000000 +00.000000

12/19/08  A11/006  A01/013 1  N  MAINT  INVESTOR
12/19/08  03/01/08 3045704.34   3018113559   .00000000   .00000000 +00.000000

12/17/07  A01/006  A11/006 1  N  MAINT  INVESTOR
12/17/07  01/01/08 3022794.12   3018113559   .00000000   .00000000 +00.000000

08/07/07  030/106  A01/006 1  N  MAINT  INVESTOR
08/07/07  09/01/07 2992265.00   3018113559   .00000000   .00000000 +00.000000


    ------------------------------------------------------------------------
```

CONFIDENTIAL Case: 1:10-52115TIAL Doc# 466-1   Filed: 06/19/15   Entered: 06/22/15 16:11:09020Page 40
of 43
BP Investigative Agency

**Defendant's Expert Materials**
**1104**

Chase (OH4-7302)
3415 Vision Drive
Columbus, OH 43219-6009

**CHASE ⬤**

March 31, 2011

████████████
████████████

Santa Barbara, CA 93108-1718

Re: Account Number: ******8325
████████████

Loan Investor
████████████

.I am writing in response to the inquiry Chase received about the loan referenced above.

Your loan was sold into a public security managed by JPMorgan Chase Bank NA and may include a number of investors. As the servicer of your loan, Chase is authorized by the security to handle any related concerns on their behalf. The address of your investor is:

3415 Vision Drive
Columbus, OH 43219
(800)848-9136

We appreciate your business. If you have questions, please call us at the telephone number below.

Sincerely,



Larry Thode
Vice President
Chase Home Lending
(800) 848-9136 Customer Care
(800) 582-0542 TDD / Text Telephone
www.chase.com

CC270

BP Investigative Agency
~~XXXXXX~~
~~Exhibit XX~~
Exhibit 7

Chase (OH4-7302)
3415 Vision Drive
Columbus, OH 43219-6009

**CHASE ◯**

April 25, 2011

02524-01 IFIA 118-000000000000

Mound, MN 55364-9008

Re:   Account Number: ******2426

Loan Investor

Dear ▓▓▓▓▓▓▓▓:

I am writing in response to the inquiry Chase received about the loan referenced above.

Your loan was sold into a public security managed by JPMorgan Chase Bank NA and may include a number of investors.  As the servicer of your loan, Chase is authorized by the security to handle any related concerns on their behalf.  The address of your investor is:

> 3415 Vision Drive
> Columbus OH 43219
> Prime Conv Arm (CI)

We appreciate your business.  If you have questions, please call us at the telephone number below.

Sincerely,

Chase
(800) 848-9136
(800) 582-0542 TDD / Text Telephone
www.chase.com

CC278

Chase
P.O. Box 183222
Columbus, OH 43218-3222

**CHASE** 

July 29, 2016


001882 - 1 of 1 MSPOF1A-Z1 000000000000

CA 91606-1209

**Here's the contact information you requested**

Account:
Property Address:  CA 91606-0000

Dear

Since we answer questions and service your mortgage on behalf of your investor, we're providing the contact information you requested.

The information for the owner of your mortgage loan is:

> Deutsche Bank Nat Trust Co as Trustee for WAMU 2007-FLEX1
> 1761 East St Andrew Place
> Santa Ana, CA 92705
> 1-714-247-6000

If you have any questions, please call us at one of the numbers below. We appreciate your business.

Sincerely,

Dean Cooper
Managing Director
Chase
1-800-848-9136
1-800-582-0542 TTY
www.chase.com

BP Investigative Agency
Exhibit 8, P.1

Defendant's Expert Materials
1107

Trustee Sale No. ▮▮▮▮ Loan No. ▮▮▮▮ Title Order No. ▮▮▮▮

3

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

On September 12, 2012 before me, ZELMA THORPES , "Notary Public", personally appeared Colleen Irby, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Zelma Thorpes_ (Seal)


ZELMA THORPES
Commission # 1960443
Notary Public - California
Los Angeles County
My Comm. Expires Dec 13, 2015

FA_MERGE.DOC

BP Investigative Agency
Exhibit 8, P.2

Defendant's Expert Materials
1108



RECORDING REQUESTED BY

CALIFORNIA RECONVEYANCE COMPANY

AND WHEN RECORDED MAIL TO

JPMC Records Center
Document Intake Department
700 Kansas Lane
Monroe, LA 71203


09/14/2012

Trustee Sale No. █████ Loan No. █████ Title Order No █████

# CORPORATE ASSIGNMENT OF DEED OF TRUST

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which hereby acknowledged, the undersigned, by these presents does convey, grant, sell, assign, transfer and set over the described Deed of Trust without recourse, representation or warranty, together with all right, title and interest secured thereby, all liens and any rights due or become due thereon to **JPMorgan Chase Bank, National Association, (ASSIGNEE).**

Said Deed of Trust made by ████████████ **HUSBAND AND WIFE AS JOINT TENANTS,** and recorded on █████ as Instrument # █████ in Book NA, Page NA, in the office of the LOS ANGELES County Recorder, CALIFORNIA.

Property more commonly known as: ██████████████, CA 91606
A.P.N. ██████████

DATE: September 12, 2012

JPMorgan Chase Bank, National Association, as Attorney-in-Fact for the Federal Deposit Insurance Corporation as Receiver of Washington Mutual Bank,

Colleen Irby, Vice President

FA_MERGE.DOC

$6L$

BP Investigative Agency
Exhibit 8, P.3

**Defendant's Expert Materials
1109**